# IN UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMES G. CONNELL, III,

    Plaintiff

      v.

CENTRAL INTELLIGENCE AGENCY.

    Defendant.

Civil Action No. 21-0627 (CRC)

## DECLARATION OF VANNA BLAINE,
## INFORMATION REVIEW OFFICER FOR THE
## LITIGATION INFORMATION REVIEW OFFICE
## CENTRAL INTELLIGENCE AGENCY

I, VANNA BLAINE, hereby declare and state:

## I.    INTRODUCTION

1.    I currently serve as the Information Review Officer ("IRO") for the Litigation Information Review Office ("LIRO") at the Central Intelligence Agency ("CIA" or "Agency"). I have held that position since February 2020.

### A.    Professional Background

2.    Prior to my current positon, I served as the Deputy IRO for LIRO beginning in April·2019, during which time I also served as the Acting IRO in the IRO's absence. Before becoming Deputy IRO, I served as the office's Litigation Production Manager for 24 months. In that capacity, I was the senior

1

litigation analyst responsible for managing and tracking case assignments, as well as litigation deadlines, and also conducted second-line reviews of Agency information subject to litigation, making classification and release determinations regarding such information when necessary. Before serving as the Production Manager, I was an Associate Information Review Officer for the Director's Area of the CIA for 11 months. In that role, I was responsible for making classification and release determinations for information originating within the Director's Area, which included, among other offices, the Office of the Director of the CIA, the Office of Congressional Affairs, the Office of Public Affairs, and the Office of General Counsel. I have held other administrative and professional positions within the CIA since 2007 and have worked in the information review and release field since 2014.

3.     I am a senior CIA official and hold original classification authority at the TOP SECRET level under written delegation of authority pursuant to section 1.3(c) of Executive Order 13526, 75 Fed. Reg. 707 (Jan. 5, 2010). This means that I am authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of Executive Order 13526 and applicable regulations.

4.   In my current role as IRO, I am responsible for ensuring that any determinations as to the release or withholding of any such documents or information are proper and do not jeopardize the national security.   Among other things, I am also responsible for the classification review of CIA documents and information that may be the subject of court proceedings or public requests for information under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

5.   Through the exercise of my official duties, I have become familiar with this civil action and Plaintiff's FOIA request.   I make the following statements based upon my personal knowledge and information made available to me in my official capacity as IRO for LIRO.

### B.   Purpose of Declaration

6.   This declaration is submitted in support of the Government's Motion for Summary Judgment in this case.

7.   The purpose of this declaration is to explain and justify, to the greatest extent possible on the public record, the CIA's actions and response to Plaintiff's FOIA request.   For the Court's convenience, the remainder of this declaration is divided into three parts: Part II provides the procedural and administrative history of the case; Part III discusses the searches for unclassified records conducted in connection with Plaintiff's request; and Part IV explains the CIA's response.

## II. __BACKGROUND__

8.   This matter concerns Plaintiff's 23 May 2017 FOIA request to the CIA "for any and all information that relates to [the] 'operational control' of the CIA over Guantanamo detainees including but not limited to the document cited in footnote 977 [of the Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program report]."  A true and correct copy of the request is attached herein as **Exhibit A.**

9.   By letter dated 24 October 2017, the CIA acknowledged receipt of Plaintiff's FOIA request and assigned it the reference number F-2017-01877.  A true and correct copy of this letter is attached herein as **Exhibit B**.

10.   In a follow-up letter, dated 8 February 2018, the CIA informed Plaintiff that his "request, as written, is quite broad and cannot be searched as it lacks specificity."  The CIA asked Plaintiff to provide more details about his request in order to understand what information he was trying to obtain.  A true and correct copy of this letter is attached herein as **Exhibit C.**

11.   By letter dated 8 March 2018, Plaintiff clarified that the period of time he was interested in is "1 September 2006 to 31 January 2007."  Plaintiff also clarified that he was "seeking to determine what 'operational control' means" and provided the following "list of possible topics":

(1) Whether CIA "operational control" included only Camp 7 or extended to other facilities such as Echo 2;
(2) What organization had decision-making authority over Camp 7;
(3) Whether CIA "operational control" ended before or after 31 January 2007;
(4) Whether the "operational control" involved CIA personnel, whether employees or contractors;
(5) Any detainee records maintained by the CIA during the period of "operational control," such as Detainee Inmate Management Systems records or the equivalent;
(6) How other agencies would obtain access to detainees during the period of "operational control, such as a Memorandum of Understanding with the Federal Bureau of Investigation or Criminal Investigative Task Force;
(7) How the facilities transitioned from CIA "operational control" to DOD "operation control."

Plaintiff noted "that by listing these topics, [he was] not implying that responsive information actually exists, only that [he] would be interested if it did exist." A true and correct copy of this letter is attached herein as **Exhibit D.**

12. By letter dated 4 May 2018, the CIA acknowledged receipt of Plaintiff's 8 March 2018 letter. Specifically, the CIA acknowledged that Plaintiff had amended his initial FOIA request to cover a defined period of time (1 September 2006 to 31 January 2007) and was now seeking to determine what "operational control" means by requesting documents on the seven possible topics that Plaintiff listed on his 8 March 2018 letter (hereinafter referred to as "Amended FOIA Request"). A true and correct copy of this letter is attached herein as **Exhibit E.**

13.  By letter dated 29 September 2020, the CIA responded to Plaintiff's Amended FOIA Request stating that it had completed a thorough search for records responsive to the request and had located a document consisting of three pages, which the CIA released in part to Plaintiff.  With respect to any other records, the CIA issued a "Glomar"[1] response, indicating that the Agency can neither confirm nor deny the existence or nonexistence of records responsive to Plaintiff's request, as the fact of the existence or nonexistence of records was properly classified and protected from disclosure under FOIA Exemptions (b)(1) and (b)(3).  A true and correct copy of this letter is attached herein as **Exhibit F.**

14.  By letter dated 17 December 2020, Plaintiff administratively appealed the Agency's response.  A true and correct copy of this letter is attached herein as **Exhibit G.**

15.  Plaintiff filed the above-captioned lawsuit on 8 March 2021, and the CIA filed its Answer on 17 May 2021.

16.  By letter dated 15 July 2021, the CIA provided a final response to Plaintiff's Amended FOIA Request.  In its response, the CIA informed Plaintiff that the Agency completed a thorough

---

[1] The origins of the Glomar response date back to the D.C. Circuit's decision in Phillippi v. CIA, 546 F.2d 1009 (D.C. Cir. 1976), which affirmed the CIA's use of the "neither confirm nor deny" response to a FOIA request for records concerning the CIA's reported contacts with the media regarding Howard Hughes' ship, the Hughes' Glomar Explorer.

search for records that would reveal an unclassified or openly acknowledged association between the Agency and the subject of Plaintiff's Amended FOIA Request, and located two (2) documents, which the Agency released in part with redactions made on the basis of FOIA exemptions (b)(1), (b)(3), (b)(5) and (b)(6), and one (1) document that the Agency withheld in its entirety based on FOIA exemptions (b)(1), (b)(3), and (b)(5). In addition, with respect to any records that may reveal a classified connection between the Agency and the subject of Plaintiff's Amended FOIA Request, the CIA issued a Glomar response, in accordance with section 3.6(a) of Executive Order 13526, as amended, refusing to confirm or deny the existence or nonexistence of such records, as the mere fact of the existence or nonexistence of such records is itself currently and properly classified and relates to CIA intelligence sources and methods information that is protected from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3). A true and correct copy of this letter is attached herein as **Exhibit H.**

17. On 29 July 2021, Plaintiff notified the Court of his position regarding the CIA's final response to his Amended FOIA Request. Plaintiff stated that he accepts the redactions to the documents released in part by the CIA. Plaintiff also stated that he objects to the complete withholding of document C06833121 and challenges the CIA's Glomar response "on the basis

7

that the question of CIA operational control (or lack thereof) over Camp VII has already been declassified."

18. On 30 September 2021, the CIA provided a *Vaughn* Index to Plaintiff justifying its withholding of document C06833121 based on FOIA exemptions (b)(1), (b)(3), and (b)(5). A true and correct copy of the index is attached herein as **Exhibit I.**[2]

## III. CIA's SEARCH FOR UNCLASSIFIED RECORDS

19. The CIA's search was limited to records that would reveal an unclassified or openly acknowledged relationship between the CIA and the subject of Plaintiff's Amended FOIA Request. The CIA employees who performed the searches have access to pertinent records; are knowledgeable about the Agency's records systems and are qualified to search those records; and regularly search those records in the course of their professional duties.

20. The Agency employees conducted a search reasonably calculated to locate all responsive records that might reflect an unclassified or otherwise openly acknowledged relationship between the CIA and the subject in Plaintiff's Amended FOIA Request. Specifically, the Agency employees conducted a search of previously-released CIA records in a case management database

---

[2] The *Vaughn* Index incorrectly states that the withheld document C06833121 34 pages in length. The document in fact consists of 24 pages.

called CADRE, which is a repository of all Agency records that have been reviewed and/or compiled for potential release, or that have been previously disclosed to the public.

21. The Agency employees conducted the search using the following terms, including different variations and combinations of the terms: "Camp 7", "Echo 2", "operational control", "detainee records", "Memorandum", "GTMO/GITMO/Guantanamo", "DOD", and "Department of Defense." The search was limited to the time period specified by Plaintiff: 1 September 2006 to 31 January 2007. The search yielded three responsive records, two of which were released to Plaintiff in part with redactions and one which was withheld in its entirety.

## IV. RESPONSE TO PLAINTIFF's AMENDED FOIA REQUEST

22. The CIA properly asserted a Glomar response with respect to any records that may reveal a classified connection between the CIA and the subject of Plaintiff's Amended FOIA Request, and properly withheld document C06833121 in full.

### A. CIA'S GLOMAR RESPONSE

23. The CIA is charged with carrying out critical functions on behalf of the United States, which include, among other activities, collecting and analyzing foreign intelligence and counterintelligence. A defining characteristic of the CIA's intelligence activities is that they are carried out through clandestine means, and therefore they must remain secret in

order to be effective. In the context of FOIA, this·means that the CIA must carefully evaluate whether its response to a FOIA request could jeopardize the clandestine nature of its intelligence activities or otherwise reveal undisclosed information about its sources, methods, capabilities, authorities, strengths, weaknesses, personnel, or resources.

24. In a common FOIA scenario, a FOIA requester submits a request to the CIA for information on a particular subject and the CIA conducts a search and advises whether responsive records were located. If records are located, the CIA provides non-exempt records or reasonably segregable non-exempt portions of records and withholds the remaining exempt records or exempt portions of records. In this common scenario, the CIA's response – either to provide or not provide the records sought – serves to confirm the existence or nonexistence of CIA records responsive to the subject of the FOIA request. In such a scenario, confirmation may pose no harm to U.S. national security because the response focuses on releasing or withholding specific substantive information contained within the records. In those circumstances, the fact that the CIA does or does not possess responsive records is not, in and of itself, classified, even though the information contained within the records may be classified.

25.   In other situations, however, the mere confirmation or denial of the existence of responsive records would, in and of itself, reveal a classified fact: namely, whether the CIA has an intelligence interest in, or clandestine connection to, a particular individual, group, subject matter, or activity.   In those cases, the CIA asserts a Glomar response because the existence or nonexistence of CIA records responsive to the request is a currently and properly classified fact, the disclosure of which reasonably could be expected to cause damage to the national security of the United States.

26.   In this case, the CIA issued a Glomar response stating that it could neither confirm nor deny the existence or nonexistence of records that may reveal a classified connection between the Agency and the subject of Plaintiff's Amended FOIA Request because confirming or denying the existence or nonexistence of such records would reveal classified intelligence sources and methods information that is protected from disclosure.   The following discussion regarding FOIA Exemptions (b)(1) and (b)(3) apply to the Agency's Glomar determination with respect to the existence or non-existence of those records.

(a)   FOIA Exemption (b)(1)

27.   Exemption (b)(1) provides that FOIA does not require the production of records that are: "(A) specifically authorized

11

under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5. U.S.C. § 552(b)(1). Here, Executive Order 13526 is the operative executive order that governs classification.

28.   Section 1.1(a) of Executive Order 13526 provides that information may be originally classified under the terms of this order if the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

29.   Furthermore, section 3.6(a) of Executive Order 13526 specifically states that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." Executive Order 13526

therefore explicitly authorizes precisely the type of response that the CIA has provided to Plaintiff in this case.

30.   Consistent with sections 1.1(a) and 3.6(a) of Executive Order 13526, I have determined that the existence or nonexistence of the requested records is a properly classified fact; the records concern "intelligence activities" and "intelligence sources and methods" within the meaning of section 1.4(c) of the Executive Order; the records are owned by and under the control of the U.S. Government; and as explained further below, the disclosure of the existence or nonexistence of requested records reasonably could be expected to result in damage to national security.

31.   Additionally, consistent with Section 1.7 of Executive Order 13526, my determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.

32.   Clandestine intelligence activities are central to the CIA's mission.  An acknowledgment of information regarding the Agency's methods or specific intelligence activities can reveal the CIA's specific intelligence capabilities, authorities,

interests, and resources. Terrorist organizations, foreign
intelligence services, and other hostile groups use such
information to thwart CIA activities and attack the United
States and its interests. These groups search continually for
information regarding the activities of the CIA and are able to
gather information from a myriad of sources, analyze this
information, and devise ways to defeat CIA activities from
seemingly disparate pieces of information.

33. Here, Plaintiff requested information to determine
what "operational control" means and provided a list of topics
for the CIA to use in its searches. As discussed above, the CIA
conducted a reasonable search to locate records from 1 September
2006 to 31 January 2007 that would reveal an unclassified or
otherwise openly acknowledged connection between the CIA and the
topics listed in Plaintiff's Amended FOIA Request. The CIA
located three responsive records.

34. Other than these three officially acknowledged
records, the Agency can neither confirm nor deny the existence
or nonexistence of any records requested by Plaintiff that may
reveal classified CIA information. A formal acknowledgement
confirming or denying the existence or nonexistence of records
reflecting a classified or otherwise publicly unacknowledged
connection between the CIA and the topics in Plaintiff's Amended
FOIA Request would reveal classified intelligence information

14

and jeopardize the clandestine nature of the Agency's intelligence activities. For example, if the CIA were to confirm the existence of responsive records, such confirmation could reveal sensitive details about CIA's intelligence sources and methods and jeopardize the safety of the CIA employees and the employees of other agencies. Conversely, if the CIA denied having records responsive to this request, that response could provide adversaries with insight into the CIA's priorities, resources, capabilities, and relationships with other agencies. In either case, confirmation or denial of the existence or nonexistence of such records would reveal sensitive information about the CIA's intelligence interests, personnel, capabilities, authorities, and resources that is protected from disclosure by Executive Order 13526 and statute. Such information could be used by terrorist organizations, foreign intelligence services, and other hostile adversaries to undermine CIA intelligence activities and attack the United States and its interests.

35. In order to avoid the potential for such damage to national security, and to be credible and effective, the CIA must use the Glomar response consistently in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including instances in which the CIA does not possess records responsive to a particular request. If the CIA were to invoke a Glomar response only when it

15

actually possessed responsive records, the Glomar response would be interpreted as an admission that responsive records exist. This practice would reveal the very information that the CIA must protect in the interest of national security.

36. For these reasons, I have determined that confirming the existence or nonexistence of records responsive to Plaintiff's Amended FOIA Request, other than the three records whose existence is unclassified or otherwise officially acknowledged, could reasonably be expected to cause damage to national security. Further, this information is currently and properly classified and is therefore exempt from disclosure under FOIA Exemption (b)(1).

(b)    FOIA Exemption (b)(3)

37. FOIA Exemption (b)(3) protects from disclosure information that is specifically exempted from disclosure by statute. A withholding statute under Exemption (b)(3) must: (A) require that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establish particular criteria for withholding or refer to particular types of matters to be withheld. 5 U.S.C. § 552(b)(3).

38. Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024(i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI"), "shall protect intelligence sources and methods from

16

unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute which, "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." 5 U.S.C. §552(b)(3). Under the direction of the DNI pursuant to section 102A, and consistent with section 1.6(d) of Executive Order 12333, the CIA is authorized, and relies on this statute, to protect CIA intelligence sources and methods from unauthorized disclosure.[3]

39. As discussed above in regards to the application of Exemption (b)(1), acknowledging the existence or nonexistence of records reflecting a classified or otherwise unacknowledged connection to the CIA in this matter would reveal information that concerns intelligence sources and methods, which the National Security Act is designed to protect. Accordingly, the fact of the existence or nonexistence of responsive records is exempt from disclosure under Exemption (b)(3) pursuant to the National Security Act. Exemptions (b)(1) and (b)(3) therefore apply independently and co-extensively to protect CIA's intelligence sources and methods from disclosure.

---

[3] Section 1.6(d) of Executive Order 12333, as amended, 3 C.F.R. 200 (1981), *reprinted in* 50 U.S.C. § 3001 note at 25 (formerly codified at 50 U.S.C.A. § 401 note at 25 (West Supp. 2009)), and as amended by Executive Order 13470, 73 Fed. Reg. 45,323 (July 30, 2008), requires the Director of the Central Intelligence Agency to "[p]rotect intelligence and intelligence sources, methods, and activities from unauthorized disclosure in accordance with guidance from the [DNI]."

40.  In contrast to Executive Order 13526, however, this statute does not require the CIA to identify and describe the damage to the national security that reasonably could be expected to result should the CIA confirm or deny the existence or nonexistence of the records.  Nonetheless, I refer the Court to the paragraphs above for a description of the damage to the national security should anything other than a Glomar response be required of the CIA in this case.

**B.   Withholding of Document C06833121**

41.  The CIA withheld in full document C06833121, which as described in the *Vaughn* Index, consists of classified draft remarks/discussion points addressing a specific aspect of a sensitive Agency intelligence program/operation.  The CIA cited FOIA exemptions (b)(1), (b)(3), and (b)(5) as the basis for withholding this record in full.  Each is described below.

(a)    FOIA Exemption (b)(1)

42.  As a senior CIA official with original classification authority, I have determined that document C06833121 is currently and properly classified and pertains to "intelligence activities (including covert action), [or] intelligence sources or methods" of sections 1.4(c) of the Executive Order; the classified information in the document is owned by and is under the control of the U.S. Government; and its unauthorized disclosure could reasonably be expected to result in damage to

national security.  Further, in accordance with section 1.7(a) of the Executive Order, none of the information at issue has been classified in order to conceal violations of law, inefficiency or administrative error; prevent embarrassment to a person, organization or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interest of national security.

43.  Here, the classified information withheld pursuant to Exemption (b)(1) consists of information that would tend to reveal specific intelligence sources, methods, and/or activities.  Intelligence methods are the techniques and means by which an intelligence agency accomplishes the mission, and the classified internal regulations, approvals, and authorities that govern the conduct of CIA personnel.  CIA's collection methods are valuable from an intelligence-gathering perspective only so long as they remain unknown and unsuspected.  The more information the CIA discloses about its operational tradecraft, the more difficult it becomes for the CIA to actually collect foreign intelligence around the world.

44.  Intelligence interests and activities refer to the CIA's targets and operations, including the clandestine activities undertaken by the CIA to collect intelligence and the means utilized by the CIA to collect intelligence.  Although it is widely acknowledged that the CIA is responsible for

conducting intelligence collection and analysis for the United States, the CIA generally does not confirm or deny the existence, or disclose the target, of specific intelligence collection activities or the operations it conducts or supports.

45.   In this case, I have determined that the CIA properly withheld document C06833121 in its entirety because it contains classified information related to the methods the Agency uses to collect and analyze intelligence, as well as details relating to a specific aspect of a sensitive Agency intelligence program/operation.  Such information must be protected to prevent foreign adversaries, terrorist organizations, and others from learning about the ways in which the CIA operates, which would allow them to take countermeasures to undermine U.S. intelligence capabilities and render collection efforts ineffective.  I have determined that disclosure of such sensitive classified CIA information could reasonably be expected to cause damage to U.S. national security.

(b)   FOIA Exemption (b)(3)

46.   The CIA cited FOIA exemption (b)(3) (National Security Act) as an additional basis for withholding document C06833121. As discussed in Part IV.A(b), Exemption (b)(3) protects information that is specifically exempted from disclosure by

statute.  Section 102A(i)(1) of the National Security Act[4]
constitutes a withholding statute in accordance with Exemption
(b)(3) and applies co-extensively to all of the information
protected by Exemption (b)(1) because the information would
reveal specific intelligence sources and methods.

47.  Although no harm rationale is required under Exemption
(b)(3), for the reasons discussed in this section, the release
of the information withheld under Exemption (b)(3) pursuant to
the National Security Act could result in harm by significantly
impairing the CIA's ability to carry out its core missions of
gathering and analyzing foreign intelligence.

(c)    FOIA Exemption (b)(5)

48.  Exemption (b)(5) provides that the FOIA's disclosure
requirements do not apply to "inter-agency or intra-agency
memorandums or letters which would not be available by law to a
party other than an agency in litigation with the agency."  5
U.S.C. § 552(b)(5).  As an initial matter, document C06833121
was circulated within the Agency, and therefore satisfies the
intra- and inter-agency threshold of the exemption.  As
described in the CIA's *Vaughn* Index, the information in the
document for which CIA asserted Exemption (b)(5) consists of

---

[4] Background information on the National Security Act is provided
in Part IV.A(b).

discussions that are protected by the deliberative process privilege and the attorney-client privilege.

## Deliberative Process Privilege

49. The deliberative process privilege protects Agency communications that are pre-decisional and deliberative. The purpose of the privilege is to prevent injury to the quality of agency decision-making.

50. The CIA invoked the deliberative process privilege here to withhold a classified document consisting of intra-Agency analysis, recommendations, assessments, and comments regarding draft language to be used as remarks by a senior Agency official. Specifically, the document reflects the CIA's internal and confidential decision-making process at interim stages of drafting remarks addressing a specific aspect of a sensitive CIA intelligence program/operation. The document has embedded comments, recommendations and edits, as well as discussions about wording, accuracy, and other deliberative ancillary matters. This record does not convey final Agency viewpoints on a particular matter, but rather reflects different considerations, opinions, options, and approaches that preceded the final remarks. Disclosure of this record would reveal, among other things, that some of the information compiled was not utilized or selected for inclusion in the final remarks, which ultimately would open the Agency's deliberative process to

public scrutiny on decisions that were not final. This, in turn, would chill the free flow of discussion in agency decision-making.

51. Furthermore, I have reviewed document C06833121 and have determined that, to the extent it contains any factual material, that information is part of the deliberations, and its disclosure would harm the Agency's deliberative process. The disclosure of facts in this document would reveal the nature of the preliminary recommendations and opinions preceding the final determination. It would further allow for a comparison between the wording in the final version and the draft thereby revealing what information was considered significant or was discarded in the course of the drafting process. Disclosure of this document would inhibit the frank communication and free exchange of ideas that the privilege is designed to protect. If the withheld information were released, CIA employees may hesitate to offer their candid opinions to superiors or coworkers, and such self-censorship would tend to degrade the quality of Agency decisions. Additionally, revealing this information could mislead or confuse the public by disclosing rationales that did not form the basis for the Agency's final decisions.

### Attorney-Client Privilege

52. As explained in the *Vaughn* Index, the Agency also asserted the attorney client privilege to protect disclosure of

23

document C06833121 under Exemption (b)(5). The attorney-client
privilege protects confidential communications between an
attorney and his or her client relating to a legal matter for
which the client has sought professional advice. In this case,
the Agency asserted the attorney-client privilege to protect
confidential communications between Agency officials and
attorneys within the CIA's Office of General Counsel.

53. The confidential communications in document C06833121
consist of factual information supplied by the client in
connection with the request for legal advice, as well as
discussions between attorneys that reflect those facts, and
legal analysis and advice provided to the client. The
confidentiality of these communications was maintained. If this
confidential information were to be disclosed, it would subject
the legal guidance to scrutiny and reveal preliminary legal risk
analysis and strategy. This is the very type of information
that the attorney-client privilege is designed to protect.

**VI. CONCLUSION**

54. In this case, the CIA conducted a thorough search for
responsive records reflecting an unclassified or otherwise
openly acknowledged connection between CIA and the topics listed
in Plaintiff's Amended FOIA Request and located three previously
acknowledged records. Two records were released to Plaintiff in
part and one was properly withheld in its entirety pursuant to

FOIA Exemptions (b)(1), (b)(3), and (b)(5). For records that would reveal a classified or otherwise unacknowledged connection between the CIA and the subject of Plaintiff's Amended FOIA Request, the fact of the existence or nonexistence of such records is itself a properly classified fact, and as explained above, is intertwined with the CIA's intelligence activities, sources, and methods such that this fact is, and must remain, classified and protected by statute. Accordingly, I have determined that the only appropriate response is for the CIA to neither confirm nor deny the existence or nonexistence of the requested records under FOIA exemptions (b)(1) and (b)(3).

\*       \*       \*

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _11th_ day of March 2022.

Vanna Blaine
Information Review Officer
Litigation Information Review Office
Central Intelligence Agency