Declaration of Amy Zittritsch

1. My name is Amy Zittritsch. I am over 18 years old and competent to make a declaration.

*Duties as Defense Information Security Officer*

2. I am employed by the United States government, Department of Defense, Military Commissions Defense Organization, as a Defense Information Security Officer (DISO). In 2014, Colonel Karen Mayberry, United States Air Force, assigned me as part of the defense team for Ammar al Baluchi in *United States v. Ammar al Baluchi*, commonly known as "the 9/11 Case." Prior to this assignment, I was employed by the United States government on other security-classification-related matters for eight years. In this declaration, I write only in my capacity as DISO and do not speak for any other element of the United States government.

3. Attorneys and others detailed to the 9/11 Case routinely work with classified information relating to the CIA former Rendition, Detention, and Interrogation Program and Camp 7. Beginning in 2012, the United States Military Commission at Naval Station Guantanamo Bay has regulated access to classified information by means of a protective order. The current applicable version of the protective order is AE013BBBB *Third Amended* Protective Order #1 to Protect Against Disclosure of National Security Information (hereinafter PO#1) (Attachment A).

4. As defined in PO#1, "The term 'Defense Information Security Officer' (DISO) refers to a security officer, serving as information security advisor to the Defense, who oversees information security provisions pertaining to the filing of motions, response, replies, and other documents with the Commission." PO#1 requires DISOs to fulfill the following duties: "(1) Assist the Defense with applying classification guides, including reviewing pleadings and other papers prepared by the defense to ensure they are unclassified or properly marked as classified. (2) Assist the Defense in performing their duty to apply derivative classification markings pursuant to E.O. 13526 § 2.1 (b). (3) Ensure compliance with the provisions of any Protective Order."

5. As part of these duties, I maintain a reference collection of all classification guidance given to Mr. al Baluchi's defense team since the inception of the case in 2011. I also review public sources of information, including disclosures under Freedom of Information Act, Mandatory Declassification Review,

military commission public release, and other release procedures, relating to Guantanamo Bay and the former CIA Rendition, Detention, and Interrogation Program. As part of my duties, I routinely discuss the provenance and classification of specific items of information with attorneys and Court Information Security Officers (CISOs) as part of the process of determining proper derivative classification markings. I am not an Original Classification Authority.

6. As part of my duties, I monitor the security clearance of members of the team to which I am detailed. I am advised by competent authorities that James G. Connell, III, Alka Pradhan, and I all hold TOP SECRET//SECURE COMPARTMENTED INFORMATION clearances with additional tickets. To the best of my understanding and belief, no statement in this declaration reveals classified information.

*Release of the redacted Executive Summary*

7. On 9 December 2014, the United States released a declassified, redacted Executive Summary of the Senate Select Committee on Intelligence Committee Study of the Central Intelligence Agency's Rendition and Detention Program (hereinafter "redacted Executive Summary"). Among other information, the redacted Executive Summary contained the following declassified information regarding CIA detention operations at Naval Station Guantanamo Bay (Attachment B).

Page 12:

> (TS// ▮▮▮▮▮▮▮▮ //NF) In early November 2001, CIA Headquarters further determined that any future CIA detention facility would have to meet U.S. prison standards and that CIA detention and interrogation operations should be tailored to "meet the requirements of U.S. law and the federal rules of criminal procedure," adding that "[s]pecific methods of interrogation w[ould] be permissible so long as they generally comport with commonly accepted practices deemed lawful by U.S. courts."[14] The CIA's search for detention site locations was then put on hold and an internal memorandum from senior CIA officials explained that detention at a U.S. military base outside of the United States was the "best option."[15] The memorandum thus urged the DCI to "[p]ress DOD and the US military, at highest levels, to have the US Military agree to host a long-term facility, and have them identify an agreeable location," specifically requesting that the DCI "[s]eek to have the US Naval Base at Guantanamo Bay designated as a long-term detention facility."[16]

[14] November 7, 2001, Draft of Legal Appendix, "Handling Interrogation." *See also* Volume I.
[15] Memorandum for DCI from J. Cofer Black, Director of Counterterrorism, via Deputy Director of Central Intelligence, General Counsel, Executive Director, Deputy Director for Operations and Associate Director of Central Intelligence/Military Support, entitled, "Approval to Establish a Detention Facility for Terrorists."
[16] Memorandum for DCI from J. Cofer Black, Director of Counterterrorism, via Deputy Director of Central Intelligence, General Counsel, Executive Director, Deputy Director for Operations and Associate Director of Central Intelligence/Military Support, entitled, "Approval to Establish a Detention Facility for Terrorists."
[17] Memorandum for DCI from J. Cofer Black, Director of Counterterrorism, via Deputy Director of Central Intelligence, General Counsel, Executive Director, Deputy Director for Operations and Associate Director of Central Intelligence/Military Support, entitled, "Approval to Establish a Detention Facility for Terrorists."
[18] Memorandum for DCI from J. Cofer Black, Director of Counterterrorism, via Deputy Director of Central Intelligence, General Counsel, Executive Director, Deputy Director for Operations and Associate Director of Central Intelligence/Military Support, entitled, "Approval to Establish a Detention Facility for Terrorists."

Page 80:

On September 5, 2006, bin al-Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba.[427] After his arrival, bin al-Shibh was placed on anti-psychotic medications.[428]

[427] HEADQUARTERS ▮▮▮ (031945Z SEP 06)
[428] ▮▮▮ SITE DAILY REPORT - 24 MAY 07; ▮▮▮ 8904 (182103Z APR 08)

Pages 140-41:

9. *U.S. Supreme Court Action in the Case of Rasul v. Bush Forces Transfer of CIA Detainees from Guantanamo Bay to Country* ▮

(TS// ▮▮▮ //NF) Beginning in September 2003, the CIA held a number of detainees at CIA facilities on the grounds of, but separate from, the U.S. military detention facilities at Guantanamo Bay, Cuba.[848] In early January 2004, the CIA and the Department of Justice began discussing the possibility that a pending U.S. Supreme Court case, *Rasul v. Bush*, might grant *habeas corpus* rights to the five CIA detainees then being held at a CIA detention facility at Guantanamo Bay.[849] Shortly after these discussions, CIA officers approached the ▮▮▮ in Country ▮ to determine if it would again be willing to host these CIA detainees, who would remain in CIA custody within an already existing Country ▮ facility.[850] By January ▮, 2004, the ▮▮▮ in Country ▮ had agreed to this arrangement for a limited period of time.[851]

(TS// ▮▮▮ //NF) Meanwhile, CIA General Counsel Scott Muller asked the Department of Justice, the National Security Council, and the White House Counsel for advice on whether the five CIA detainees being held at Guantanamo Bay should remain at Guantanamo Bay or be moved pending the Supreme Court's decision.[852] After consultation with the U.S. solicitor general in February 2004, the Department of Justice recommended that the CIA move four detainees out of a CIA detention facility at Guantanamo Bay pending the Supreme Court's resolution of the case.[853] The Department of Justice concluded that a fifth detainee, Ibn Shaykh al-Libi, did not need to be transferred because he had originally been detained under military authority and had been declared to the ICRC.[854] Nonetheless, by April ▮, 2004, all five CIA detainees were transferred from Guantanamo Bay to other CIA detention facilities.[855]

[848] April ▌, 2003, Memorandum for Director, DCI Counterterrorist Center, from ▌▌▌▌, Chief Renditions and Detainees Group, via ▌▌▌▌, Counterterrorist Center, Chief of Operations, ▌▌▌▌, Chief, ▌▌▌▌, Subject: Request to Relocate High-Value Detainees to an Interim Detention Facility at Guantanamo. *See also* DIRECTOR ▌▌▌▌. CIA detainees were held at two facilities at Guantanamo Bay, DETENTION SITE MAROON and DETENTION SITE INDIGO. (*See* Quarterly Review of Confinement Conditions for CIA Detainees, Coverage Period: ▌▌▌▌) A third CIA detention facility, DETENTION SITE RED ▌▌▌▌. *See* ▌3897▌ ▌3445▌ ▌9754▌ ▌8405▌ ▌8408▌; and September 1, 2006, Memorandum of Agreement Between the Department of Defense (DOD) and the Central Intelligence Agency (CIA) Concerning the Detention by DOD of Certain Terrorists at a Facility at Guantanamo Bay Naval Station.

[849] Email from: Scott W. Muller; to: ▌▌▌▌, [REDACTED]; cc: [REDACTED]; subject: Detainees in Gitmo; date: January ▌, 2004.
[850] *See* HEADQUARTERS ▌▌▌▌, [REDACTED] 1845 ▌▌▌▌. The CIA's long-term facility in Country ▌, which the CIA Station in Country ▌ had warned was a drain on the Station's resources, had not yet been completed. *See* [REDACTED] 1785 ▌▌▌▌.
[851] [REDACTED] 1679 ▌▌▌▌
[852] Email from: Scott Muller; to: James Pavitt, ▌▌▌▌; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ▌▌▌▌, [REDACTED], ▌▌▌▌; subject: CIA Detainees at GITMO; date: February ▌, 2004.
[853] Email from: Scott Muller; to: James Pavitt, ▌▌▌▌; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ▌▌▌▌, [REDACTED], ▌▌▌▌; subject: CIA Detainees at GITMO; date: February ▌, 2004.
[854] Email from: Scott Muller; to: James Pavitt, ▌▌▌▌; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ▌▌▌▌, [REDACTED], ▌▌▌▌; subject: CIA Detainees at GITMO; date: February ▌, 2004. ▌10255▌ ALEC ▌▌▌▌ ▌13698▌ *See* ALEC ▌▌▌▌
[855] ▌1672▌ ▌1674▌; [REDACTED] 1898 ▌▌▌▌

Page 160:

(TS/▌▌▌▌/NF) After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA.[977]

[977] CIA Background Memo for CIA Director visit to Guantanamo, December ▌, 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility.

Page 440:

On more than one occasion the CIA directed CIA personnel at Guantanamo Bay, Cuba, not to brief a visiting Committee member about the CIA detention facility there, including during a July 2005 visit by Chairman Roberts.[2467]

[2467] Because the Committee was not informed of the CIA detention site at Guantanamo Bay, Cuba, no member of the Committee was aware that the U.S. Supreme Court decision to grant certiorari in the case of *Rasul v. Bush*, which related to the *habeas corpus* rights of detainees at Guantanamo Bay, resulted in the transfer of CIA detainees from the CIA detention facility at Guantanamo Bay to other CIA detention facilities. *See* HEADQUARTERS ███ ███, subject "RESTRICTED ACCESS TO [DETENTION SITE COBALT] AND [DETENTION SITE ORANGE]"; email from: ███; to ███; cc: Jose Rodriguez, [REDACTED], ███, [REDACTED], ███, [REDACTED], [REDACTED]; subject: guidance to ███ gitmo; date: May 14, 2004; forwarding final cable: HEADQUARTERS ███ (141502Z MAY 04), subject "Possible Brief to US Senator"; email from: Stanley Moskowitz; to: [REDACTED]; cc: [REDACTED]; subject: Re: guidance to ███gitmo; date: May 14, 2004; CIA responses to Questions for the Record, March 13, 2008 (DTS #2008-1310); "CODEL Roberts to Miami/Guantanamo, 7-8 July 2005," dated 5 July, ███ 902860.

*Impact of the redacted Executive Summary release*

8. Throughout the 9/11 Case, the Office of the Chief Prosecutor (OCP) has represented the interests on the CIA and all other government departments and agencies. Despite regular disputes over CIA equities in the military commission, CIA has never sent an attorney separate from OCP to represent their interests. In particular, OCP has regularly represented the interests of CIA in legal proceedings regarding the production of CIA documents in discovery.

9. On 12 December 2014, the military commission in the 9/11 Case ordered OCP to update Protective Order #1 in light of changed classification policy reflected in the redacted Executive Summary.

10. On 30 January 2015, the 9/11 case prosecution filed a motion to amend the protective order in light of new classification policy (Attachment C). Among other changes, the amendment (reflected in the current Protective Order #1, Attachment A) provided that the following information was no longer classified:

- ~~(U//FOUO)~~ Information regarding the conditions of confinement as applied to the 119 individuals mentioned in Appendix 2 of the SSCI Executive Summary acknowledged to have been in CIA custody.

11. The five defendants in the 9/11 Case are included in the 119 individuals mentioned in Appendix 2 of the SSCI Executive Summary acknowledged to have been in CIA custody.

*Classification guidance on Camp 7*

12. Based on my experience and training on security classification matters, I am aware of a difference between a classification guide and classification guidance. As defined in Executive Order 13,526 § 6.1(h), "'Classification guide' means a documentary form of classification guidance issued by an original classification authority that identifies the elements of information regarding a specific subject that must be classified and establishes the level and duration of classification for each such element." As defined in § 6.1(g), "'Classification guidance' means any instruction or source that prescribes the classification of specific information."

13. In the 9/11 Case, the United States government has not provided, and I have never reviewed, a classification guide regarding CIA operational control over Camp 7.

14. The United States has, however, provided written classification guidance over various matters in the case, including CIA operational control over Camp 7. An unclassified paragraph of the current written classification guidance provides that while the statement regarding operational control on page 160 of the redacted Executive Summary is unclassified, specifics of the operational control are classified. Neither this paragraph nor any classification guidance to which I have access states that the existence of specifics regarding CIA operational control of Camp 7 (as opposed to the specifics themselves) is classified. Indeed, the classification guidance regarding the classification of specifics is itself unclassified.

*Documents for public release*

15. In the course of my duties, I have come to understand the role of Original Classification Authority security classification review in the process for public release of military commission documents.

16. With respect to filings and orders other than transcripts, counsel and the military judge have a duty to prepare the document on a computer network of the appropriate classification. CISOs, DISOs, and other security professionals are available to advise counsel or the military judge as to the appropriate system, and such advice to defense counsel is a regular part of my duties.

17. After the preparation of an order or filing of a pleading, the CISO examines the document and, if necessary, forwards it for classification review. Under Regulation for Trial by Military Commission § 17-1(c)(3)(A), "The DoD Security Classification/Declassification Review team or appropriate non-DoD federal

department and agency original classification authority shall review and make appropriate redactions as necessary to render the material suitable for public posting." I have consulted with CISOs on many occasions in the course of this process. The classification review process for pleadings and orders can take weeks, months, or even years.

18. Unofficial transcripts—which are separate from the official court record—are prepared by stenographers and forwarded to appropriate Original Classification Authorities (OCAs) for review. The classification review process for unofficial transcripts is faster than for pleadings and orders, although on occasion can take a week or more. The Office of Military Commissions has released slides explaining this process (Attachment D).

19. The public release of filings, orders, and unofficial transcripts only comes after classification review by appropriate OCAs. For this reason, DISOs, counsel, media, and others routinely rely on public release of filings, orders, and unofficial transcripts as official acknowledgement that the unredacted information contained therein is unclassified.

20. Under U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 27, 2022.