# Attachment B

In 2008, the CIA's Rendition, Detention, and Interrogation Group, the lead unit for detention and interrogation operations at the CIA, had a total of ▮ positions, which were filled with ▮ CIA staff officers and ▮ contractors, meaning that contractors made up 85% of the workforce for detention and interrogation operations.

### #14: CIA detainees were subjected to coercive interrogation techniques that had not been approved by the Department of Justice or had not been authorized by CIA Headquarters.

Prior to mid-2004, the CIA routinely subjected detainees to nudity and dietary manipulation. The CIA also used abdominal slaps and cold water dousing on several detainees during that period. None of these techniques had been approved by the Department of Justice.

At least 17 detainees were subjected to CIA enhanced interrogation techniques without authorization from CIA Headquarters. Additionally, multiple detainees were subjected to techniques that were applied in ways that diverged from the specific authorization, or were subjected to enhanced interrogation techniques by interrogators who had not been authorized to use them. Although these incidents were recorded in CIA cables and, in at least some cases were identified at the time by supervisors at CIA Headquarters as being inappropriate, corrective action was rarely taken against the interrogators involved.

### #15: The CIA did not conduct a comprehensive or accurate accounting of the number of individuals it detained, and held individuals who did not meet the legal standard for detention. The CIA's claims about the number of detainees held and subjected to its enhanced interrogation techniques were inaccurate.

The CIA never conducted a comprehensive audit or developed a complete and accurate list of the individuals it had detained or subjected to its enhanced interrogation techniques. CIA statements to the Committee and later to the public that the CIA detained fewer than 100 individuals, and that less than a third of those 100 detainees were subjected to the CIA's enhanced interrogation techniques, were inaccurate. The Committee's review of CIA records determined that the CIA detained at least 119 individuals, of whom at least 39 were subjected to the CIA's enhanced interrogation techniques.

Of the 119 known detainees, at least 26 were wrongfully held and did not meet the detention standard in the September 2001 Memorandum of Notification (MON). These included an "intellectually challenged" man whose CIA detention was used solely as leverage to get a family member to provide information, two individuals who were intelligence sources for foreign liaison services and were former CIA sources, and two individuals whom the CIA assessed to be connected to al-Qa'ida based solely on information fabricated by a CIA detainee subjected to the CIA's enhanced interrogation techniques. Detainees often remained in custody for months after the CIA determined that they did not meet the MON standard. CIA records provide insufficient information to justify the detention of many other detainees.

(TS// //NF) Ramzi bin al-Shibh was subjected to interrogation techniques and conditions of confinement that were not approved by CIA Headquarters. CIA interrogators used the CIA's enhanced interrogation techniques for behavior adjustment purposes, in response to perceived disrespect, and on several occasions, before bin al-Shibh had an opportunity to respond to an interrogator's questions or before a question was asked. The CIA's enhanced interrogation techniques were applied when bin al-Shibh failed to address an interrogator as "sir," when interrogators noted bin al-Shibh had a "blank stare" on his face, and when bin al-Shibh complained of stomach pain.[422] Further, despite CIA policy at the time to keep detainees under constant light for security purposes, bin al-Shibh was kept in total darkness to heighten his sense of fear.[423]

(TS// //NF) CIA psychological assessments of bin al-Shibh were slow to recognize the onset of psychological problems brought about, according to later CIA assessments, by bin al-Shibh's long-term social isolation and his anxiety that the CIA would return to using its enhanced interrogation techniques against him. The symptoms included visions, paranoia, insomnia, and attempts at self-harm.[424] In April 2005, a CIA psychologist stated that bin al-Shibh "has remained in social isolation" for as long as two and half years and the isolation was having a "clear and escalating effect on his psychological functioning." The officer continued, "in [bin al-Shibh's] case, it is important to keep in mind that he was previously a relatively high-functioning individual, making his deterioration over the past several months more alarming."[425] The psychologist wrote, "significant alterations to RBS'[s] detention environment must occur soon to prevent further and more serious psychological disturbance."[426] On September 5, 2006, bin al-Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba.[427] After his arrival, bin al-Shibh was placed on anti-psychotic medications.[428]

(TS// //NF) The CIA disseminated 109 intelligence reports from the CIA interrogations of Ramzi bin al-Shibh.[429] A CIA assessment, which included intelligence from his

---

[422] ███ 10582 (242026Z FEB 03); ███ 10627 (281949Z FEB 03)
[423] ███ 10521 (191750Z FEB 03). The cable referred to keeping bin al-Shibh in darkness as a "standard interrogation technique." The same cable states that during the night of February 18, 2003, the light went out in bin al-Shibh's cell and that "[w]hen security personnel arrived to replace the bulb, bin al-Shibh was cowering in the corner, shivering. Security personnel noted that he appeared relieved as soon as the light was replaced."
[424] ███ 1759 (021319Z OCT 04); HEADQUARTERS ███ (040023Z NOV 05); ███ 1890 (171225Z NOV 04); ███ 1878 (140915Z NOV 04); ███ 1930 (061620Z DEC 04); ███ 2207 (111319Z APR 05); ███ 2210 (141507Z APR 05); ███ 2535 (051805Z JUL 05); ███ 2589 (120857Z JUL 05); ███ 2830 (291304Z AUG 05); ███ 1890 (171225Z NOV 04); ███ 1893 (200831Z NOV 04); CIA document entitled, "Detainee Talking Points for ICRC Rebuttal, ███"; ███ 2210 (141507Z APR 05); ███ 2535 (051805Z JUL 05); ███ 2210 (141507Z APR 05); ███ 2535 (051805Z JUL 05); ███ 2830 (291304Z AUG 05); ███ 1930 (061620Z DEC 04); ███ 2210 (141507Z APR 05)
[425] ███ 2210 (141507Z APR 05)
[426] ███ 2210 (141507Z APR 05)
[427] HEADQUARTERS ███ (031945Z SEP 06)
[428] ███ SITE DAILY REPORT - 24 MAY 07: ███ 8904 (182103Z APR 08)
[429] See Volume II for additional information.

CIA Headquarters directed the CIA Station in Country ■ to "think big" about how CIA Headquarters could support Country ■'s ████████████.[843] After the Station initially submitted relatively modest proposals, CIA Headquarters reiterated the directive, adding that the Station should provide a "wish list."[844] In ███ 2003, the Station proposed a more expansive $■ million in ████████ subsidies.[845] ████ subsidy payments, intended in part as compensation for support of the CIA detention program, rose as high as $■ million.[846] By ████████ 2003, after an extension of five months beyond the originally agreed upon timeframe for concluding CIA detention activities in Country ■, both bin al-Shibh and al-Nashiri had been transferred out of Country ■ to the CIA detention facility at Guantanamo Bay, Cuba.[847]

9. *U.S. Supreme Court Action in the Case of Rasul v. Bush Forces Transfer of CIA Detainees from Guantanamo Bay to Country* ■

(TS// ████████ //NF) Beginning in September 2003, the CIA held a number of detainees at CIA facilities on the grounds of, but separate from, the U.S. military detention facilities at Guantanamo Bay, Cuba.[848] In early January 2004, the CIA and the Department of Justice began discussing the possibility that a pending U.S. Supreme Court case, *Rasul v. Bush*, might grant *habeas corpus* rights to the five CIA detainees then being held at a CIA detention facility at

---

████████ although CIA Headquarters asked the CIA Station to "advise if additional funds may be needed to keep [the facility] viable over the coming year and beyond." CIA Headquarters added, "we cannot have enough blacksite hosts, and we are loathe to let one we have slip away." Country ■ never hosted CIA detainees. *See* HEADQUAR ███ ████████; [REDACTED] 5298 ████████; HEADQUAR ███ ████

[843] ALEC ███ ████ 03). In an interview on the CIA program, ████████ noted that the program had "more money than we could possibly spend we thought, and it turned out to be accurate." In the same interview, he stated that "in one case, we gave ████ $■,000,000 ████████████████. Myself and José [Rodriguez] ████████████████. We never counted it. I'm not about to count that kind of money for a receipt." The boxes contained one hundred dollar bills. ████ did not identify the recipient of the $■ million. *See* transcript of Oral History Interview, Interviewee: ████████ (RJ) - October 13, 2006, Interviewer: [REDACTED] and [REDACTED].
[844] ALEC ███ ████ 03)
[845] ALEC ███ ████
[846] *See* DTS #2010-2448.
[847] [REDACTED] 2498 ████████
[848] April ■, 2003, Memorandum for Director, DCI Counterterrorist Center, from ████████, Chief Renditions and Detainees Group, via ████████, Counterterrorist Center, Chief of Operations, ████ ████████, Chief, ████████, Subject: Request to Relocate High-Value Detainees to an Interim Detention Facility at Guantanamo. *See also* DIRECTOR ███ ████████. CIA detainees were held at two facilities at Guantanamo Bay, DETENTION SITE MAROON and DETENTION SITE INDIGO. (*See* Quarterly Review of Confinement Conditions for CIA Detainees, Coverage Period: ████████.) A third CIA detention facility, DETENTION SITE RED ████████████████████████████████. *See* 3897 ████ ; 3445 ████; 9754 ████; 8405 ████; 8408 ████; and September 1, 2006, Memorandum of Agreement Between the Department of Defense (DOD) and the Central Intelligence Agency (CIA) Concerning the Detention by DOD of Certain Terrorists at a Facility at Guantanamo Bay Naval Station.

Guantanamo Bay.[849] Shortly after these discussions, CIA officers approached the ███████ in Country █ to determine if it would again be willing to host these CIA detainees, who would remain in CIA custody within an already existing Country █ facility.[850] By January █, 2004, the ███████ in Country █ had agreed to this arrangement for a limited period of time.[851]

(TS// ███████ //NF) Meanwhile, CIA General Counsel Scott Muller asked the Department of Justice, the National Security Council, and the White House Counsel for advice on whether the five CIA detainees being held at Guantanamo Bay should remain at Guantanamo Bay or be moved pending the Supreme Court's decision.[852] After consultation with the U.S. solicitor general in February 2004, the Department of Justice recommended that the CIA move four detainees out of a CIA detention facility at Guantanamo Bay pending the Supreme Court's resolution of the case.[853] The Department of Justice concluded that a fifth detainee, Ibn Shaykh al-Libi, did not need to be transferred because he had originally been detained under military authority and had been declared to the ICRC.[854] Nonetheless, by April █, 2004, all five CIA detainees were transferred from Guantanamo Bay to other CIA detention facilities.[855]

(TS// ███████ //NF) Shortly after placing CIA detainees within an already existing Country █ facility for a second time, tensions arose between the CIA and ████ Country █ ███████.[856] In ███ 2004, CIA detainees in a Country █ facility claimed to hear cries of pain from other detainees presumed to be in the ███████████████████████ facility.[857] When the CIA chief of Station approached the ███████████

---

[849] Email from: Scott W. Muller; to: ███████, [REDACTED]; cc: [REDACTED]; subject: Detainees in Gitmo; date: January █, 2004.
[850] See HEADQUARTERS ████ ████████; [REDACTED] 1845 ███████. The CIA's long-term facility in Country █, which the CIA Station in Country █ had warned was a drain on the Station's resources, had not yet been completed. See [REDACTED] 1785 ███████.
[851] [REDACTED] 1679 ███████
[852] Email from: Scott Muller; to: James Pavitt, ███████; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ███████, [REDACTED], ███████; subject: CIA Detainees at GITMO; date: February █, 2004.
[853] Email from: Scott Muller; to: James Pavitt, ███████; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ███████, [REDACTED], ███████; subject: CIA Detainees at GITMO; date: February █, 2004.
[854] Email from: Scott Muller; to: James Pavitt, ███████; cc: George Tenet, John McLaughlin, [REDACTED], [REDACTED], ███████, [REDACTED], ███████; subject: CIA Detainees at GITMO; date: February █, 2004.
███████████████████████ See ███████
10255 ███████; ALEC ███████; 13698 ███████; ALEC ███████
[855] ███████ 1672 ███████; ███████ 1674 ███████; [REDACTED] 1898 ███████
[856] See, for example, [REDACTED] 1679 ███████. For additional details of the CIA's interactions with Country █, see Volume I.
[857] Among the detainees making this claim was Ibn Shaykh al-Libi, who had previously been rendered from CIA custody to ███████. A Libyan national, Ibn Shaykh al-Libi reported while in ███ custody that Iraq was supporting al-Qa'ida and providing assistance with chemical and biological weapons. Some of this information was cited by Secretary Powell in his speech to the United Nations, and was used as a justification for the 2003 invasion of Iraq. Ibn Shaykh al-Libi recanted the claim after he was rendered to CIA custody on February █, 2003, claiming that he had been tortured by the ███████, and only told them what he assessed they wanted to hear. For more details, see Volume III. While in Country █, al-Libi told CIA debriefers that the "sobbing and yelling" he

significant inaccurate statements, especially regarding the significance of information acquired from CIA detainees and the effectiveness of the CIA's interrogation techniques.[974]

(U) In the speech, the president announced the transfer of 14 detainees to Department of Defense custody at Guantanamo Bay and the submission to Congress of proposed legislation on military commissions.[975] As all other detainees in the CIA's custody had been transferred to other nations, the CIA had no detainees in its custody at the time of the speech.[976]

2. *The International Committee of the Red Cross (ICRC) Gains Access to CIA Detainees After Their Transfer to U.S. Military Custody in September 2006*

(TS// [REDACTED] //NF) After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA.[977] In October 2006, the 14 detainees were allowed meetings with the ICRC and described in detail similar stories regarding their detention, treatment, and interrogation while in CIA custody. The ICRC provided information on these claims to the CIA.[978] Acting CIA General Counsel John Rizzo emailed the CIA director and other CIA senior leaders, following a November 8, 2006, meeting with the ICRC, stating:

> "[a]s described to us, albeit in summary form, what the detainees allege actually does not sound that far removed from the reality... the ICRC, for its part, seems to find their stories largely credible, having put much stock in the fact that the story each detainee has told about his transfer, treatment and conditions of confinement was basically consistent, even though they had been incommunicado with each other throughout their detention by us."[979]

(TS// [REDACTED] //NF) In February 2007 the ICRC transmitted to the CIA its final report on the "Treatment of Fourteen 'High Value Detainees' in CIA Custody." The ICRC report concluded that "the ICRC clearly considers that the allegations of the fourteen include descriptions of treatment and interrogation techniques - singly or in combination - that amounted to torture and/or cruel, inhuman or degrading treatment."[980] Notwithstanding Rizzo's comments, the CIA disagreed with a number of the ICRC's findings, provided rebuttals to the ICRC in

---

[974] *See* Volume I and Volume II for additional information.
[975] September 6, 2006, The White House, President Discusses Creation of Military Commissions to Try Suspected Terrorists.
[976] *See* Volume III for additional information.
[977] CIA Background Memo for CIA Director visit to Guantanamo, December [REDACTED], 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility.
[978] Email from: [REDACTED], CTC/LGL; to: John Rizzo, [REDACTED], [REDACTED], [REDACTED], [REDACTED], [REDACTED], [REDACTED], [REDACTED], [REDACTED], [REDACTED]; cc: [REDACTED]; subject: 8 November 2006 Meeting with ICRC reps; date: November 9, 2006, at 12:25 PM.
[979] Email from: John A. Rizzo; to: Michael V. Hayden, Stephen R. Kappes, Michael J. Morell; cc: [REDACTED], [REDACTED], [REDACTED]; subject: Fw: 8 November 2006 Meeting with ICRC Reps; date: November 9, 2006, at 12:25 PM.
[980] February 14, 2007, Letter to John Rizzo, Acting General Counsel, from [REDACTED], International Committee of the Red Cross, [REDACTED].

memorandum was later disputed by Chairman Roberts.[2463] The Committee has no independent record of this briefing.

(TS// //NF) Throughout 2003, the CIA refused to answer questions from Committee members and staff about the CIA interrogations of KSM and other CIA detainees.[2464] The CIA produced talking points for a September 4, 2003, briefing on the CIA interrogation program exclusively for Committee leadership; however, there are no contemporaneous records of the briefing taking place. The CIA talking points include information about the use of the CIA's enhanced interrogation techniques, their effectiveness, and various abuses that occurred in the program.[2465] Many of the CIA representations in the talking points were inaccurate.[2466] The CIA continued to withhold from the Committee, including its leadership, any information on the location of the CIA's detention facilities. On more than one occasion the CIA directed CIA personnel at Guantanamo Bay, Cuba, not to brief a visiting Committee member about the CIA detention facility there, including during a July 2005 visit by Chairman Roberts.[2467]

(TS// //NF) In 2004, the Committee conducted two hearings on the CIA's role in interrogating U.S. military detainees at Abu Ghraib prison in Iraq. CIA witnesses stressed that the CIA was more limited in its interrogation authorities than the Department of Defense, but declined to respond to Committee questions about the interrogation of KSM or press reports on CIA detention facilities.[2468] During the first briefing, on May 12, 2004, Committee members requested Department of Justice memoranda addressing the legality of CIA interrogations.

---

[2463] Moskowitz Memorandum for the Record, February 4, 2003, "Subject: Sensitive Notification." For information on Senator Roberts's objections, see "Destroying C.I.A. Tapes Wasn't Opposed, Memos Say," by Scott Shane, The New York Times, dated February 22, 2010.

[2464] Transcript of CIA briefing for the Senate Select Committee on Intelligence, March 5, 2003 (DTS #2003-1156); Transcript of "Intelligence Update," April 30, 2003 (DTS #2003-2174); Transcript of Senate Select Committee on Intelligence briefing, September 3, 2003 (DTS #2004-0288); email from: ▮▮▮; to: [REDACTED]; subject: Re: EYES ONLY Re: Question Regarding Interrogations from SSCI Member Briefing on KSM Capture; date: March 17, 2003.

[2465] CIA Interrogation Program: DDO Talking Points, 04 September 2003.

[2466] For example, the talking points included inaccurate data on the waterboarding of Abu Zubaydah and KSM; stated that two unauthorized techniques were used with a detainee, whereas 'Abd al-Rahim al-Nashiri was subjected to numerous unauthorized techniques; and inaccurately stated that the offending officers were removed from the site. The talking points also stated that the use of the CIA's enhanced interrogation techniques "has produced significant results," and that the "[i]nformation acquired has saved countless lives...." See CIA Interrogation Program: DDO Talking Points, 04 September 2003.

[2467] Because the Committee was not informed of the CIA detention site at Guantanamo Bay, Cuba, no member of the Committee was aware that the U.S. Supreme Court decision to grant certiorari in the case of Rasul v. Bush, which related to the habeas corpus rights of detainees at Guantanamo Bay, resulted in the transfer of CIA detainees from the CIA detention facility at Guantanamo Bay to other CIA detention facilities. See HEADQUARTERS ▮▮▮, subject "RESTRICTED ACCESS TO [DETENTION SITE COBALT] AND [DETENTION SITE ORANGE]"; email from: ▮▮▮; to ▮▮▮; cc: Jose Rodriguez, [REDACTED], ▮▮▮, [REDACTED], ▮▮▮, [REDACTED], [REDACTED]; subject: guidance to ▮▮ gitmo; date: May 14, 2004; forwarding final cable: HEADQUARTERS ▮▮▮ (141502Z MAY 04), subject "Possible Brief to US Senator"; email from: Stanley Moskowitz; to: [REDACTED]; cc: [REDACTED]; subject: Re: guidance to ▮▮ gitmo; date: May 14, 2004; CIA responses to Questions for the Record, March 13, 2008 (DTS #2008-1310); "CODEL Roberts to Miami/Guantanamo, 7-8 July 2005," dated 5 July, ▮▮▮ 902860.

[2468] Transcript of hearing, May 12, 2004 (DTS #2004-2332); Transcript of hearing, September 13, 2004 (DTS #2005-0750).