# Declaration of Alka Pradhan

1. My name is Alka Pradhan. I am over 18 years old and competent to make a declaration.

*Duties as counsel*

2. I am employed by the United States government, Department of Defense, Military Commissions Defense Organization as a civilian attorney. In 2015, I was detailed by Brigadier General John G. Baker, United States Marine Corps, as an attorney for Ammar al Baluchi in *United States v. Khalid Shaikh Mohammad et al.*, commonly known as "the 9/11 Case." In this declaration, I write only in my capacity as counsel for Mr. Baluchi, and do not speak for any other element of the United States government.

3. Prior to my employment at the Military Commissions Defense Organization, I was employed by the UK human rights organization Reprieve as U.S.-based counsel, representing Guantanamo Bay detainees and civilian victims of U.S. drone strikes in Pakistan and Yemen. I also worked as senior counsel for The Constitution Project's Task Force on Detainee Treatment, investigating and writing a comprehensive report on U.S. detention operations since 2001. Among the topics that I investigated, including interviews of U.S. and foreign government officials, was the former CIA Rendition, Detention, and Interrogation Program (RDI Program).

4. Since 2015, my duties as assigned by Learned Counsel James Connell primarily although not exclusively involve analysis and litigation of the role of the CIA in the torture and other cruel, inhuman, and degrading treatment of Mr. al Baluchi. This area of focus includes the RDI Program and conditions of confinement at Camp VII.[1] In the course of my duties, I have examined many hundreds of classified and unclassified documents relating to the RDI Program and Camp VII.

5. Under Regulation for Military Commission § 9-1(b)(2)(F), my duties as counsel include safeguarding national security information. To the best of my understanding and belief, no statement in this declaration reveals classified information.

---

[1] In the United States Military Commissions, Roman and Arabic numerals are used interchangeably to describe Camps V and VII.

*Existence of CIA Camp VII records declassified in SSCI Executive Summary*

6. The redacted Executive Summary of the Senate Select Committee on Intelligence report on the CIA RDI Program includes the following declassified text at page 80 (Attachment A):

> On September 5, 2006, bin al-Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba.[427] After his arrival, bin al-Shibh was placed on anti-psychotic medications.[428]
>
> [428] ▬ SITE DAILY REPORT - 24 MAY 07; ▬ 8904 (182103Z APR 08)

7. From unclassified sources, I am aware that "site" is CIA jargon for a specific location at which it conducts operations. From review of many declassified documents, I am also aware that CIA dates documents in the distinctive format DDHHHHZ MMM YY. This date format breaks down into
   a two-digit date
   four digits of military time
   a capital Z for Zulu or Greenwich Mean Time
   a space
   a three-letter month abbreviation in all caps
   a space
   a two-digit year.
   This distinctive CIA format can be seen throughout the redacted Executive Summary, including in footnote 423 on page 80.

8. Based on my experience in reviewing CIA documents released under the Freedom of Information Act, the context of the redacted Executive Summary, and other unclassified sources, I can say to a reasonable degree of professional certainty that the footnote

   > [428] ▬ SITE DAILY REPORT - 24 MAY 07; ▬ 8904 (182103Z APR 08)

   refers to two CIA documents: a "Site Daily Report" dated 24 May 2007 and a cable numbered 8904 dated 18 April 2008.

*Litigation over CIA records of Camp 7*

9. In January 2020, attorneys for Ramzi bin al Shibh, a co-defendant in the 9/11 Case, filed a motion to compel production of CIA records of Camp VII (Attachment B). This unclassified motion sought the production of CIA records relating to Camp VII, based on the existence of such records revealed in the SSCI Executive Summary.

10. Following review by the Department of Defense Security Classification/ Declassification Review Team, among others, the U.S. government released

Mr. bin al Shibh's motion AE 711 to the public with only one minor redaction of an email address. The publicly-released version of AE 711 includes assertions from Mr. bin al Shibh's defense counsel regarding the existence of CIA records regarding operational control of Camp VII.

11. On November 2, 2021, I and other attorneys conducted argument in open session on Mr. bin al Shibh's motion to compel CIA records from Camp VII (Attachment C). The open session was monitored for disclosure of classified information by a military judge, multiple prosecutors, a Court Information Security Officer, and on information and belief, an Original Classification Authority for the CIA. The prosecution had access to a text device allowing communication from classified information equity holders in case of unauthorized disclosure of information. The open session was transmitted to an audience of media and other observers on a 40-second delay to allow the military judge or CISO to prevent the disclosure of classified information.

12. In the course of oral argument on November 2, 2021, I and other defense attorneys repeatedly argued the existence and significance of CIA records regarding its role at Camp VII in the late 2006 and early 2007 timeframe. In this oral argument, a prosecutor from the Office of the Chief Prosecutor represented the interests of CIA. One of many examples is the argument of Cheryl Bormann, counsel for Walid bin 'Atash, at page 34246-47:

```
    LDC [MS. BORMANN]:  So I heard Mr. Feeler say that it is
relevant and noncumulative, and I'm going to quote him, what
the CIA has to say about Mr. Binalshibh.  And I think he's
right.  That's a very narrow question.  However, the larger
question on this particular issue is why the CIA has anything
to say about Mr. Binalshibh or any of these men in early 2007
```

```
       and late 2006.  According to the government's witness, they
       had nothing to do with these guys, and it's clear they did.
              So when you're examining the questions surrounding
       this particular motion, I suggest that you pay particular
       attention to the fact that, one, the records exist and, two,
       the fact that they exist ought to tell you something about
       their attenuation argument.
```

13. Later on November 2, 2021, the prosecution three times acknowledged the existence of CIA records regarding their role at Camp VII, specifically including the Site Daily Reports. In the transcript, "MJ" stands for Military Judge, and "TC" stands for Trial Counsel, the military term for prosecutor. At page 34252 of the Unofficial Transcript, the prosecutor admits the existence of the Site Daily Reports from Camp VII:

So when you're saying that the defense already has some of these medical records ----

TC [MR. SWANN]: They have all the medical records.

MJ [Col McCALL]: Understood. But, again, those are the medical records that were produced and compiled by the DoD, correct? And it sounds like the -- the defense's argument is that there may be additional reports relating to the same topic produced by the CIA.

TC [MR. SWANN]: There are no additional reports. Let me address that one that he ----

MJ [Col McCALL]: But -- so -- and this is where I'm trying to cut through some of the -- the churn between the parties. If a document doesn't exist, that makes my job very easy. The document doesn't exist, the argument is over.

If the question then is, well, the document exists but we're not going to produce it because it doesn't fall under -- you know, it's not relevant or material, okay. Then I -- then I'm getting involved.

So I guess that's my first question is: When they reference what was -- this report that was referenced in the footnote 428, and then let's move into the second category of the site daily reports, those do exist, correct?

TC [MR. SWANN]: Yes, sir.

At page 34255, the military judge and prosecutor discuss the significance of documents showing mixed DoD-CIA control of Camp VII:

MJ [Col McCALL]: Well, I -- but -- so it still is an issue in dispute, though, correct? I mean, so it's not a -- it would be very simple, and again, it would make things easier for me if it was black and white, DoD was in complete control, CIA was not involved, or if it was the opposite, if CIA was involved such as in the RDI program, DoD was not involved.

But here where it's -- it sounds like, the testimony from the camp commander and some of the other documentation, shows there was an MOU, there was some overlap, there was some mixing; and so once that becomes in dispute, the amount of CIA involvement and its effect then on the potential attenuation argument, isn't this then a matter of weight, that it should go to the defense so that they can then look at the CIA

documents to determine, hey, this helps our argument that CIA was exerting control, was having some type of supervisory action ----

TC [MR. SWANN]: Well, but ----

MJ [Col McCALL]: ---- versus -- I mean, it seems like if the documents that the document may possess, it sounds like, are simply regurgitating what were already in DoD medical records, it seems that the government would want to give those to the defense and foreclose that argument.

TC [MR. SWANN]: That -- that may well be true. But in this case -- in this case, that's not what those documents do.

And at pages 34259-60, the prosecutor again admits the existence of the Site Daily Reports:

MJ [Col McCALL]: But again, the -- the defense position appears to be that they're wanting -- it's not the underlying information, it's the fact that it's then being put into CIA reports, being communicated via CIA channels; any other communications among the CIA and FBI, again, to show that -- that working together between the DoD and the CIA, and then that might have been -- they could lend to defense arguments for having an effect on the LHM. That makes sense to me.

So I guess going back, my question is: It sounds like those do exist, these daily site reports?

TC [MR. SWANN]: Yes, sir.

MJ [Col McCALL]: Okay. And they have not been produced? Because it sounds like the -- the government position is that they are cumulative.

TC [MR. SWANN]: Yeah. One more.

MJ [Col McCALL]: Sure.

TC [MR. SWANN]: Mr. Trivett suggests that I just simply ask you to go back and take a look at the statement of relevant facts. We have -- we have admitted a number of things, but it ----

```
MJ [Col McCALL]:  I'll do that.
TC [MR. SWANN]:  These particular items -- that one
particular item they have by virtue of the report itself.  The
rest of these items have -- they don't contribute to anything
that you need to determine about the voluntariness of these
statements.  People write reports day in and day out and they
send reports everywhere, and this is just an example of a
report going out.
```

14. On 11 January 2022, the military judge granted Mr. bin al Shibh's motion and ordered the prosecution to produce "any CIA records related to Camp 7 that reference Mr. bin al Shibh's detention, treatment, and conditions, or his 2007 [FBI-DoD] interrogation." (Attachment D.)

*Classification guidance on 2022 Camp VII inspection*

15. In April 2021, I and other defense attorneys learned from Mr. al Baluchi and the media that Joint Task Force-Guantanamo had relocated prisoners at Camp VII to another prison. I participated in an inspection of parts of Camp VII in March 2022.  During the Camp VII inspection, an attorney from the Office of the Staff Judge Advocate for Joint Task Force-Guantanamo escorted me and the other members of the inspection team.  Among other roles, the attorney advised on what elements the inspection team was allowed to photograph. At no time did the attorney advise me that, or prohibit photography on the basis that, the existence or non-existence of information regarding CIA operational control of Camp VII was classified.

16. Under U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on April 26, 2022.

*[signature]*

_____
Alka Pradhan