# Attachment C

1  [The R.M.C. 803 session was called to order at 1357,

2  02 November 2021.]

3      MJ [Col McCALL]:  The commission is called to order.

4  Parties are again present with the exception of Mr. Ali.  I

5  can't quite see, is Mr. Hawsawi in the back?  It looks like --

6  yeah, I can see him.  Okay.

7          Mr. Sowards.

8      LDC [MR. SOWARDS]:  Thank you, Your Honor.  Not to return

9  to the argument on the motion we had, but I did want you to

10  know that I had answered your question without consulting with

11  my -- my colleagues, and there is one witness that during this

12  session Ms. Radostitz would be prepared to examine, if it's

13  convenient for the government, and that is the -- I guess they

14  refer to him as the former camp commander.  And his was one of

15  the testimonies that was interrupted, not by COVID-related

16  problems, but something else.

17          So if they can get that back on track.  And she was

18  indicating that that might actually assist with the

19  information she needs for Special Agent Pellegrino's

20  examination.

21      MJ [Col McCALL]:  Okay.

22      LDC [MR. SOWARDS]:  So just keep that in ----

23      MJ [Col McCALL]:  Thank you, Mr. Sowards.

1    And, government, I'm not going to ask you your

2 position on that right now.  We'll see where we get and -- but

3 I expect you to start to consider it and then I'll ask you at

4 some point if it looks like it's an option.

5    MTC [MR. TRIVETT]:  Yes, sir.

6    MJ [Col McCALL]:  Mr. Connell.

7    LDC [MR. CONNELL]:  Sir, when I left our ELC office about

8 five minutes ago, the feed was down to that and that's fine.

9 I mean, I understand that.  But has there been a comms check

10 with the stenos and the interpreters to see if their feeds are

11 up?

12    MJ [Col McCALL]:  I didn't hear that it was an issue.  We

13 can check on it.

14    LDC [MR. CONNELL]:  I know that we're on the same feed

15 that they are, sir, so that's what my concern was.

16    MJ [Col McCALL]:  All right.  We're checking on it.

17 **[Pause.]**

18    MJ [Col McCALL]:  It sounds like at least the stenos are

19 good.  We're waiting to hear from the linguists.

20    Okay.  It sounds like we're good with the linguists as

21 well.

22    All right.  We'll go ahead and move into AE 711.  This

23 is Mr. Binalshibh's motion to compel production of CIA records

1 related to Camp VII.

2     DC [MR. FEELER]:  Good afternoon, Your Honor.

3     MJ [Col McCALL]:  Good afternoon.

4     DC [MR. FEELER]:  Wyatt Feeler again on behalf of

5 Mr. Binalshibh.

6     So AE 711, as we discussed a little bit this morning,

7 is a motion to compel and it's related to a host of issues in

8 this case, not least of which currently is the voluntariness

9 issue, but also related potentially to other suppression

10 issues, to mitigation, to outrageous government conduct, and,

11 depending on the discovery we could receive, to other issues

12 we haven't even thought of yet.

13     The issue goes to the heart of the defense.  And what

14 we're asking for here, to be very clear, are CIA records from

15 Guantanamo Bay or, more specifically, Camp VII related to

16 Mr. Binalshibh from the time after he was brought for the

17 second time to Guantanamo Bay in September 2006.

18     And the -- the relevant records we would be seeking

19 are those that are directly related to Mr. Binalshibh, for

20 example, that mention him or talk about him; those that talk

21 about conditions of confinement at Camp VII, which even if

22 they don't mention him by name, are pretty directly relevant

23 to Mr. Binalshibh; and any that discuss the planning,

1  preparation, and conduct of the LHM interrogation, which is,

2  of course, at issue in the suppression litigation.

3      So the genesis of this motion has to do with the

4  SSCI Report and footnote 428, which you'll be familiar with if

5  you've read the motion.  So the unclassified redacted

6  executive summary of the SSCI Report talks about

7  Mr. Binalshibh's transfer from the black sites to Guantanamo

8  Bay.  It gives the date he was transferred and then it says,

9  after his arrival, Mr. Binalshibh was placed on antipsychotic

10  medications, and there's a footnote there for reference.

11      And footnote 428, it says redacted, site daily report,

12  24 May '07, and there's a colon and it says redacted and then

13  there's the rest of a citation there that appears the same.

14  And if -- you know, if you look at other footnotes in the

15  report, it appears the same as CIA cables.  It has a time and

16  a date, some numbers that don't mean much to me, but must have

17  meant something to someone.

18      So request 1 in our discovery request and the motion

19  to compel is as narrow as I could conceive of a request.  It

20  is for this record in footnote 428.  We obviously have reason

21  to believe it exists.  It references Mr. Binalshibh.  It comes

22  from early 2007, and it references him being placed on

23  antipsychotic medications, and it comes from a time when we

1 know, as I discussed this morning in reference to a couple of
2 motions, that he had been involuntarily, forcibly medicated
3 for a period of several months at Camp VII.

4     Obviously, our -- our request is not limited to this
5 document, but it is a little curious to me that the
6 government's primary and first contention in their response to
7 our motion seems to be that it is overbroad.  It makes me
8 wonder if that's almost a go-to response to motions to compel
9 because I'm not sure, as I said, how this request -- request
10 could be any narrower.  So that is request 1.

11     There are three more requests, getting broader from
12 there.  The second request is for any site daily reports.
13 Whatever this is from 24 May '07, calls itself a site daily
14 report.  So we ask for any other site daily reports that meet
15 those criteria that I listed above:  Relevant to
16 Mr. Binalshibh, conditions of confinement, LHM interrogation.

17     The second -- since the second half of the footnote
18 appears to be a CIA cable that I assume contained this report
19 or sent it to someone else, then our third request was for CIA
20 cables.  Because after Mr. Binalshibh was transferred to
21 Guantanamo Bay, apparently he's showing up in site daily
22 reports and in CIA cables.

23     And the fourth request is for any communications, in

1  case we didn't cover anything, between the CIA and other

2  agencies that contain the same information.

3      As far as I'm aware, we don't have the document in

4  428.  The government obviously could have very easily said in

5  their response, you have this document, here's the Bates

6  number, and I would have gone and read it.

7      We have a good-faith basis to believe that there are

8  more similar documents.  And I'll get to the -- in a minute to

9  the discovery the government has provided and why that's not

10  enough.

11      But this document is called a site daily report.  I

12  assume the CIA doesn't -- or whoever created it, doesn't

13  create something and call it a daily report if they're only

14  producing it monthly or annually.  So a good-faith basis to

15  believe that there are other similar documents out there that

16  could be relevant.

17      What we're not asking to do, and this goes to the

18  narrowness, is to go through drawers of files and look for

19  anything that could exist.  And that's what the government in

20  footnote 3 on page 5 of their response accuses us of doing.

21  The defense advocates for the idea of open file discovery

22  whereby it has the ability to open every single drawer of the

23  government's filing cabinet -- this is why I usually don't

1    read -- and allow it alone to determine what classified

2    information is noncumulative, helpful, and relevant.

3         Your Honor, if that's what I wanted to do, I would

4    have asked for all CIA records; and then I would have gone

5    through them and looked for things that I found to be

6    relevant, helpful, and noncumulative.  Instead, following the

7    usual discovery practice, we're asking the government to look

8    through documents and find the ones that are relevant,

9    helpful, and noncumulative.  And here we have at least one

10   document that we don't have that we think meets those

11   criteria.

12        Right before the government says that, they have this

13   italicized portion of this footnote, and I won't spend too

14   long on this.  But they say it appears the defense grounds its

15   motion on the basis that, given the commission's duty to

16   consider the totality of circumstances surrounding the LHM,

17   that the defense must have access to all evidence that could

18   demonstrate why the statements must be suppressed or refute

19   the government's theory of voluntariness.

20        And if their contention is that we believe we have a

21   right to all documents that could demonstrate why the

22   statements must be suppressed or refute the government's

23   theory of voluntariness, then I completely agree with that.

1  We are in the middle of litigating a voluntariness issue.  We

2  have the right to those very types of documents.

3       I talked a little bit this morning about the theory of

4  suppression.  Obviously, if you have any questions about how

5  these documents -- I hope it's pretty clear -- about how these

6  documents, CIA documents from the time Mr. Binalshibh is

7  supposedly in DoD custody, are relevant, or about why any

8  government documents talking about his forcible medication in

9  United States Government custody, and especially his forcible

10  medication within weeks of supposedly consenting to an

11  interrogation by the FBI are relevant to our issue, I'm happy

12  to explain that more, but I think the relevance speaks for

13  itself.

14       So I'll move on to address why what the government has

15  provided is not enough.  The government says that they've

16  provided medical records, which is true; that they've provided

17  DIMS, which is true.  Well, let me -- let me stop there

18  because that's kind of one category.  That would be an answer

19  to this request if all we were looking for was the fact that

20  Mr. Binalshibh was medicated with antipsychotic medications.

21  That's not all we're looking for.

22       So the fact that we have a DoD record or a JTF record

23  that chronicles his medication or the reason why he was

1  medicated or a doctor's note, something like that, that does

2  not make a CIA record about his involuntary medication from a

3  period months after he came out of DoD custody -- or CIA

4  custody after his time in the black sites cumulative.  It was

5  created for a different purpose by a different organization

6  with different concerns, I assume.  I haven't seen the record.

7  So it's not about the fact of involuntary medication.  That's

8  merely the reason that we know that relevant records exist.

9         It's also why the government's contention that we can

10  question the Camp VII commander is not enough.  The Camp VII

11  commander, of course, didn't work for the CIA.  The Camp VII

12  commander said on his testimony that he never saw one of the

13  detainees during the time he was supervising the camp in

14  distress.  And this is the Camp VII commander who was in

15  charge of that facility during the time that Mr. Binalshibh

16  was forcibly removed from his cell, forcibly shaved, and

17  ultimately involuntarily and forcibly medicated.

18         Now, the CIA records, the CP7 records.  So the

19  government points out that we've been provided a statement

20  admitting relevant facts regarding Camp VII, and that's true.

21  We have -- the Camp VII commander talked about in his open

22  testimony that there was a memorandum of understanding

23  governing, between DoD and the CIA, governing who did what in

1  the camp.  So there's a relationship here.  So we have

2  discovery related to that.

3       The problem is that MOA and the other discovery we've

4  been provided, the statement of fact -- relevant facts, are

5  general documents.  They're not about Mr. Binalshibh.  They're

6  relevant, but they're not specific to Mr. Binalshibh.  And the

7  interesting thing as we try to get discovery in this case --

8  or what I find interesting is, when we request general

9  records, right, the response is often, well, you need to be

10  requesting a record that's specific to your client.  That's

11  not about your client.  And I understand that.  Here we have a

12  case where we're requesting specific records, specific to our

13  client, and at least part of the response is, well, you have

14  general records.  It can't be both.

15       A little bit about additional materiality of the issue

16  and then I don't have a lot more to say, frankly, Your Honor.

17  This morning I talked a little bit about attenuation, that the

18  government's theory is attenuation.  I think you understand

19  that, why the -- why the role of the CIA is important here.

20  You can find that in our briefs, so I'm not going to spend a

21  lot of time harping on it.  The -- the government's things

22  have changed argument, which could very well be undercut by

23  what the CIA is now saying about Mr. Binalshibh.  And we

1 know -- I will say in addition to this -- this document, we
2 know that two months after Mr. Binalshibh was transferred to
3 Camp VII in November of 2006, the CIA prepared a -- what they
4 called a psychological background.

5       Now, the CIA had done psychological reports on
6 Mr. Binalshibh during his time in the black sites.  Some of
7 those reports were written by the psychologists who approved
8 of his EITs, so they are worth what they are worth as far as I
9 am concerned, but they had done these reports.

10      They did another one after he was transferred to
11 Camp VII, and we do have that.  I have no idea why it was
12 prepared or who it was given to, what the purpose of it was,
13 why the CIA's writing a psychological background two months
14 after Mr. Binalshibh supposedly left their custody.  But we do
15 have that.  So we know that -- I mean, I guess it's a
16 possibility they created that only for their own records.  I
17 doubt it.

18      The final issue that is important here, as if we
19 needed more materiality, is that related to attenuation, the
20 issue of who was running Camp VII and what the roles were is
21 at issue.  And as you might be aware, there's a pending motion
22 series in AE 692 that arose out of the camp commander's
23 testimony.

1    The SSCI Report, among other things, says that when

2  Mr. Binalshibh and the others were transferred to Camp VII,

3  they remained under the operational control of the CIA.  And

4  that is -- and the government can correct me if I'm wrong on

5  this.  As far as I'm aware, that is the only contention in the

6  SSCI Report that the government does not agree with, and they

7  had the camp commander testify to as much.  So that is a

8  contentious issue.  There's a reason that the government does

9  not want to admit that, I think, because it cuts so far

10  against their attenuation argument.

11    And that's part of why the camp commander didn't

12  finish his testimony, because of that 692 issue that arose in

13  his testimony.  And I won't go through the issues with that.

14  Just letting you know that that's another issue that's before

15  the commission that CIA records from this time could be very

16  relevant to.

17    With that, subject to your questions, Your Honor,

18  that's -- that's all I have.

19    MJ [Col McCALL]:  No.  I may have more questions for you

20  after I hear from the government, but, no, I appreciate that.

21  Thank you.

22    DC [MR. FEELER]:  Thank you.

23    MJ [Col McCALL]:  Any other defense counsel wish to be

1  heard?  Mr. Connell?

2      LDC [MR. CONNELL]:  Ms. Pradhan from the RHR will be

3  arguing on our behalf.

4      MJ [Col McCALL]:  Okay.

5      ADC [MS. PRADHAN]:  Good afternoon, Your Honor.  Can you

6  hear me?

7      MJ [Col McCALL]:  I can.

8      ADC [MS. PRADHAN]:  Great.  It always takes me just a

9  second to get oriented over here.

10      So as Mr. Feeler's argument did just now, my argument

11  on this goes beyond the issue of Mr. Binalshibh's position on

12  Special Agent Butsch.  Mr. Connell has elucidated our position

13  on that and, of course, I understand our colleague's position

14  on team Binalshibh.

15      The issue of CIA control of Camp VII is one that I'm

16  sure you understand, sir, as critical to a resolution of a

17  number of major motions, including every defendant's motion to

18  suppress, but also pending motions to dismiss for outrageous

19  government conduct and whether the military commission will

20  impose any sanctions on the government for their treatment of

21  Camp VII, which is detailed in AE 819 and 821.

22      Mr. Binalshibh, I think, very effectively pointed to

23  the examples from the SSCI Report that point to existing

1  documents of relevance to the issues ----

2      MJ [Col McCALL]:  Ms. Pradhan, if you could stop for just

3  a second.

4      ADC [MS. PRADHAN]:  Yes, sir.

5      MJ [Col McCALL]:  If we can switch the main camera.  I

6  have all of the camera views up here on the bench, so I have

7  the direct shot to you.  The one that's up on the big screen

8  is -- just barely gets you on the camera.

9      ADC [MS. PRADHAN]:  I'm okay with that, sir, but whatever

10  you want.

11      MJ [Col McCALL]:  Hold on.

12      ADC [MS. PRADHAN]:  Sure.

13      MJ [Col McCALL]:  We'll press.  We'll just keep it this

14  way for now.  Go ahead.

15      ADC [MS. PRADHAN]:  Yes, sir.  Thank you.

16          Mr. Feeler mentioned AE 692, and I won't go into too

17  much detail on that, obviously.  Well, actually, briefly, on

18  the documents that Mr. Feeler mentioned from the SSCI Report,

19  he did mention the site daily reports.  And I just want to

20  flag the military commission that we do have -- we did file a

21  505 notice for the series.  That's at 711C.  And we do have I

22  think a decent amount of classified argument on this motion

23  and would -- for which we can go into a little bit more detail

1   on those documents.

2       Regarding 692, I just wanted to flag that I mentioned
3   this issue briefly during the last -- last month's --
4   September's oral argument, in the context of areas where the
5   government states publicly, I may do so today, that the CIA
6   did not control Camp VII, the men were in DoD custody, and
7   that's why the information is not discoverable or perhaps
8   doesn't exist.

9       And then we're limited in the ability to challenge
10  that because of the classified nature of most of the bits of
11  information that we have.  And again, this is where -- this is
12  why we filed the 505 notice.  But I do want to talk about a
13  little bit in open session what we -- what we do know, what is
14  available to the public.

15      Most government responses on discovery fall into one
16  of two categories:  There's nothing there or it's not
17  relevant.  And this motion is a really good example of the
18  second, because claiming that there's nothing there is just
19  too much of a stretch on this one.  There are a few
20  unclassified highlights of what we know to exist.  Mr. Feeler
21  talked through some of them.

22      But the Camp VII commander's testimony in
23  November 2019 that is referenced in great detail in 819 and

1  821 is also there on this subject.  And I want to note that

2  the -- the publicly released transcripts from the 806 session,

3  the classified session of his testimony, are very, very

4  heavily redacted.  I'm not going to go into anything

5  classified, but he did answer questions about, at for example,

6  page 28937 of his 4 November 2019 testimony, this is of the

7  publicly released transcript, he did answer questions about a,

8  quote, interagency meeting in relation to August 2006 when he

9  was familiarizing himself with Camp VII.  He did mention,

10  quote, interagency decisions being made in a, quote, summary

11  of conclusions for an interagency process.  That's at

12  page 28946 of the publicly released transcript.

13        CIA documents discussing or outlining their

14  involvement in these decisions should exist.  And for

15  suppression purposes, just to be crystal clear in layman's

16  terms, how much -- if and how much the CIA was able to

17  administer Camp VII to be just another black site is extremely

18  relevant to all five defendants' state of minds while they

19  were there.

20        It's also relevant to any motions regarding outrageous

21  government conduct.  If the CIA did do this and was

22  successful, was there pushback?  Were there internal squabbles

23  about whether conditions of confinement as imposed, perhaps by

1  the CIA, were legal under the Geneva Conventions since they
2  were now publicly reported to be in DoD custody?  Did the CIA
3  win those fights?

4          This is actually a topic on which if the government
5  believes its own argument that there was clear separation
6  between the CIA and DoD, they should want us to have.  We know
7  from the unredacted parts of the Camp VII commander's
8  testimony that he was asked about periodic interagency
9  meetings regarding Camp VII at 10-day and 30-day intervals in
10 addition to the site daily report that Mr. Feeler mentioned.

11         And we know that he was asked, in the course of
12 discussing SOPs and the management of Camp VII, about a
13 document that listed for consideration the, quote, modalities
14 for referral of allegations of detainee mistreatment that
15 occurred prior to arrival.  And that's at page 29010 of the
16 publicly released transcript of November 4th, 2019.  His
17 answer is redacted from the publicly released transcript.

18         The CIA documents stating or discussing or outlining
19 their involvement in those meetings and this document should
20 exist, particularly as regards modalities of reporting torture
21 at CIA black sites.  Again, just to be crystal clear, how
22 detainees could report torture occurring before they got to
23 Camp VII, what that process was, and how or whether the CIA

1  controlled that process and in what way is extremely relevant

2  to detainees' state of mind and conditions of confinement,

3  particularly in a period where they were unrepresented by

4  counsel by design.

5      We know that the Camp VII commander was asked about

6  the division of duties and responsibilities at Camp VII.

7  That's at page 29018 of the publicly released transcript, and

8  that he talked about, quote, support personnel there as well.

9  And I can discuss the significance, the extreme significance

10 of those statements more in -- in closed session.

11     But it's an unclassified fact that the CIA was

12 involved in the preparation for the LHM interrogations months

13 after their transfers to Camp VII.  And we know, actually,

14 that even though the men were purportedly in DoD custody, the

15 FBI agents who interrogated them were required to write up

16 their notes on CIA computers.

17     Given what we know about the level of CIA control over

18 the LHM process, it just wouldn't be credible for the

19 government to state that there are no CIA documents about the

20 exertion of control over Camp VII administration that the

21 Camp VII commander himself discussed.

22     So they -- they don't exactly.  They go to the second

23 category.  They recycle their old argument that the defense

1   must prove that the information requested is, quote, more than

2   theoretically relevant.  I mean, as Mr. Feeler pointed out, I

3   think we're way past that.  But there are three things I just

4   want to highlight really fast about this.

5         The first is that, again, they don't deny that the

6   documents exist in that response.  What they do is pivot --

7   this is the second point -- pivot to the relevance argument

8   that has been one major cause of these nine years of pretrial

9   hearings, the delay that they talk about so often.

10        The military commission doesn't review the classified

11  information that the government holds back on relevance

12  grounds.  So we have to do this decoding exercise in so many

13  of these cases where we analyze redactions and put together

14  handfuls of unredacted words in a transcript or from a

15  footnote of the SSCI redacted executive summary to show that,

16  look, something is there and it is relevant.  And that, of

17  course, goes to the third point, which is why we should have

18  it and why it is, in fact, noncumulative and relevant.

19        The taint of the LHM statements in addition to

20  destruction of evidence motions is the most important issue

21  we've ever litigated in nine years.  And when Mr. Binalshibh

22  talks about the totality of circumstances, the military

23  commission is well aware that that's a legal term of art and

1  the government knows, just as well as we do, that to apply it

2  to the suppression issue, we argue -- this is not ----

3      MJ [Col McCALL]:  Ms. Pradhan, if you can slow down a

4  little bit, I'm getting the sign from the linguists.

5      ADC [MS. PRADHAN]:  Of course, sir.  Sorry about that.

6      MJ [Col McCALL]:  That's fine.

7      ADC [MS. PRADHAN]:  The government knows then -- and, you

8  know, we've made no secret of this certainly in our

9  suppression group brief at AE 628 that our theory is that the

10  torture and interrogation program was a whole-government

11  program involving multiple agencies and the White House.  And

12  we argue that it continues to be a whole-government program,

13  which is why other government agencies exert such control over

14  the discovery process and even courtroom proceedings, which

15  we've seen numerous times in the past nine years and, again,

16  which I can -- I'm happy to talk about more in closed session.

17      The government says in their response, Mr. Feeler --

18  Mr. Feeler alluded to this, that we've received voluminous

19  discovery regarding the defendants' detention at Camp VII.

20  And so, you know, let's look at the examples they provide.

21  The first is LHM documents.  We got the LHM documents early on

22  in 2013.  Because the government's story early on, still is,

23  is what's in the public consciousness now, that the men were

 1  moved to Guantanamo, away from CIA torture, and interrogated

 2  by the FBI while drinking McDonald's coffee.  So the LHM

 3  statements helped promote that narrative.

 4      The medical and the DIMS records, which we do have,

 5  are obviously DoD-generated documents pertaining to their

 6  daily and periodic assessments here at Guantanamo and, to our

 7  knowledge, involving DoD medical personnel.  But it wasn't

 8  until December 2014, two and a half years into these

 9  proceedings, that the SSCI released the redacted executive

10  summary of their report with that line saying that -- that,

11  you know, that one line, in a couple -- in these footnotes

12  saying that per CIA documents, the CIA maintained what they

13  called operational control over Camp VII.

14      Now, if anybody was on notice, at least by that point,

15  that further discovery should be produced to the defense about

16  that relevant and material fact, it was the government.

17  That's their obligation.  And it didn't happen then.  That was

18  seven years ago.

19      And, you know, I want to refer really fast and

20  contextualize Mr. Trivett's statements about -- this morning

21  about delay, because they're really directly relevant to this

22  motion and sort of what we knew when FBI -- you know, about

23  FBI involvement with the CIA and CIA involvement at

1   Guantanamo, which is the heart of these suppression motions.

2        Mr. Trivett said the defense has known about these

3   issues for nine years.  And that's just false.  With this

4   continuous casting of aspersions on the defense, we're really

5   getting into candor issues.  I won't belabor the timeline

6   beginning in December 2017 with an accidental disclosure by

7   Special Agent Perkins that, on the stand, that she'd had

8   access to black site reports while prepping for the LHM

9   interrogations, which in one -- one swoop broke the

10  government's neatly laid wall between the FBI and the CIA.

11       But even then, it wasn't until May 2018 for the first

12  time that the prosecution represented to Judge Pohl that the

13  prosecution team had had no idea up until that point, six

14  years into pretrial hearings, of the FBI's involvement at the

15  black sites.  We briefed all that.  That's in, for example,

16  524RR, it's in the 534, 562 motions to reconsider.  It's in

17  628.

18       And that's when we started getting this discovery

19  about the collaborations between the FBI and CIA at the black

20  sites, and then slowly information about Camp VII.  So, for

21  example, two more discovery markers pertinent to this issue,

22  we got or started getting DoD records, the 10- and 30-day

23  assessments regarding early administration of Camp VII on

1  September 26th, 2019, after we'd begun witness testimony on

2  suppression.

3       And Mr. Feeler discussed really fast, he mentioned a

4  document that the prosecution said they'd produced to us.

5  They -- they filed a classified document on this topic in

6  2018.  And in their response to 711, 711A, that -- their

7  response was unclassified.  And they summarized the title of

8  that document as, quote, statement admitting relevant facts

9  regarding Camp VII.

10       That classified document is in the record at AE 575

11  Attachment C, which is included in our 505 notice, and the

12  government, I believe, refers -- has referenced it as also

13  being at AE 641 (Gov) Attachment D.

14       Now, the government's treatment of this document in

15  this -- their unclassified response is, frankly, another

16  example of kind of misleading between unclassified and

17  classified pleadings.  The title of that document is different

18  from how the prosecution summarized it in that unclassified

19  filing.

20       I have the document here.  I can represent that the

21  title, as well as the section headers, are not portion marked

22  by the government as required on classified work product, so I

23  don't know if the title of that document is classified or not.

1  But out of an abundance of caution, I won't read the title in

2  open session except to say that the reason the government

3  summarized the title in an unclassified pleading is because

4  the title itself confirms that discovery in this motion exists

5  and is relevant and material.

6       And so we -- we have to be very clear about what we're

7  asking for here.  It's not a data dump of everything about

8  Camp VII in this motion.  It's the CIA's own documentation of

9  its involvement during, frankly, a critical time, but also

10  down the road of what their involvement was or even continues

11  to be at Camp VII.  That's the missing piece of what we don't

12  have.  And, of course, there's a lot more detail in -- in

13  closed session that we can go into.

14       But subject to your questions, sir.

15     MJ [Col McCALL]:  No questions.  Thank you, Ms. Pradhan.

16       All right.  Any other defense team?

17       Ms. Bormann?

18     LDC [MS. BORMANN]:  So I heard Mr. Feeler say that it is

19  relevant and noncumulative, and I'm going to quote him, what

20  the CIA has to say about Mr. Binalshibh.  And I think he's

21  right.  That's a very narrow question.  However, the larger

22  question on this particular issue is why the CIA has anything

23  to say about Mr. Binalshibh or any of these men in early 2007

 1  and late 2006.  According to the government's witness, they
 2  had nothing to do with these guys, and it's clear they did.
 3          So when you're examining the questions surrounding
 4  this particular motion, I suggest that you pay particular
 5  attention to the fact that, one, the records exist and, two,
 6  the fact that they exist ought to tell you something about
 7  their attenuation argument.
 8          In order to rebut their attenuation argument, we are
 9  entitled to material that tends to do that.  So that's what
10  we're asking for.
11      MJ [Col McCALL]:  Thank you, Ms. Bormann.
12          Any other defense teams?  It looks like a negative.
13          All right.  Government.
14      TC [MR. SWANN]:  Good afternoon, sir.
15      MJ [Col McCALL]:  Good afternoon, Mr. Swann.
16      TC [MR. SWANN]:  Sir, a couple of things I want to correct
17  just so that you can make -- that you don't be misled like I
18  was initially when I read these pleadings.
19          Take a look at the reply brief that the Binalshibh
20  team filed in this case.  That reply brief kind of leads you
21  to believe that we're talking about an entirely different
22  motion.  Apparently it was a pretty bad cut and paste of some
23  sort, but it's making reference to -- yeah, the reply brief

1  dated 11 February 2020 talks about -- this is their reply to

2  the government's response to Mr. Binalshibh's motion to compel

3  production related to his 2004 relocation from Guantanamo Bay,

4  Cuba.

5  So I don't know that we ever really -- I'm sure there

6  are bits and pieces in here that address this -- that are

7  response.  But don't -- that caused me to see what happened

8  in -- in AE 704, to see if the judge maybe had made a ruling

9  in that case.  And the judge did exactly that.  He explained

10  the law regarding discovery by saying, information is

11  discoverable if it is material to the preparation of the

12  defense or exculpatory.  The defense is also entitled to

13  information if there's a strong indication it will play an

14  important role in uncovering admissible evidence, assist in

15  impeachment, corroborate testimony, or aid in some sort of

16  witness preparation, and finally, information is discoverable

17  if it's material to the defense, but ----

18  Then the judge goes on to explain that a mere

19  conclusory allegation that the requested information is

20  material to the preparation of the defense doesn't satisfy the

21  defense's burden to show the reasonableness and the

22  materiality of that request.

23  Similarly, which is all you have here, is a vague

1  asserted need for potentially exculpatory information or

2  evidence that might be contained in materials sought that

3  doesn't pass muster.

4      Regarding classified information specifically, the

5  Court of Appeals of the District Court -- of Columbia has held

6  that classified information is not discoverable as a mere

7  showing of a theoretical relevance in the face of the

8  government's classified information privilege but further

9  requires seeking classified information is entitled to

10  information that is at least helpful to the defense.

11      Furthermore, the defense must be able to sufficiently

12  establish that the materials sought, in fact, exist.  And

13  finally, a defense discovery that is overbroad or otherwise

14  objectionable may be simply denied.  The commission is under

15  no obligation to amend or modify a request to render it

16  unobjectionable.

17      And the final paragraph, which is all important to us.

18  In the criminal case, the prosecution in a military commission

19  is responsible for determining what information it must

20  disclose in discovery.  Our decision is final.  Defense

21  counsel have no constitutional right to conduct their own

22  research in the state's files to argue relevance.  It's

23  incumbent upon the prosecution to exercise this duty

1 faithfully because consequences are dire if it fails to

2 fill -- fulfill it's obligation.  We understand that.  We're

3 not doing this thing again.

4      So that said, let me go to what the defense has

5 requested in 711.  And at some point in time I'll do 721.  And

6 while I've heard Mr. Feeler mention 812, I've got that one

7 too, so ----

8      MJ [Col McCALL]:  Okay.  Well, let's stick to 711 for now

9 and then we'll move into 721 after.

10      TC [MR. SWANN]:  711.

11      MJ [Col McCALL]:  Please.

12      TC [MR. SWANN]:  In short, they're moving to compel

13 information they believe exists.  He's talking about a -- a

14 report.  And if you look at the report, the report -- I mean,

15 the report is what it is.  They have it.  They have it in the

16 Senate subcommittee report and it's in there, and it's talking

17 about something that occurred in May of 2007.  This is five

18 months after the interviews that Special Agent Butsch did with

19 the accused in this case.  And they're talking about a

20 forcible medication of the accused.  They have that

21 information.  Again, that's May of 2007.

22      MJ [Col McCALL]:  But, Mr. Swann, let me just -- I'm

23 trying to make sure I'm understanding.  So you're saying they

1  have it because they have access to where it's written out in

2  the report, where it's mentioned in the report?

3      TC [MR. SWANN]:  Yeah, that's exactly.  It's a one-liner

4  that says -- it talks about being forcibly medicated in May of

5  2007, more than four months after they met with Butsch.  But

6  here's what they also have ----

7      MJ [Col McCALL]:  But that's a -- but before we move on,

8  again, I'm trying to make sure that I'm understanding.  So

9  that's a reference to this daily site report, correct?  But

10  it's not the actual daily site report.

11      TC [MR. SWANN]:  No, but the medical records say the same

12  thing.  They have medical records, okay?  I've -- I pulled out

13  just one medical record in looking at this.  That medical

14  record is dated -- let me get it.  It's with 22.

15      MJ [Col McCALL]:  Sure.

16      TC [MR. SWANN]:  They have a medical record that's found

17  at MEA-10013-00010955.  This is a 2 February 2007 report, a

18  psychiatrist's progress note where they are considering the

19  forcible medication of this accused.  That goes on from that

20  period in time all the way to -- until they actually do it,

21  sometime in -- in May or June, okay?

22          So they have that information already.  It's

23  throughout those reports.  That's just the -- that's just the

1 first report in this period of time. So it's no -- it's no

2 secret that the camp was considering the forcible medication

3 of the accused using some medication. And they had to do it.

4 He was -- he was creating -- let's just say he was creating a

5 ruckus in the camp itself, tearing off cameras off the walls

6 and doing other things.

7     But they have all of the information that they can use

8 to be able to formulate it. I've heard a lot about this.

9 Ms. Pradhan was just talking about the statement of relevant

10 facts. That didn't come out of the blue. That was a judge

11 sitting and looking through thousands of pages with our

12 statement of relevant facts that he approved under the 505

13 process, and that's what they've got. They have 10- and

14 30-day reporting both by -- to the SOUTHCOM commander from the

15 admiral here that -- that information, and we extended that

16 all the way out for about 18 months and gave it to them.

17     They've heard the testimony, and while they might not

18 agree with the testimony about who was in charge at Camp VII,

19 it is the testimony. And you'll get a chance to see him again

20 and he can explain to you what we're talking about.

21     MJ [Col McCALL]: Well, let me -- let me stop you there

22 and dig in. And again, just to make sure that I'm not

23 misunderstanding things. It gets a little convoluted here.

1    So when you're saying that the defense already has

2  some of these medical records ----

3    TC [MR. SWANN]:  They have all the medical records.

4    MJ [Col McCALL]:  Understood.  But, again, those are the

5  medical records that were produced and compiled by the DoD,

6  correct?  And it sounds like the -- the defense's argument is

7  that there may be additional reports relating to the same

8  topic produced by the CIA.

9    TC [MR. SWANN]:  There are no additional reports.  Let me

10  address that one that he ----

11    MJ [Col McCALL]:  But -- so -- and this is where I'm

12  trying to cut through some of the -- the churn between the

13  parties.  If a document doesn't exist, that makes my job very

14  easy.  The document doesn't exist, the argument is over.

15    If the question then is, well, the document exists but

16  we're not going to produce it because it doesn't fall under --

17  you know, it's not relevant or material, okay.  Then I -- then

18  I'm getting involved.

19    So I guess that's my first question is:  When they

20  reference what was -- this report that was referenced in the

21  footnote 428, and then let's move into the second category of

22  the site daily reports, those do exist, correct?

23    TC [MR. SWANN]:  Yes, sir.

1    MJ [Col McCALL]:  And the defense does not have them,

2 correct?

3    TC [MR. SWANN]:  Yes, sir.

4    MJ [Col McCALL]:  And it sounds like your argument is that

5 they are cumulative to DoD medical reports that have already

6 been provided.  Am I tracking?

7    TC [MR. SWANN]:  Yeah, there were no -- there were no --

8 there were no agency doctors seeing any of these accused

9 beyond September of '06.  One report that he mentioned, I do

10 recall having looked at all of the CIA reporting and medical

11 reports and I -- I can't call him on it right now, but I would

12 suggest that he might want to look at the date of that

13 particular report because some reports towards the end,

14 meaning in -- in August before they arrived here at

15 Guantanamo, were prepared.  And then those reports were in

16 a -- well, we didn't get it into the file soon enough and so

17 it was in the system.  We discovered those, okay?  So that's

18 what he is talking about.

19       No -- no doctors from another agency ever saw any of

20 these individuals after the day they arrived on Guantanamo

21 Bay, Cuba.  Now -- and I'll say this with a great deal of

22 confidence.  Every agency report regarding their -- their

23 medical treatment have been turned over.

1    Now, I know for a fact that you have seen a few

2 recently and that we sent those through the -- through a 505

3 process.  And I know that in looking at it, I believe there

4 were ten documents that relate to this particular accused.

5 Those will be provided.  But none of those reports even come

6 close -- come close to this timeline that we're talking about.

7 They are all very early that simply got captured up and then

8 we had to turn them over because they're medical reports.  We

9 turned them over.  We went through the process, and they're

10 being -- they're in the motion now of being provided to the

11 defense.  So I can say that with some confidence.

12    Now, I fail to understand how a single site report

13 dated sometime in May of 2007 has any relevance to this

14 particular motion at all.

15    MJ [Col McCALL]:  So -- and I may be misstating the

16 defense's position.  So I guess let me ask this.  So is the

17 government's position that the issue of CIA oversight or

18 control of Camp VII is not an issue?  Is that it doesn't go

19 towards the attenuation argument that the -- the government

20 has for the admissibility of the LHM?

21    TC [MR. SWANN]:  Just a second, sir.

22    MJ [Col McCALL]:  Sure.

23    TC [MR. SWANN]:  Sir, our position -- our position is --

1 is simply explained in the statement of relevant facts.  They

2 have all the information that the judge approved in that case

3 for turnover to the defense.  So they have everything.

4      I mean, the testimony of the camp commander, a man on

5 the ground during that period of time, we're not going to

6 dispute that there was a memorandum of understanding, but

7 that's all contained there.  So he can tell you exactly what

8 the day-to-day operation of what was going on in that camp

9 when his testimony is continued in this case.

10      MJ [Col McCALL]:  Well, I -- but -- so it still is an

11 issue in dispute, though, correct?  I mean, so it's not a --

12 it would be very simple, and again, it would make things

13 easier for me if it was black and white, DoD was in complete

14 control, CIA was not involved, or if it was the opposite, if

15 CIA was involved such as in the RDI program, DoD was not

16 involved.

17      But here where it's -- it sounds like, the testimony

18 from the camp commander and some of the other documentation,

19 shows there was an MOU, there was some overlap, there was some

20 mixing; and so once that becomes in dispute, the amount of CIA

21 involvement and its effect then on the potential attenuation

22 argument, isn't this then a matter of weight, that it should

23 go to the defense so that they can then look at the CIA

1  documents to determine, hey, this helps our argument that CIA
2  was exerting control, was having some type of supervisory
3  action ----

4       TC [MR. SWANN]:  Well, but ----

5       MJ [Col McCALL]:  ---- versus -- I mean, it seems like if
6  the documents that the document may possess, it sounds like,
7  are simply regurgitating what were already in DoD medical
8  records, it seems that the government would want to give those
9  to the defense and foreclose that argument.

10      TC [MR. SWANN]:  That -- that may well be true.  But in
11 this case -- in this case, that's not what those documents do.

12      MJ [Col McCALL]:  Okay.

13      TC [MR. SWANN]:  Okay.  They don't -- I mean, you would
14 think that giving them the 10- and 30-day reports, which we
15 did, which is the -- the -- which is the -- here's our -- our
16 understanding of what's going on, the important events that
17 are occurring, okay?  We did all of that because the camp
18 commander was going to talk about those things.

19          But that's not what these items do.  And if it were
20 relevant, even marginally relevant or even out there, I
21 wouldn't stand in front of you and say we're going to take the
22 risk and not turn them over because there's nothing in them,
23 okay?

1      The DIMS records.  The DIMS records -- and I don't
2  know if you've seen one of these.
3      MJ [Col McCALL]:  I have.
4      TC [MR. SWANN]:  Okay.  So you understand that a DIMS
5  record actually shows a guy was handed a bottle of water; a
6  guy was given the following food, calories and all that sort
7  of stuff; and he received mail or whatever the case may be.
8  They are extremely detailed.  He was taken out of his cell and
9  he was taken to the medical room for an evaluation.  There's a
10  report that's prepared or generated there if it was necessary.
11      The items that we have turned over are -- are
12  everything that went on in that camp from on or about the 6th
13  of September to the day they hit the camp and up to the
14  present time.  I think they -- we have them all the way
15  through now.  The last medical records were turned over 31
16  August for that entire month.  So I've got the September and
17  October ones that I'm looking at right now and they'll be
18  turned over probably in the next couple of weeks.
19      But all of this information has been turned over.
20  There's just nothing more that we can give.  Those -- those
21  particular items that you're talking -- that one item, they
22  have that.  It makes a mention of something that occurred in
23  May of '07.  Hardly relevant to anything.  But it's otherwise

1  contained in the DIMS.

2      It's otherwise contained in a -- a -- I've got a

3  better one.  It's otherwise contained in an e-mail.  A week

4  before that report is made, and this is found at

5  MEA-10013-00004805.  This is a report of the -- a medical

6  committee consisting of several individuals, seven or eight

7  individuals to include the judge advocate that was here at

8  that time.  And the bioethics committee met on 25 April 2007

9  to hear a presentation in accordance with the detainee.  It's

10  unclassified.  And we turned that over, my recollection is

11  2014.

12      So they have this information.  That little snippet

13  that says they're thinking about giving him involuntary

14  medication, the defense knows that.  A week before, the

15  doctors met to discuss all of this and ultimately came to a

16  conclusion and a decision.  So this information has been

17  turned over.  And that's not a report.  That's an e-mail that

18  we went to look for.  So that information is there, too.

19      MJ [Col McCALL]:  Yeah, I understand that.  And again, I'm

20  trying to make sure I'm understanding the government's

21  position.  But it sounds like the government's position is

22  that the underlying information, whether it was the medication

23  or whatever was going on with the accused, the underlying

1  information, whether via the DIMS or some other medical

2  record, has been provided.

3     TC [MR. SWANN]:  It's long ago been provided.

4     MJ [Col McCALL]:  But again, the -- the defense position

5  appears to be that they're wanting -- it's not the underlying

6  information, it's the fact that it's then being put into CIA

7  reports, being communicated via CIA channels; any other

8  communications among the CIA and FBI, again, to show that --

9  that working together between the DoD and the CIA, and then

10  that might have been -- they could lend to defense arguments

11  for having an effect on the LHM.  That makes sense to me.

12     So I guess going back, my question is:  It sounds like

13  those do exist, these daily site reports?

14     TC [MR. SWANN]:  Yes, sir.

15     MJ [Col McCALL]:  Okay.  And they have not been produced?

16  Because it sounds like the -- the government position is that

17  they are cumulative.

18     TC [MR. SWANN]:  Yeah.  One more.

19     MJ [Col McCALL]:  Sure.

20     TC [MR. SWANN]:  Mr. Trivett suggests that I just simply

21  ask you to go back and take a look at the statement of

22  relevant facts.  We have -- we have admitted a number of

23  things, but it ----

1    MJ [Col McCALL]:  I'll do that.

2    TC [MR. SWANN]:  These particular items -- that one

3    particular item they have by virtue of the report itself.  The

4    rest of these items have -- they don't contribute to anything

5    that you need to determine about the voluntariness of these

6    statements.  People write reports day in and day out and they

7    send reports everywhere, and this is just an example of a

8    report going out.

9    MJ [Col McCALL]:  Okay.  All right.

10        All right.  Defense, we'll start off -- back off with

11   Mr. Feeler.  All right.  So, Mr. Feeler ----

12   DC [MR. FEELER]:  Yes.

13   MJ [Col McCALL]:  ---- before you get into whatever issues

14   you want to address, let me ask you a question then.  So we

15   left off with Mr. Swann saying go back and look at the

16   statement of relevant facts.  What is it you're hoping to

17   accomplish by getting these daily site reports and some of the

18   other underlying documents that's still in dispute from

19   those -- apart from the statement of relevant facts?  I think

20   I know, but I want to hear from you.

21   DC [MR. FEELER]:  Sure.  Judge, the first thing it goes to

22   is specificity.  And that's what I tried to be clear on in my

23   opening argument, that the statement of relevant facts doesn't

1  go into -- I can't promise it never mentions Mr. Binalshibh,

2  but it's not about Mr. Binalshibh.  So any information the CIA

3  was putting in reports about Mr. Binalshibh would be the kind

4  of information that we're looking for, or about the LHMs

5  specifically.

6          So the reason I closed with my argument about the

7  issue of who was running the camp is that that is another

8  reason why this information is relevant, and it's a very

9  important one.  But the point we started with was we know

10  there's a record related -- directly related to

11  Mr. Binalshibh, a CIA record related to his forcible

12  antipsychotic medication, and we don't have it.  And to say

13  it's cumulative because we have non-CIA records about it, at

14  the point of discovery, that can't be where we're at, when the

15  CIA had held him in the black sites for four years.

16          So we're looking for information about him, about the

17  LHM, about conditions of confinement.  I think a lot of this

18  information is also relevant to who was running the camp,

19  which is an important issue that's -- that's in dispute right

20  now.  So I hope that answers your question of what we are

21  looking for.

22          Frankly, I'm looking for any information that I can

23  get about my client from the time period that the government

1    is in possession of.  And it's not -- you know, Mr. Swann

2    mentioned several times the date of the report.  This

3    discovery request and motion is not just about this report.

4    The reason I focused on the report so much is because that's

5    how we learned that there's something out there and that it

6    is -- that there is information in there directly relevant to

7    Mr. Binalshibh.

8            But it's not -- you know, the fact that this report

9    was a few months later doesn't mean that there's not earlier

10   information.  And the report itself, you know, we're talking

11   in the context of suppression here because that's what's

12   currently before the commission.  But the idea that CIA

13   records, from the organization that held Mr. Binalshibh in the

14   black sites and put him through what he went through there,

15   that CIA records related to his later forced medication in

16   United States Government custody could not be mitigation, for

17   example, takes a very strained view of what's relevant in this

18   case.

19           There's a reason they've given us our client's medical

20   records, because they understand that those are relevant.  And

21   this is -- it's not about the information.  It's about the CIA

22   record.  It's not the same thing.

23           One other just very brief point, Your Honor, is that

1  November psychological assessment.  Well, before I do that, I

2  just wanted to present one hypothetical that hopefully would

3  show where I'm going with this.

4      MJ [Col McCALL]:  Okay.

5      DC [MR. FEELER]:  The CIA writes something in a cable

6  about Mr. Binalshibh's forcible medication and it's not he was

7  forcibly medicated today.  You could imagine a case where they

8  said, Wow, that guy who we did all that stuff to in the black

9  sites and being forcibly medicated.  We really messed him up,

10  didn't we?

11      And before you think I've gone way off the rails with

12  a hypothetical here, if you look at the SSCI Report, the CIA

13  was saying very similar things to that at the end of the black

14  site period.  So -- so it's not some, you know, outlandish

15  hypothetical.  The reason I say that is to -- to press the

16  point, it's not just the information.  It's the context and

17  it's who was writing the information.  And who was writing the

18  information was the CIA.  So it's not just about continued

19  involvement.

20      Your Honor, that's really all I had at this point on

21  reply, so I ----

22      MJ [Col McCALL]:  All right.  Thank you, Mr. Feeler.

23      Any other defense wish to be heard?

1       Mr. Nevin?

2       CDC [MR. NEVIN]:  Yes, please, Your Honor.  And -- and

3   thank you.  David Nevin for Mr. Mohammad.

4       And I passed the first time around because I thought

5   Mr. ----

6       MJ [Col McCALL]:  You're fine.

7       CDC [MR. NEVIN]:  Yeah.  I thought Mr. Feeler had spoken

8   to this.  I think he did.

9       I just wanted to say that from Mr. Mohammad's

10  standpoint, and this is really the point you made a moment

11  ago, so I'll simply repeat this.  It's not a matter of the --

12  it's not a matter only of the content of any site daily

13  report, whether it relates to Mr. Mohammad or -- or

14  Mr. Binalshibh or someone else.  It's also who's writing it

15  because -- and this is a problem that -- that comes up from

16  time to time in -- from where we sit trying to discern what

17  the government is doing.

18      It frequently seems that where they go is, when

19  they're not disclosing material, is to cumulativeness.  In

20  other words -- and I catch this from Mr. Swann's comments to

21  you.  They know perfectly well that there's this issue of

22  forced medication.  There are no surprises here.  They know

23  about the forced medication.  So what's the -- what's the --

1    you know, they aren't surprised by any of this.

2         But -- but just as you said, the point of this is

3    not -- is not only the forced medication in the case of

4    Mr. Binalshibh.  The point is also that the CIA is writing a

5    report about it.  It could be that the CIA is writing a report

6    about anything.  Forced medication happens to be a

7    particularly sensitive issue, but it could be about a

8    hangnail.

9         The idea of the government's view of this is that the

10   CIA on day whatever it is, says we're through.  We're through

11   with these detainees.  They're -- they're in the custody of

12   the DoD now.  We're wiping our hands of this.  We have no

13   input, no nothing.  We're out of here.  And something similar

14   to that was said to Mr. Mohammad prior to his interrogation

15   here at Guantanamo Bay.

16        Well, now when it turns out that daily reports are

17   being filed by the CIA, suddenly you get a very different

18   picture.  Whether it's a daily report about forced medication

19   or whether it's a daily report about a hangnail, the CIA is

20   right in there on a daily basis, participating, involved, and

21   particularly where you have this issue of attenuation, which

22   is really where the government goes with -- in response to our

23   suppression arguments.  They go right to attenuation.  The

1    stuff is -- the stuff is square on point.

2         And so I -- I hesitated to get up because Your Honor

3    had articulated that, but I just wanted there to be no

4    question where Mr. Mohammad stands on this.  So thank you for

5    hearing me.

6    MJ [Col McCALL]:  Thank you, Mr. Nevin.

7         Ms. Bormann.

8    LDC [MS. BORMANN]:  I won't argue what Mr. Nevin just did

9    because I think I hit it the last time around in a very short

10   and brief way.  But I will -- the government, through

11   Mr. Trivett, through Mr. Swann, asked you to revisit the

12   statement of relevant facts, which is actually not what it's

13   called, but I will refer to it in that way in an unclassified

14   setting.

15        What I'd like you to do is to look to see whether or

16   not the judge that issued that statement of relevant facts

17   actually saw the daily site reports issued by the CIA.

18   Because if he didn't and the government withheld that

19   information, that substitution is not adequate.

20        Thank you.

21   MJ [Col McCALL]:  Thank you, Ms. Bormann.  Anyone else?

22        Ms. Pradhan?

23   ADC [MS. PRADHAN]:  Yes, sir, briefly, if I may.

1    MJ [Col McCALL]:  Please.

2    ADC [MS. PRADHAN]:  We heard a lot from Mr. Swann focusing

3  on medical records.  And I just want to point Your Honor to

4  the things we didn't hear very much about, which is documents

5  that exist, CIA documents about their involvement in the LHM

6  prep, CIA documents about potential involvement in the

7  conditions of confinement at Camp VII, and there is

8  actually -- and I -- you know, those -- the conditions of

9  confinement issue, again, pertain not just to suppression, but

10  they're a Geneva Convention issue.  They're an outrageous

11  government conduct issue, right?  Like, that has far-reaching

12  consequences, those documents.

13       There's another category, actually, of -- of

14  information that is classified that I can talk about in closed

15  session if given the opportunity, sir.  But on that, I heard

16  Mr. Swann invite you to read the statement of -- I think we're

17  calling it the statement of relevant facts.  I absolutely join

18  Mr. Swann inviting you to read that statement, sir, because I

19  understand that the prosecution produced this statement

20  unilaterally, I believe, in part to avoid producing the CIA

21  documents.

22       Obviously, that's not how discovery works anywhere,

23  much less in a capital case.  But the statement is -- without

1  going into the substance, it is full of generalizations and

2  summaries written in large part in passive voice ----

3      MJ [Col McCALL]:  Ms. Pradhan, the linguist's warning

4  light is flashing again, if you could slow down.

5      ADC [MS. PRADHAN]:  Certainly, sir.  I'm always a little

6  bit -- when I argue from here, I'm always a little glad that

7  they're down here -- there and I'm up here so I don't have to

8  face them later.  I'm very sorry.

9      But the statement is -- as I was saying, is written

10  largely in passive voice to obscure the actors.  And if it

11  were a 505 summary of the CIA documents, which it is not, it

12  would be grossly inadequate.

13      The statement raises -- it is rich in what it says

14  because it raises many more questions than answers, and it

15  actually is a very good example of what I mentioned earlier in

16  terms of the other government agencies' control over the

17  discovery process here.

18      The last thing I just wanted to mention really fast is

19  this morning, sir, there was some discussion over whether or

20  not we could call witnesses and, you know, then confront them

21  later if discovery were to emerge.  This is actually a very

22  good example of that.  We -- we called the Camp VII commander.

23  He spoke about CIA involvement at Camp VII, right?  Certainly

1    a lot in classified session and a decent amount, as I pointed

2    out, in open session, which raised issues.

3         We're now asking for discovery on what he raised.  The

4    government is refusing it.  We've asked for a number of CIA

5    witnesses in relation to the motion to suppress.  The

6    government has refused all of them other than Drs. Mitchell

7    and Jessen.  So, you know, we can't -- there's really no way,

8    it seems, that we can ask for information in a way that is --

9    that will pass muster with whoever is controlling the

10   discovery process in this case.

11        Subject to your questions, sir.

12        MJ [Col McCALL]:  No questions.  Thank you.

13        ADC [MS. PRADHAN]:  Thank you.

14        MJ [Col McCALL]:  Mr. Swann.

15        TC [MR. SWANN]:  Just one point, Your Honor.  I ask that

16   you look at AE 516.

17        MJ [Col McCALL]:  Could you repeat that?

18        TC [MR. SWANN]:  AE 516.  The government's position and

19   the judge's agreement in that order is that we have satisfied

20   our obligations with respect to Camp VII and involvement.

21        All right, sir.  Thank you.

22        MJ [Col McCALL]:  I'll take a look at that.  Thank you.

23        All right.  We've been going a little over an hour.  I