# Attachment G

1  **[The R.M.C. 803 session was called to order at 0901,**

2  **1 November 2019.]**

3       MJ [Col COHEN]:  The commission is called to order.  Good

4  morning, everyone.

5           General Martins, are all the government counsel who

6  were present at the close of the previous open session again

7  present?

8       CP [BG MARTINS]:  Good morning, Your Honor.  Yes.

9       MJ [Col COHEN]:  All right.  Thank you, sir.

10          Team KSM, I see Mr. Sowards, Ms. LeBoeuf,

11  Ms. Radostitz, and Mr. Nevin, all here to represent the

12  accused.

13          For WBA, I see Mr. Montross and Ms. Bormann, both

14  here.

15          None of the accused are currently present.  I'll just

16  go ahead and say that.

17          For Mr. Harrington, his team, I see Mr. Harrington and

18  Major Bare.

19          For Mr. Connell's team, I see Mr. Connell.  Mr. Farley

20  is not here, but Ms. Pradhan is.  I see Captain Andreu here as

21  well.

22          And then I see Mr. Ruiz.  Mr. Gleason, is that you

23  back there?  Yes.  And, Mr. Ruiz, remind me of the gentleman

1    MJ [Col COHEN]:  I understand.  Okay.  Excellent.

2        Trial Counsel, do you wish to be heard on the request

3    to defer the argument until Monday?

4    MTC [MR. TRIVETT]:  No.  We're in agreement with that,

5    sir.

6    MJ [Col COHEN]:  Okay.  Done.  I will issue a written

7    order to follow on AE 665, but the government may act on the

8    oral -- oral granting of the motion at this time.  Okay.

9        Are there any other matters to take up before we call

10   the witness?

11       Oh, Mr. Connell, are those binders necessary for this

12   witness?  Yeah, if you could -- sir, if you want to come

13   forward or have Ms. ███████ come forward and then just

14   take what you need or leave what you don't.  Or just the

15   opposite of what I just said:  Leave what you need, take what

16   you don't.

17   **[Pause.]**

18   MJ [Col COHEN]:  All right, Counsel.  I think we're ready

19   to start.  General Martins, is this -- is this a defense

20   witness?

21   CP [BG MARTINS]:  No, Your Honor.

22   MJ [Col COHEN]:  Okay.

23   CP [BG MARTINS]:  Government witness.

1    MJ [Col COHEN]:  Excellent.  Then the government may call

2    the witness, then.

3    CP [BG MARTINS]:  Please inform the witness to come to the

4    courtroom.  Please proceed to the witness stand, remain

5    standing, and raise your right hand for the oath.

6    **FIRST CAMP VII COMMANDER, civilian, was called as a witness**

7    **for the prosecution, was sworn, and testified as follows:**

8    **DIRECT EXAMINATION**

9    **Questions by the Chief Prosecutor [BG MARTINS]:**

10   MJ [Col COHEN]:  Good morning, sir.

11   WIT:  Good morning, sir.

12   Q.  You were the first Camp VII commander; is that

13   correct?

14   A.  That's correct, yes, sir.

15   Q.  And are you aware that all are admonished by this

16   commission that you are to testify in this open session only

17   in that capacity?

18   A.  Yes, sir, I understand.

19   Q.  And are you also aware that all are admonished by this

20   commission that you are to be identified only as the first

21   Camp VII commander?

22   A.  Yes, sir, I understand.

23   CP [BG MARTINS]:  Your witness, Mr. Swann.

1 **Questions by the Trial Counsel [MR. SWANN]:**

2     Q.  The general indicated that you were the first camp

3 commander of Task Force Platinum; am I correct?

4     A.  That's correct, sir.

5     Q.  All right.  And the time is August of 2006 until late

6 March 2008?

7     A.  Yes, sir, that's correct.

8     Q.  Who gave you that job?

9     A.  Admiral Harry Harris, so now the U.S. Ambassador to

10 South Korea.

11     Q.  Admiral Harris got four stars, right?

12     A.  Correct.  That's correct.

13     Q.  And then went on to be the ambassador?

14     A.  Yes, sir.

15     Q.  What was your understanding of your role as the OIC of

16 Camp VII?

17     A.  The commander, responsible for the safe, humane care

18 and custody of those detainees in my charge.

19     Q.  All right.  Have you seen the classification guidance

20 in this case?

21     A.  I have, yes, sir.

22     Q.  So I'll simply remind you that if I or anyone else ask

23 you a question that you believe calls for a classified

1  response, please let us know, and we will address that in the

2  appropriate forum.

3       A.  I will.

4       Q.  Furthermore, at least three of the defense teams had

5  the opportunity to interview you; is that correct?

6       A.  That is correct.

7       Q.  Mr. Connell interviewed you back in August, I believe,

8  and although you allowed him an hour, you actually ended up

9  giving him closer to two?

10      A.  Yes, sir.  I think you're right.

11      Q.  Then you were asked late last week to be interviewed

12  by the Hawsawi team and then the Mohammad team ----

13      A.  Correct.

14      Q.  ---- correct?  And you agreed to those interviews?

15      A.  I did.

16      Q.  Did anyone else ask you to be interviewed in this

17  case?

18      A.  No, sir.

19      Q.  Now, I know Mr. Connell may have asked a follow-up

20  question for a second interview.  Did I address that issue

21  with you?

22      A.  You did address that issue.

23      Q.  And we decided that no further interviews were

1  necessary?

2      A.  That's correct.

3      Q.  While you agreed to the interviews by these three

4  teams, did anyone from the prosecution team try to talk you

5  out of that?

6      A.  Absolutely not, sir.

7      Q.  So let's go right to the arrival of the 14 high-value

8  detainees during the first week of September 2006.

9      A.  Okay.

10     Q.  What were you doing then?

11     A.  At the arrival time, I was on the airfield responsible

12 for receiving them and ensuring their safe movement back to

13 Camp VII; accounting for them at that time, and safely moving

14 them back to Camp VII.

15     Q.  And they came off a C-17, correct?

16     A.  That's correct.

17     Q.  Was your task force, your soldiers, your sailors, were

18 they with you at that time?

19     A.  Absolutely.  A good portion of them was -- were.

20     Q.  Now, I'll address the issues about how they got from

21 one place to another in the classified session.

22     A.  Okay.

23     Q.  But let's go ahead straight to Camp VII, that

1   location.

2        A.  Okay.

3        Q.  How were they in-processed?

4        A.  So when we arrived at Camp VII, the first thing we

5   wanted to do was to allow each of the detainees to move to

6   their -- their cell, allow them to get cleaned up.  We had

7   showers there.  We had food for them at that time, and we had

8   new clothes for them to put on.  So the first thing was the --

9   to just simply get acclimated to the -- to the facility, get

10  cleaned up, and be prepared for the -- for in-processing.

11       Q.  How long did the in-processing take for all 14 of

12  these individuals?

13       A.  It consumed the entire night.  It took a good 12 --

14  probably 8 to 12 hours.

15       Q.  And were you there throughout that entire period of

16  time?

17       A.  Yes, sir, absolutely.

18       Q.  Did you have occasion to address any of the accused in

19  this case?  And you understand those to be Khalid Shaikh

20  Mohammad, Walid Bin'Attash, Ramzi Binalshibh, Ali Abdul Aziz

21  Ali, and Mustafa al Hawsawi.  Did you address any of these

22  individuals?

23       A.  I addressed all of them.  One of the -- the last

1 in-processing station was an opportunity for me to meet -- to

2 speak to them individually, at which time I let them know you

3 are -- you have arrived to Naval Station Guantanamo,

4 Guantanamo Bay, Cuba.  You are under the custody of the

5 Department of Defense here.  And then I continued to read the

6 camp rules at that time, asked if there were any questions.

7     Q.  Did you explain to any of them the application of the

8 Geneva Conventions?

9     A.  We talked about Geneva Convention Common Article 3,

10 that our detention operations are consistent with Geneva

11 Convention Common Article 3, that's correct.

12     Q.  Were you ordered to say that?

13     A.  No.  That was a script that I put together.  I thought

14 that it was appropriate that they understood that, that they

15 understood where they were.  I discussed that with Admiral

16 Harris prior to doing that, but we thought it was all pro --

17 he thought it was appropriate.

18     Q.  And what were you wearing when you addressed the

19 detainees?

20     A.  Military uniform.

21     Q.  You've already testified that when they arrived at

22 Camp VII, they were immediately placed into their cells?

23     A.  Correct.

1    Q. Did they have a chance to get cleansed up?

2    A. Absolutely. That was one of the first things we

3  provided for them. They had showers in their cells and they

4  had fresh clothes there.

5    Q. That's something that people don't understand, but

6  each of these individuals actually has a shower facility

7  inside their respective cell?

8    A. Correct. The shower, a toilet, a desk, a chair, a bed

9  with a mattress. And then we -- the basic issue items we

10  said -- we also included. So a couple of different types of

11  footwear, prayer beads, prayer rug, prayer cap, a copy of the

12  Quran, and -- that basically defines -- defines it. We had a

13  mirror, a sink for them to get cleaned up as well as the

14  shower.

15    Q. Now, you said that you informed them of the rules. If

16  you remember, generally, what were those rules?

17  ███████████████████████████████████████████████

18  ███████████████████████████████████████████████

19  ███████████████████████████████████████████████

20  ███████████████████████████████████████████████

21  ███████████████████████████████████████████████

22    The simple rules that, you know, violence, attacks

23  against the guard force were -- would be unacceptable; the --

1  that -- just abide by the overall -- overall camp rules.  We

2  let them know what the schedule would be like, if you will,

3  that meals would be delivered to them, and water exchange with

4  them on request.

5       As much protocol as it was rules, if you will.

6       Q.  Now, I note that Ramadan was from 23 September 2006

7  until approximately 23 October 2006, about two weeks after

8  they arrived.  Do you remember anything special that was done

9  during the Ramadan season?

10      A.  Well, we did adjust the -- the meal delivery schedule

11  to allow for the fasting period.  We did adjust our schedule

12  within the camps.  We always -- we observed quiet time.  We

13  understood when the prayer times were, and those were quiet

14  times within the camp.  And made sure that we followed all

15  those similar cultural practices.

16      Halal meals were provided.  A special meal was

17  provided to break the fast at the conclusion of each.  So we

18  haven't -- our guard force was familiar with the -- the

19  procedures for Ramadan, if you will, and adapted our schedule

20  to accommodate.

21      Q.  What about music being piped in during prayer call?

22      A.  We did provide the prayer call, call to prayer, five

23  times a day, I believe.

1    Q.  All right.  Let's talk about recreational activities

2  now.  Did they have access to recreation during this period of

3  time?

4    A.  They did.  ████████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████████ they were able to get sunlight and

7  access to outdoor, nature a little bit.

8  █████████████████████████████████████████████████████

9  █████████████████████████████████████████████████████

10  ████████████████████████████████████In each recreation area,

11  we had -- I call it state-of-the-art exercise equipment, newer

12  equipment than some of the other camps at that time, so good

13  conditions in there.

14    We -- we allowed the detainee to bring coffee.  We'd

15  take coffee to him out there, and we would bring meals

16  sometimes out there if the -- if the recreation coincided

17  with -- with the meal schedule.

18  █████████████████████████████████████████████████████

19  █████████████████████████████████████████████████████

20  █████████████████████████████████████████████████████

21  █████████████████████████████████████████████████████

22  █████████████████████████████████████████████████████

23  █████████████████████████████████████████████████████

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████████

4 ████████████████████████████████████

5 ████████████████████████████████████

6　　　　　So that basically describes the recreation.  We had

7　some other exercise equipment, an ab ball, if you will, an

8　abdominal workout ball, we had a pull-up bar, and continued to

9　expand that capability as the months continued.

10　　　Q.  Did they have access to library books?

11　　　A.  We did.  We had library books.  We had -- we would

12　circulate those throughout the week so they could also take

13　those to recreation, if you will.  In addition to the Quran,

14　Tafsir.  We had other library books for them to choose from

15　and as many as we could in their native language.

16　International Community of the Red Cross helped us with that

17　in gaining -- in gaining some additional books.

18　　　Q.  All right.  So you've mentioned the -- the ICRC.

19　Between the period of time of their arrival early

20　September 2006 until the -- and we'll talk about the law

21　enforcement interviews that were conducted in January of 2007,

22　approximately a four-month period of time -- did the

23　International Committee of the Red Cross visit these

1  gentlemen?

2      A.  They did.  I believe it was October, the first visit,

3  and then another one in December.  It was an opportunity for

4  each one of the detainees to meet with a delegation from the

5  ICRC at Camp Echo II where they would -- they would meet.  We

6  would take the detainee there, they'd meet with the ICRC

7  delegation and have -- have discussions.  And then go back to

8  their cell afterward.

9          This -- they could actually come back a second day

10 if -- if schedule permitted for the ICRC.  But that first took

11 place in October, then once again in December, as I best

12 remember.

13     Q.  And if you know, the meeting place of the ICRC, that's

14 the same meeting place that the interviews were conducted and

15 the same location where the accused see their attorneys day in

16 and day out.

17     A.  That's correct, sir.

18     Q.  Now, what about access to doctors and medicines and

19 things of that nature?

20     A.  So that was, of course, a big part of the

21 in-processing.  We had dedicated medical staff as part of my

22 task force that I was commander of at that time, met doctor

23 and -- and corpsmen that provided 24/7 care.  We were

1  available -- they were available throughout the night.

2       We'd -- so in-processing, a little more deliberate

3  process where we did medical exams for each of the detainees.

4  We later followed up with a little more extensive capability.

5  We gave them dental exams, if you will, and then optometry

6  exams a little bit later.  Not all of that was completed on

7  the in-processing day, but those -- those preventive medicine

8  practices -- preventive care practices, I should say, were

9  applied at that time.

10      Q.  Now, if I were to say that the period of time between

11 September and January, they had access to dental, doctors,

12 cardiologists, endodontists, would that be correct?

13      A.  To the best of my knowledge.  I honestly don't

14 remember a cardiologist at that time, but -- but I do remember

15 the others.

16      Q.  Do you remember any CT scans being done during that

17 period of time?

18      A.  I do not remember.

19      Q.  So what was your principal place of duty during the

20 months of September to -- to February of 2007?

21      A.  Camp VII.  That was my only job.  That was my only

22 responsibility.  Now, I did have -- I did have another command

23 post that I was able to use.  The camp itself didn't have all

1   the means for which I needed to -- to be the commander and

2   complete administrative responsibilities.  So I did have

3   another -- an alternate command post in Camp America that I

4   used for a lot of the administrative logistics functions that

5   couldn't otherwise be accomplished at Camp VII.

6       Q.  How long do you think you spent each day out at

7   Camp VII?

8       A.  Eight to 12 hours, I would guess.

9       Q.  And that -- that wasn't the end of your day, was it?

10      A.  No.  We still -- we still had other duties to perform

11  over at Camp America, accountability for my folks and

12  training, if you will, physical fitness training and other

13  types of training, evaluations and things like that.

14      Q.  Seven days a week?

15      A.  Absolutely.

16      Q.  At that time, did you have any computer access at

17  Camp VII?

18      A.  I had had a standalone computer.  ██████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ██████   We were able to use that for administrative purposes.

23  But that -- that was the only -- that was the only computer

1    that I used at Camp VII.

2        Q.  Now, the guards that you had, were they trained on how

3    to interact with the accused?

4        A.  They were.  We had a rehearsal period before -- before

5    they arrived.  We understood that most of our interactions

6    would be transactional, if you will.  So our role of the guard

7    force was not to engage in detailed conversation, discussions.

8    If there were questions for which the guard force couldn't

9    answer, then they were elevated through the chain of command

10   there within -- within Camp VII to -- to satisfy the

11   requirement.

12       Q.  And what about you?  Did you have interaction with the

13   accused during -- well, the nearly 19 months that you were in

14   command?

15       A.  I did.  So each time SOPs change, for example, the

16   recreation schedule changed or when Ramadan was approaching, I

17   briefed them.  I talked to them individually on how that --

18   how that would unfold.  I wanted to make sure I got the

19   message across.

20           And so we would put together a -- with my command

21   team, we'd put together some of that -- that language.  So if

22   there were questions asked, we were all on the same page, so

23   different changes in procedures, if you will, primarily

1  within -- within the camp.  I'd let them know that the ICRC

2  was coming and they'd have an opportunity to meet with them,

3  so those types of things I -- I delivered myself.

4      Q.  Now, all of these transactions, they would be

5  documented in what is known as the Detainee Information

6  Management System ----

7      A.  Correct.

8      Q.  ---- DIMS.

9          When you say transactional, are you talking about

10  things like swapping out a waterboarder -- water bottle, a --

11  swapping out a T-shirt, those kind of things?

12      A.  Correct, correct.  Exchange of laundry, exchange of

13  meals, books, ICRC -- postcards, letters, things like that

14  that detainees were ----

15      Q.  What about your guards?  What did they wear?

16      A.  Uniforms, military uniforms.

17      Q.  How did the guards talk to each other?

18      A.  We addressed each other -- for the protection of

19  operational security, we had pseudonyms that we used within

20  the -- within the facility.  We didn't use our -- our own --

21  our own names within the facility.  We all had nametags, if

22  you will, that identified -- that each of us had a pseudonym

23  that we wore all of the time in there, and so that the

1 detainees could identify us as well. So that pseudonym was

2 consistent throughout Camp VII.

3     Q. And how did the guards address the detainees?

4     A. "Detainee." I mean, we didn't typically use the

5 detainee's ----

6     Q. They had ISN numbers, right?

7     A. Correct. They had ISN numbers.

8     Q. All right. We've talked a little bit about some of

9 the amenities. What kind of food did they get during this

10 period of time?

11     A. So meals were delivered three times a day by my force

12 to -- from the -- from the dining facility to -- to Camp VII.

13 Halal meals -- halal-certified meals were the primary. And

14 there's a menu that cycled through about a two-week --

15 two-week period.

16         The detainees had some selection in what was offered,

17 but typically there were four or five different meal

18 selections, and they would pick that and that would be their,

19 for example, dinner meal of choice at that time period.

20     Q. How would their cells be cleaned?

21     A. They did -- they did most of the cleaning themselves.

22 So typically Sunday was a day for which we distributed

23 grooming, personal grooming gear. Each one of them had his

1  own razor and trimmers and scissors and things like that that

2  we would use -- we would pass out on Sundays, and then Sunday

3  we'd also use for the cell cleaning opportunity.

4      But if the detainee asked for a means to clean his

5  cell any other day of the week, I believe we would do that.

6  Sunday was typically the day for that, and if we had to do

7  some additional cleaning, my guard force would do that.

8      Q.  All right.  Let's shift now to the law enforcement

9  interviews that were conducted of these five men from

10  January 2007, extending at least for one of these men, into

11  February of 2008.

12     A.  Okay.

13     Q.  How did the interviews work?

14     A.  Well, first of all, Admiral Harris notified me about

15  these law enforcement teams.  I was able to meet them in

16  advance, and we understood how this process would take place.

17  Echo II would be the site for which we would -- we would meet.

18  We worked out those arrangements, if you will, with the law

19  enforcement team.

20     Then when time began, when the first -- when we

21  started the interviews, I would -- I would go or one of my

22  guard force members would go individually to each cell and

23  notify the detainee, "Tomorrow you have a meeting.  You have a

1  knows everything.

2      MJ [Col COHEN]:  Okay.

3      Q.  Did the camp, while you were there, have standard

4  operating procedures?

5      A.  We did.  We were able to leverage the existing

6  standing operating procedures from other camps that were in

7  operation at the same time to build our own.  So we were able

8  to adapt those, those SOPs, to conform with our unique

9  facility.  For the most part, we were able to follow those, to

10  the extent possible, in -- at Camp VII.

11      Q.  I think -- well, I believe -- would you agree with

12  this statement, that in some instances with respect to SOPs,

13  that you were actually ahead of the other camps on Guantanamo?

14      A.  Well, we certainly tried to keep pace with them.  I

15  mean, I consulted with other -- with the -- with the JTF

16  commander.  He was interested in the SOP development.  I would

17  like to say I at least tried to keep pace with those that were

18  already prepared.  Remember, those SOPs had been prepared over

19  a period of years.  So I did my best to make sure they were in

20  keeping with the same procedures.

21      MJ [Col COHEN]:  Mr. Swann, may I ask a question?  Sir,

22  when you say "other camps," are you talking about other DoD

23  camps?

1    WIT:  Correct, sir.  I'm referring to Camps V and VI.

2    MJ [Col COHEN]:  Copy.  Thank you.

3    Q.  All right.  You had 19 months as the camp commander?

4    A.  Yes, sir.

5    Q.  Did you see anything to suggest that any of these men,

6    during the period of time, say, September to -- the interview

7    periods, were disoriented, anxious, distressed, having any

8    difficulty concentrating?

9    A.  I could say that -- when it comes to distress, I --

10   that would be something I would have observed.  Anxiety,

11   things like that, are tough to -- tough for me to be able

12   to -- to evaluate.  But distress is something that I think I

13   would be able to recognize as the camp commander with my

14   engagements with them.  I'm comfortable -- I'm comfortable

15   with that assessment.

16   Q.  Did you see anything to indicate that any of these men

17   were incapable of making their own decisions?

18   A.  No, sir.  I had conversations with them.  They were

19   able to -- they clearly let me know when they didn't want to

20   go to a meeting, when they wanted to go to a meeting.

21       I remember we had medical care that we took them out

22   of Camp VII for dental cleaning, dental checks, optometry.  We

23   had -- they had conversations with me and other members of my

1  guard force for those things, and I -- I believe they were

2  engaging and understood their -- their decisions.

3      TC [MR. SWANN]:  Everything that I ask further on will be

4  in a closed session.  Thank you.

5      WIT:  Yes, sir.  Thank you.

6      Q.  Excuse me.  One final question.  And we've talked

7  about this.

8      A.  Okay.

9      Q.  In the Senate Select Committee on Intelligence,

10  subcommittee study of the CIA's detention and interrogation

11  program at page 160, there's a statement that reads that these

12  men were under the operational control of the Central

13  Intelligence Agency.  Do you believe that statement to be

14  true?

15      A.  No, sir.  Operational control refers to the

16  authorities a commander has over his or her assigned forces,

17  and I believe I -- as a commander, I had -- I had full

18  responsibility and authorities over those -- those forces.

19  They responded to my orders consistently.  I -- I believe that

20  to be the case.

21      TC [MR. SWANN]:  Okay.  I will ask you for your reasons in

22  the closed session.

23      WIT:  Okay.

1    LDC [MR. CONNELL]:  Yes, sir.

2    MJ [Col COHEN]:  All right.

3                    CROSS-EXAMINATION

4  **Questions by the Learned Defense Counsel [MR. CONNELL]:**

5    Q.  Good morning, sir.

6    A.  Good morning, sir.

7    Q.  Are you good for water?

8    A.  I'm good.  Thank you very much.

9    Q.  Thank you.  Mr. Swann made the point that you had

10 agreed to meet with me, which I really appreciate.

11   A.  Thank you, sir.

12   Q.  I hope that it helps everything go more smoothly.  And

13 along those lines, if I ask you about any kind of document,

14 I'll show you where it is.

15   A.  Okay.

16   Q.  And they will be the same documents that we went over

17 when we met.

18   A.  Okay.  Understood.

19   Q.  Specifically about documents, do you see that there's

20 a binder in front of you?

21   A.  I do.

22   Q.  There are a few different tabs in that binder.  Would

23 you mind just looking at the -- at the green tabs, and you'll

1  see one that says CP7 on it?

2      A.  Okay.

3      Q.  Okay.  That's the one that we're basically going to be

4  talking about.  And some of the writing is very small.

5      A.  I brought my glasses.  Thanks.

6      Q.  Very good.  I did too, so we're good.

7      A.  Okay.

8      Q.  Okay.  The -- you'll see some -- some documents I'm

9  going to be showing you on the document camera because -- but

10 when I ask you about one of those documents, do you see that

11 down there in the corner there is a -- a number that says CP,

12 dash, something, something?

13     A.  I do.

14     Q.  Okay.  So that's what lawyers call the Bates number,

15 and we'll be -- I'll be referring to that.  So if I need to

16 direct you to CP7, page 7, then that's how you would find it.

17     A.  Understood.

18     Q.  Okay.  Great.  The -- the other sort of ground rules

19 things that I want to go over with you is, obviously there's a

20 lot of classified information surrounding our topic here.  And

21 can we agree that I have formulated the questions sometimes,

22 like the government did, to try to pick out unclassified

23 aspects of otherwise classified topics?

1    A.  I agree.  I understand.

2    Q.  And so I'll just ask that you listen very closely to

3  the question.  Sometimes I'll ask you a yes-or-no question,

4  like do you know something.  And I'm not asking you to tell me

5  the underlying thing.  I'm asking do you know it.

6    A.  Thank you.

7    Q.  Does that make sense?

8    A.  Yes, it does.

9    Q.  Okay.  The other thing is that the judge has ruled

10  that all of us here in this courtroom are custodians of

11  classified information.  So in an open session, if I ask a

12  question that you think calls for a classified answer, the

13  best practice is just to say that it's a 505 issue.

14    A.  Okay.

15    Q.  All right?  And that's a way to address the question

16  without confirming or denying whether the information in my

17  question was classified.

18    A.  I understand.

19    Q.  And if there's an objection, either about classified

20  information privilege or some other topic, the attorneys will

21  confer usually, and then the judge will rule.  So you just

22  wait for -- can we just agree that you'll wait for the judge

23  to tell you whether to answer or not?

1    A.  I understand.  I'll wait.

2    Q.  Okay.  Great.  Thank you very much.

3    A.  Sure.

4  **[The security classification button was pushed in the**

5  **courtroom which caused the video feed to terminate at 1026,**

6  **1 November 2019.]**

7  **[The Military Commission resumed at 1029, 1 November 2019.]**

8    MJ [Col COHEN]:  Counsel, we're back on.  All right, thank

9  you.  We let it run while you guys were conferring.  Are we

10 all on the same page?

11   LDC [MR. CONNELL]:  I believe so, sir.

12   MJ [Col COHEN]:  Okay.  Excellent.

13                  CROSS-EXAMINATION CONTINUED

14 Questions by the Learned Defense Counsel [MR. CONNELL]:

15   Q.  At some point Admiral Harris nominated you to be

16 Camp VII commander?

17   A.  That is correct, sir.

18   Q.  Okay.  And that was a new camp?  Camp VII was not

19 previously in operation?

20   A.  That's correct.

21   Q.  Okay.

22   LDC [MR. CONNELL]:  May I consult?

23   MJ [Col COHEN]:  You may, absolutely.

1 discussions here in the courtroom, and while people might be

2 seeing you doing it, they don't know what you're actually

3 saying ----

4     LDC [MR. CONNELL]:  Right.

5     MJ [Col COHEN]:  ---- which allows for more free-flowing

6 discussion while we're here.

7     LDC [MR. CONNELL]:  Yes.

8     MJ [Col COHEN]:  All right.  Let's re-call the witness.

9 **[The witness resumed the witness stand.]**

10     MJ [Col COHEN]:  Sir, you are back on the stand.  Please

11 have your seat, and I remind you, you're still under oath.

12 Thank you for your patience.

13     WIT:  Thank you, Judge.

14     MJ [Col COHEN]:  Mr. Connell, you may continue.

15     LDC [MR. CONNELL]:  Thank you.  Sorry about all that, sir.

16                    **CROSS-EXAMINATION CONTINUED**

17 **Questions by the Learned Defense Counsel [MR. CONNELL]:**

18     Q.  At some point after your nomination as Camp VII

19 commander, you participated in an interagency meeting where

20 you received more information about your mission; is that

21 right?

22     A.  Correct.

23     Q.  And you learned you'd be in charge of two facilities,

1  Camp VII and Camp Echo II?

2      A.  So the facility -- the facility really remained -- I

3  was responsible for the -- for the operations.  Facilities we

4  can talk about in a 505 session.

5      Q.  I understand the distinction.

6          You would be responsible for the operation of two --

7  two -- of Camp VII and Camp Echo II?

8      A.  Correct.

9      Q.  Okay.  And at that time, although you didn't know any

10  details, you know that at one time Camp Echo II had been used

11  by the CIA to house detainees?

12      A.  I learned that.  I don't remember specifically when,

13  but I learned that at some point, yes.

14      Q.  Okay.  And in -- as part of your responsibilities, you

15  inspected the -- the physical facilities before the detainees

16  arrived?

17      A.  Yes, sir.  My team -- my team was responsible for

18  that.  That's correct.

19      Q.  Okay.  Sir, I'm going to show you some photographs on

20  the screen in front of you.

21      A.  Okay.

22      Q.  These photographs have already been -- I've already

23  discussed them with the prosecution, and this will -- because

1  the documents themselves are classified, they will not be

2  shown outside of this courtroom.  The -- so I'll ask you to --

3  this is one of those occasions you should listen very

4  carefully to the question and only answer the question which I

5  ask.

6       A.  Okay.

7       LDC [MR. CONNELL]:  So, sir, if I could have access to the

8  document camera, I have pre-coordinated with the court

9  reporters, and this will not be displayed to the gallery.

10      MJ [Col COHEN]:  Okay.  Trial Counsel?

11      MTC [MR. TRIVETT]:  Sir, we have no objection to it being

12  displayed to the witness.  Obviously, it can't be displayed to

13  the gallery.  Our concern, too, is to make sure that it's not

14  on counsel screens, which can be seen sometimes from the

15  gallery.

16      MJ [Col COHEN]:  Especially as you get closer towards the

17  back.

18      MTC [MR. TRIVETT]:  Yes, sir.

19      MJ [Col COHEN]:  So what would you like me to do with

20  that?

21      LDC [MR. CONNELL]:  I'm sorry, sir?

22      MJ [Col COHEN]:  What would you like me to do with that?

23  Because that is technically true.  The closer you get to those

1  long.

2     MJ [Col COHEN]:  Okay.  So I'll tell you what, then.

3  Let's just try to get through your examination and then we'll

4  take a recess.

5       Ma'am, we'll come back to you after lunch.

6     LDC [MR. CONNELL]:  Yes, sir.

7     MJ [Col COHEN]:  Unless he's really fast, and then I'll

8  adjust.  All right.

9       We're ready for the witness.  Thank you, sir.

10  **[The witness resumed the witness stand.]**

11     MJ [Col COHEN]:  Sir, please return to your seat.  I think

12  we're going to get a little bit further down the road, so ----

13     WIT:  Okay.

14     MJ [Col COHEN]:  Mr. Connell is going to ask you some

15  questions.

16     WIT:  All right, sir.  Thank you.

17               CROSS-EXAMINATION CONTINUED

18  **Questions by the Learned Defense Counsel [MR. CONNELL]:**

19     Q.  Sir, I want to assure you none of this has anything to

20  do with you.  I know you're out there sweating, but it is all,

21  it has nothing to do with you.  At the end of the day we went

22  for the low-tech solution of I just made copies of the packet

23  and you should have some loose papers in front of you.

1    A.  I see them.

2    Q.  All right.  Very good.  That's what I'm going be --

3  I'm just going to go through those with you for a little bit,

4  okay?  I've talked to the prosecution about all of this.

5  Everybody is on the -- I think everybody is on the same page.

6    A.  Okay.

7    Q.  The pages change, but there we are.  Okay.

8        So on the -- the first document that's in front of you

9  should say at the bottom of it AE 502W Attachment B, PDF

10  page 220.

11    A.  Acknowledge.

12    Q.  Do you see that?  Okay.

13        And that is a photograph of a tier; is that right?

14    A.  That is correct.

15    Q.  Okay.  And if you'll turn to the next page, it should

16  say at the bottom of the AE 502W Attachment B, PDF page 167?

17    A.  That's the one I have.

18    Q.  Okay.  And that's a picture of an empty cell?

19    A.  Correct.

20    Q.  It depicts the items that you described on direct

21  examination, the desk, the bed, et cetera?

22    A.  Yes, it does.

23    Q.  Sir, if you'll turn the page to AE 502W Attachment B,

1   PDF page 46 ----

2        A.  Okay.

3        Q.  ---- that's a diagram.  I'll give you a second to look

4   at it.  The -- does that appear to be a diagram of one of the

5   cells in Camp VII?

6        A.  Okay.  It does, yes.

7        Q.  And so like, I'm sure, every cell in the world, the

8   cells that you described on direct examination, they have a

9   door?

10       A.  Yes, sir.

11       Q.  And the -- on one of the doors, the -- and you can

12  turn to AE 502W Attachment B, PDF page 163.  There's a small

13  glass window in the door?

14       A.  Correct.

15       Q.  And there are lockable slots called -- often called

16  bean holes?

17       A.  Yes.

18       Q.  And at the time that you were there, the bean hole

19  slots in Camp VII were kept closed except when they were in

20  use for passing food or other purposes, correct?

21       A.  That's true.

22       Q.  And the door that contains the -- the bean holes ▮

23  ▬▬▬▬▬▬

1  A.  I believe so.  That sounds familiar.

2  Q.  And if you'll look at page 163 that's in front of you,

3  on the right-hand side of that photograph ███████████

4  ████████

5  A.  Yes.

6  Q.  ██████████████████████████████████████████

7  ████████████

8  A.  Correct.

9  ████████████████████████████

10  A.  Yes.

11  Q.  Okay.  If you could turn to AE 502W Attachment B, PDF

12  166.  Should be the next page.

13  A.  Okay.

14  Q.  That picture depicts what it looks like when

15  █████████████████████████████████████ Would you

16  agree?

17  A.  I would agree.

18  Q.  And if you turn to the next page, PDF 161 in that same

19  exhibit.

20  A.  Okay.

21  Q.  ██████████████████████████████████████████

22  ███████████████

23  A.  That's correct.

1    Q.  ████████████████████████████████

2    ██████████████████████████████████████

3    ██████████████████████████████████████

4    A.  That's correct.

5    Q.  Okay.  There is an -- you testified on direct

6    examination ████████████████

7    A.  Correct.

8    Q.  And if you could just flip back, sir, to -- two pages,

9    to PDF page 166.

10   A.  Got it.

11   Q.  Is that a photograph ████████████ that you

12   testified about?

13   A.  Yes, it is.

14   █████████████████████████████████

15   ████████████████████████████████████

16   ████████████████████████████████████

17   ████████████████████████████████████

18   ██████████████████████████████████

19   Q.  Okay.  Now, you testified on direct ████████

20   ████████████████████████

21   A.  Yes, I did.

22   Q.  Okay.  ████████████████████████

23   A.  I did.

1    Q.  All right.  To refer to a space that is partially open

2  to the outside?

3    A.  Correct.

4    Q.  Yeah.

5    A.  That's correct.

6  ████████████████████████████████████████

7    A.  That's correct.

8  ████████████████████████████████████████

9  ████████████████████████████████████████

10    A.  That's correct.

11    Q.  If you wouldn't mind looking at the next page in your

12  packet, which is AE 502W Attachment B, PDF page 168.

13    A.  Yes.

14    Q.  Would you agree that this picture ███████████

15  ████████████████████████████████████████

16  ████████████████████████████████████████

17    A.  I would agree.

18    Q.  Okay.  And if you would turn to the next page, 502W

19  Attachment B, PDF page 48.  Would you take a look at that for

20  a moment████████████████████████████████

21  ██████  This one was occupied, but ----

22    A.  Yes.

23    Q.  And if you would turn to the next page, 502W

1    Attachment B, PDF page 176.

2        A.  Got it.

3        Q.  And at the -- on the outside ████████████████ you

4    mentioned it's possible to see a little bit of nature, see

5    some sunlight.  ███████████████████████████████████

6    ████████████████████████

7        A.  I would agree.

8        Q.  Okay.  And page 176 is a photograph ███████████

9    ██████████████████████████████████████████

10       A.  I would agree.

11       Q.  Okay.  Now, you testified on direct examination about

12   the outdoor recreation area.

13       A.  Yes.

14       Q.  Could you turn to the next page, 502W Attachment B,

15   PDF page 194.

16       A.  Okay.

17       Q.  The -- at some point -- let me ask this a different

18   way.  ████████████████████████████████████████

19   ██████████████████████████████████████

20       A.  That's what I remember, yes.

21       Q.  Okay.  And at some point that was modified, in the

22   evolution that you described,███████████████████████████

23   ██████████████████████████████

1    A.  That's accurate.

2    Q.  Okay.  And if you will look at page 194, I -- █████

3    ████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    Q.  Okay.

9    A.  That's correct.

10   Q.  Okay.  And on the far right edge of the photograph ████

11   ████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   A.  Yes.

15   Q.  And on the far left-hand side of the picture █████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   A.  Yes.

20   Q.  ---- that you referred to?

21   A.  I see it.

22   Q.  Okay.  Okay.  You can put those down, sir.

23   A.  Okay.

1    Q.  We're done with those.

2        I'd like to ask you a little bit about the chain of

3   command.  In your role as camp commander of Camp VII, were you

4   under Joint Detention Group?

5    A.  No, I was not.  I reported directly to the JTF

6   commander.

7    Q.  Okay.  And the JTF commander obviously was under

8   SOUTHCOM?

9    A.  Correct.

10   Q.  All right.  But a number of government agencies had

11  interests or equities in the situation at Camp VII, correct?

12  Let me give you an example:  The Secretary of Defense.

13   A.  No -- oh, other -- okay.  I thought you said other

14  government agencies.  Yes, there are a lot of -- there are

15  staff in the -- in the OSD, in the Pentagon, that had interest

16  in that.  That is correct.

17   Q.  Right.  The -- and so there was an interagency body

18  that took the various organizations that had interests and

19  allowed them to come to consensus on policy issues?

20   A.  Yes.  I'm familiar with that.

21   Q.  Okay.  And at the level immediately above Admiral

22  Harris, it was called the Special Detainee Follow-Up Group?

23   A.  Yes.

1    Q.  And then there was one -- I don't know if you ever had

2  any interaction, but there was one level above that called the

3  Special Leadership Oversight Committee?

4    A.  I didn't have any interaction with it.

5    Q.  Okay.  But you were aware of its existence?

6    A.  I believe.  I believe there was another -- a higher

7  level, but I don't remember specifically that was -- that's

8  what it was called.

9    Q.  That's fine, sir.  And when decisions had to be made

10  about what the policy was going to be for -- on a particular

11  issue at Camp VII, that was -- the decisions were made -- if

12  they were on big issues, they were made by that Interagency

13  Policy Group; is that right?

14    A.  So there were -- the decision-makers started with

15  myself and Admiral Harris and OSD staff.  I mean, sometimes

16  the OSD staff would answer things directly, and then other

17  times they would go to that Special Detainee Follow-Up Group.

18         So those decisions, you referred to them as big ones.

19  I mean, decisions were made at all those levels at one time or

20  another during my tenure.

21    Q.  Sure.  That makes sense.  There -- so for issues that

22  were -- so let's sort of start at the lowest level.

23         For issues at the lowest level, there was a daily

1 meeting?  I know there were two daily meetings.  I'm talking

2 about the lower level one first.

3      A.  Yes, that's correct.

4      Q.  Okay.  There was a daily meeting, and you were

5 represented at that?

6      A.  Yes, that's correct.

7      Q.  And the medical staff, the psychologist and the M.D.,

8 were represented at that?

9      A.  Typically, yes.

10      Q.  Okay.  And a representative from another Government

11 agency was also present?

12      A.  Yes.

13      Q.  Okay.  And then later there was a -- in the day for

14 one level higher, there were other meetings that -- where you

15 would brief Admiral Harris on the situation?

16      A.  That's correct.

17      Q.  Okay.  And the same parties were present for that

18 meeting?

19      A.  Agreed.

20      Q.  And then if an issue had to go -- so if a decision

21 could be made basically at your level, you just made the

22 decision?

23      A.  That's correct.  That's correct.

1    Q.  And if a decision needed elevation, it would go first

2  to Admiral Harris?

3    A.  Yes.

4    Q.  And if a decision needed elevation beyond that, it

5  would go to the interagency group?

6    A.  Or to OSD policy.

7    Q.  Or the OSD ----

8    A.  The policy -- there was a -- there's a step in

9  between.  OSD policy.

10   Q.  Okay.  And was that Mr. England?

11   A.  No.  That was OSD detainee policy director.

12   Q.  Okay.  Or was that Mr. Coble?

13   A.  He was one of the members of that policy group that

14 I'm referring to, yes.

15   Q.  Okay.  The -- I'd like to ask you specifically about

16 one example of decision-making.  When you inspected Camp VII,

17 one of the comparisons you made was with Camp Delta; is that

18 fair to say?

19   A.  Camp V or VI, I would say.

20   Q.  V or VI, excuse me.  Is that more accurate, to say

21 Camp V or VI?

22   A.  Yes, that's more accurate.

23   Q.  You made a comparison to Camp V or VI?

1    A.  Correct.

2    ███████████████████████████████████████████

3    ███████████████████████████████████████████

4    A.  That is correct.

5    Q.  Okay.  And so you directed the people who worked under

6    you ████████████████████████  to make it comply with the

7    situation in Camp V and VI?

8    A.  That's correct.

9    Q.  Okay.  And that decision was countermanded by the

10   Interagency Policy Group?

11   A.  I don't know who it was countermanded by, but it was

12   countermanded.  That's correct.

13   Q.  Okay.  And the decisions of -- or discussions with the

14   Interagency Policy Group, when they took place, were generally

15   by video teleconference?

16   A.  Yes.

17   Q.  And sometimes there was communication by e-mail?

18   A.  Correct, both ways.

19   Q.  And when decisions were made, or sort of bigger

20   decisions -- maybe not every minute decision, but bigger

21   decisions were made by an Interagency Policy Group, like other

22   Interagency Policy Groups, they would issue a thing called a

23   summary of conclusions?

1    A.  I remember seeing those.

2    Q.  Okay.  And sometimes they would -- those would contain

3 policy directions to you?

4    A.  Agreed.

5    Q.  Okay.  One of the things that you testified to on

6 direct examination was that Camp VII had ███████ call to

7 prayer?

8    A.  We did.  That's correct.

9    Q.  Yeah.  And the reason why there was a -- first of all,

10 I mean, most fundamentally the reason why there was a call to

11 prayer was to let the detainees know that it was prayer time?

12    A.  Correct.

13    Q.  And I'm sure you all coordinated those with the --

14 with the schedule of prayer times?

15    A.  Yes, sir.

16    Q.  Yeah.  And the reason why that was a service performed

17 by Camp VII as opposed to, say, another detainee, was that at

18 that time detainees could not communicate with each other to

19 sort of -- to communicate the call to prayer; is that fair?

20    A.  I -- I believe so.  I don't know why that decision was

21 made specifically, but that makes sense to me, yes.

22    Q.  Okay.  You talked about accommodations for Ramadan.

23    A.  Yes, sir.

1   Q.  And it -- it became clear to you at some point,

2   clearly, that Ramadan was a very significant event in the

3   religious life of a Muslim?

4   A.  Absolutely.

5   Q.  Yeah.  And sort of the daily rhythms of the camp would

6   change at that time?

7   A.  Yes, sir.

8   Q.  And one of those daily -- one of the requirements of

9   Ramadan, for an observant Muslim, is that they fast during

10  daylight hours; do you agree?

11  A.  I agree.

12  Q.  So when you talked about providing an opportunity for

13  the men to break their fast after the sun had gone down, that

14  was an accommodation that Camp VII made for the holy season of

15  Ramadan?

16  A.  That's correct.

17  Q.  Is it correct to say that at this time in -- at the --

18  that you were there, that meal was provided individually in

19  the cells to the men?

20  A.  It was, yes.

21  Q.  Because at that time there was no opportunity for any

22  kind of meal as a group, correct?

23  A.  No.  I mean, under a rare occasion that -- ████████

1  ██████████████████████████████████████████ it

2  was call to prayer -- it was time to break the fast, then --

3  then when we would -- they would break the fast together.  But

4  that -- that didn't happen initially; that happened later --

5  later in the process.

6      Q.  Understood, sir.  And likewise, prayer for the men --

7  so in the course of understanding these issues, you came to

8  understand that generally, on Fridays, observant Muslims

9  congregate and have a communal prayer?

10     A.  Yes.

11     Q.  Much like for Christians go to church on Sunday?

12     A.  Yes.

13     Q.  And at the time that you were there, there was no

14  mechanism or opportunity for group prayer ██████████████████

15  ██████████████████████████

16     A.  I would agree.

17     Q.  Okay.  And was it your opinion that there should be

18  some way to have group prayer?

19     A.  I believe that we -- we strived to match those SOPs

20  with -- with Camps V and VI, which did allow that.  But

21  governing policy at the time did not -- did not allow that.

22  We -- we do -- you know, it was the belief that for

23  Admiral Harris, myself, we believed that we were to work our

1 ways towards those consistent procedures that were successful

2 in Camps V and VI.

3      Q.  That makes sense.  And at the time the governing

4 policy on that particular issue came from higher than

5 Admiral Harris?

6      A.  That's correct.

7      Q.  Sir, you talked on direct examination about the ICRC

8 visits.

9      A.  Yes.

10     Q.  The -- when was the -- so during the period of time

11 between September 2006 and January of 2007, there were two

12 ICRC visits.  Is that -- am I right?

13     A.  That's correct.

14     Q.  Okay.  When was the first of those?

15     A.  October.  It was a week-long period in October.  I

16 don't precise -- remember precisely the one, but I -- it was

17 October.

18     Q.  Okay.  And at some point someone had to decide what

19 order those ICRC visits would take place in; is that right?

20     A.  Correct.  We usually worked with ICRC to set that up.

21     Q.  Sure.  And -- and the order of interviews or meetings

22 with the ICRC, the order in which detainees would have their

23 meetings, at least for that first meeting, that was the

1  subject of interagency discussion; would you agree?

2  A.  See, I don't remember specifically that.  I -- I mean,

3  I don't remember specifically that -- that being an OSD

4  policy.  I -- in my memory, I remember after almost two years

5  there, typically that was an arrangement we worked out with

6  the ICRC.

7  Is it possible that OSD directed those, the sequence,

8  the timing?  It's possible.  I don't specifically remember

9  that in October of 2006.

10  Q.  Okay.  You testified on direct examination about your

11  duty station.  Do you recall?  That Camp VII was one duty

12  station; you had an alternate duty station at Camp America?

13  A.  Correct.  That's correct.

14  Q.  And Camp VII was also the duty station of some other

15  government agencies?

16  A.  Correct.

17  Q.  You testified on direct examination that the guards

18  were trained and that essentially their interactions with the

19  detainees -- their training was that those should be

20  transactional; is that correct?

21  A.  That's correct.

22  Q.  All right.  And by transactional, you mean when there

23  is an authorized transaction, like the exchange of material or

1  water or meal service, laundry, those sorts of things.

2  That's -- that's the limit of what guards should be engaging

3  with detainees on, correct?

4      A.  That's what I'm referring to.  I mean, there would be

5  a little bit more interaction, for example, when a detainee

6  was being moved, obviously, from either inside the facility or

7  to a -- a place outside the facility.  There was a little more

8  interaction.

9      Q.  In that situation there would often have to be

10  directions to the detainee?

11      A.  Absolutely, yes.

12      Q.  Past those transactional interactions, was personal

13  conversation between guards and detainees prohibited?

14      A.  So prohibited, no.  It was not typical.  It would -- a

15  detainee may engage in conversation during water bottles being

16  exchanged or the meals being exchanged.  The detainee may ask

17  some questions at that time period and there would be a brief

18  conversation, but for the most part, we -- those were

19  limited -- limited discussions, and we tried to keep them that

20  way.

21      Q.  The guards had a limited set of topics on which they

22  were allowed to make decisions, right?  Most decisions had to

23  go somewhere higher?

1    A.  Yes.  If there was a -- if there was a question, it

2  would -- they would come to me.  They would come through their

3  chain of command and maybe through a watch commander to me for

4  a decision to be made, yes.

5    Q.  Right.  So there were the equivalent of NCOs, for

6  example, who they would work their way through?

7    A.  That's correct.

8    Q.  And so the guards weren't coming to you every day with

9  questions?

10    A.  That's correct.

11    Q.  Right.

12    LDC [MR. CONNELL]:  Your Honor, if I may have a moment?

13    MJ [Col COHEN]:  You may.

14  **[Counsel conferred.]**

15    MJ [Col COHEN]:  Mr. Connell, were you able to resolve

16  your issue?

17    LDC [MR. CONNELL]:  We at least have a path forward, Your

18  Honor.

19    MJ [Col COHEN]:  Okay.  Great.

20    Q.  The -- so the various guards that worked missions

21  relating to Camp VII, ████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3     Q. Sure.

4     A. Correct, generally.

5     Q. So my next question applies ████████████████████████

6 okay? You testified on direct examination -- but do me a

7 favor. Don't answer this question until the government has an

8 opportunity to speak, which ----

9     A. Okay.

10     Q. ████████████████████████████████████████████ you

11 testified on direct examination that they wore military

12 uniforms. Were they, in fact, military?

13     TC [MR. SWANN]: Objection, Your Honor.

14     MJ [Col COHEN]: Basis?

15     TC [MR. SWANN]: Calls for a classified response.

16     MJ [Col COHEN]: Okay.

17     LDC [MR. CONNELL]: I don't actually think so, Your Honor.

18 Perhaps we could go to 658A because ----

19     MJ [Col COHEN]: Okay. That's fine. Let's do that. All

20 right. Thank you. Counsel, look to paragraph 68.

21     LDC [MR. CONNELL]: 68. Sir, I'm glad you pointed me to

22 that because I was at 10, so I was in the whole wrong part.

23     MJ [Col COHEN]: My CISO helped me out.

 1    LDC [MR. CONNELL]:  Okay.  68 is quite specific, and my

 2  question does not implicate either -- it does not implicate

 3  the second sentence of 68.

 4    MJ [Col COHEN]:  Okay.  Trial Counsel, the question itself

 5  would not call for that answer, that specific piece of

 6  information, but it would -- but -- so the question is, is --

 7  are we in a nuance where it's something you did not

 8  anticipate, or is it just that specific fact that is -- that

 9  is privileged?

10        If you guys need a moment to chat, I'm fine with that.

11  Like I said, you don't have to make a -- as you're discussing

12  here, let me tell you how I interpret this, is I see a very

13  specific piece of information that cannot -- that you have

14  asserted national security privilege over, but just a very

15  specific piece; whereas a generic answer, in the way we've

16  done other types of generic answers, would not necessarily be

17  covered by this as it's currently written.

18        So I'll let you all chat.  Thank you.

19  **[Counsel conferred.]**

20    TC [MR. SWANN]:  Your Honor, it's in paragraph 66.

21    MJ [Col COHEN]:  Okay.  Thank you.  Let's look at that

22  paragraph.  Thank you.

23        Yes.  So once again, though, I'm looking at it as if

1  we do not -- the question, as posed, is were they Department

2  of Defense, not -- I'm not implying whether they were or not.

3  That's not what my question is.  That is the question posed.

4  Not if they were not, what were they?  So I need an answer to

5  that -- that -- that specific line of questioning.  That's

6  where we're at.

7      TC [MR. SWANN]:  The first question can be asked.

8      MJ [Col COHEN]:  Okay.  And answered?

9      TC [MR. SWANN]:  And answered.

10     MJ [Col COHEN]:  With the instruction of do not

11  indicate -- because I think ----

12     TC [MR. SWANN]:  That's it.

13     MJ [Col COHEN]:  ---- I know what the answer is going to

14  be, as do counsel.

15     TC [MR. SWANN]:  Right.

16     MJ [Col COHEN]:  Sir, specifically based on the assertion

17  of privilege by the government, you may answer the question as

18  to whether or not they were Department of Defense.  You may

19  not answer anything beyond that if they were not.

20     WIT:  Understood, sir.

21     MJ [Col COHEN]:  All right.

22     Q.  So I'll give you -- I'll repeat my question, which I

23  think was very narrow and precisely framed and a yes-or-no

1  question, which is: ███████████████████ were the

2  guards military?

3      A.  No.

4      Q.  Sir, you testified on direct examination that ----

5      MJ [Col COHEN]:  And we'll take up the rest in the closed

6  session.

7      LDC [MR. CONNELL]:  Yes, sir.

8      Q.  ---- on direct examination, that the -- about how

9  detainees were addressed, like when the guard had to call

10  their -- had to call their ----

11     A.  Yes.

12     Q.  ---- attention?

13     A.  Yes.

14     Q.  The -- and could you explain that to us?  I understood

15  you to say one thing, and then I think you might have been cut

16  off.  You said often they were addressed as "Detainee"?

17     A.  "Detainee" or their specific ISN.

18     Q.  I see.  So Mr. al Baluchi, for example, who is my

19  client, is 10018.  He would be called "18" or "10018"?

20     A.  Correct.  Both of those would be applicable.

21     Q.  Or "Detainee"?

22     A.  Yes.  All of those would be applicable.

23     Q.  Now, I think this is just a matter of maybe refreshing

1  **[The R.M.C. 803 session was called to order at 1346,**

2  **1 November 2019.]**

3      MJ [Col COHEN]:  The commission is called to order.  The

4  parties are present.  Mr. Connell, are you ready to continue?

5      LDC [MR. CONNELL]:  Yes, sir.

6      MJ [Col COHEN]:  All right.  Please call the witness.

7      LDC [MS. BORMANN]:  Judge, for the record ----

8      MJ [Col COHEN]:  Yes, ma'am.

9      LDC [MS. BORMANN]:  ---- Captain Peer has rejoined us.

10     MJ [Col COHEN]:  He has.  Thank you, ma'am.  I apologize.

11     LDC [MS. BORMANN]:  No worries.

12     MJ [Col COHEN]:  Thank you.

13  **[The witness resumed the witness stand.]**

14     MJ [Col COHEN]:  Please, sir, have your seat.  You are

15  still under oath.

16     WIT:  Thank you, sir.

17     MJ [Col COHEN]:  Thank you.

18        Your witness, Mr. Connell.

19     LDC [MR. CONNELL]:  Thank you, Your Honor.

20     MJ [Col COHEN]:  You're welcome.

21     LDC [MR. CONNELL]:  Sir, I found my document, and I just

22  went ahead and made a copy for everybody so that we could all

23  look at the same thing.  The document that I'm referring to is

1 AE 628RRRR (AAA), and it is a document released under the

2 Freedom of Information Act in 2016 with unambiguous markings.

3 I would request access to the document camera and publication

4 to the gallery.

5     MJ [Col COHEN]:  This appears to be consistent with 118W.

6 Government, do you agree?

7     TC [MR. SWANN]:  We do, Your Honor.

8     MJ [Col COHEN]:  Okay.  You may do so.

9     LDC [MR. CONNELL]:  Thank you.

10     MJ [Col COHEN]:  You may publish to the gallery.  Okay.

11 Thank you.

12             **CROSS-EXAMINATION CONTINUED**

13 **Questions by the Learned Defense Counsel [MR. CONNELL]:**

14     Q.  Sir, you were asked on direct examination about the

15 SSCI use of this phrase, "operational control"?

16     A.  Yes.

17     Q.  Yes.  Is it fair to say that the division of

18 responsibilities between DoD and CIA regarding Camp VII is

19 memorialized, perhaps among other places, in a memorandum of

20 agreement?

21     A.  I agree, sir.

22     Q.  Yeah.  Thank you.  And the title of that memorandum of

23 agreement is "Memorandum of Agreement Between the Department

1  of Defense and the Central Intelligence Agency Concerning the

2  Detention by DoD of Certain Terrorists At a Facility

3  Guantanamo Bay Naval Station"; is that right?

4       A.  Yes, sir, I acknowledge.

5       Q.  And the -- in the -- just in that first sentence, the

6  memorandum uses the phrase "duties and responsibilities of DoD

7  and CIA concerning DoD's detention"; is that right?

8       A.  Yes, sir.  I agree.

9       Q.  And this memorandum of agreement, if you could flip to

10  the back, was signed at the very end of August and very

11  beginning of September 2006?

12       A.  Agreed, sir.

13       Q.  And it was operative during the time that you were

14  commander of ----

15       A.  That is correct.

16       Q.  Yes.  And I just wanted to draw your attention to one

17  particular part.  Sir, if you could turn your attention to

18  page 7.

19       A.  Okay.

20       Q.  The memorandum of agreement, among other things,

21  states that, "Investigations of or inquiries into allegations

22  of detainee mistreatment that pertain to activities occurring

23  after the arrival of a detainee at GTMO shall be the

1  responsibility of DoD."

2      A.  I acknowledge.

3      Q.  Was that your understanding at the time?

4      A.  Yes, it is.

5      Q.  And, "Any such allegation shall be reported to the

6  commander JTF-GTMO who shall ensure that it is properly

7  investigated in accordance with law and policy"?

8      A.  Agreed.

9      Q.  Without giving us any details, did that ever happen?

10 Were there ever allegations of detainee mistreatment or --

11 after arrival at Guantanamo?

12     A.  No, not under my watch.

13 LDC [MR. CONNELL]:  Okay.  Thank you, sir.

14 WIT:  Yes, sir.  Thank you.

15 LDC [MR. CONNELL]:  Nothing further.

16 MJ [Col COHEN]:  Thank you, Counsel.

17     Ma'am, your turn.

18     Can we cut the feed, please.

19                    CROSS-EXAMINATION

20 Questions by the Assistant Defense Counsel [MS. RADOSTITZ]:

21     Q.  Sir, I'm Rita Radostitz, and I represent Mr. Mohammad.

22     I want to follow up on that last question first and

23 then I'll get to the questions that I had prepared.  Was there

1 not a report of one of the guards tightening the handcuffs too

2 tight and that person was, in fact, disciplined for that under

3 your watch?

4     A.  So that is partially correct.  So there were -- there

5 was an observation from my guard force leadership reported to

6 me directly upon instance that the shackles were tighter than

7 they should be by normal SOP.  I -- I believe when reported --

8 and I did report this is -- to the commander of the JTF, but

9 it was more of an SOP violation rather than an injury or

10 anything with regard to that.

11       Typically, our SOP said the shackles should be certain

12 tightness, where two fingers could be squeezed between the --

13 the shackles themself and the skin, and so a certain guard

14 force member was not adhering to that.

15       So we identified that and we retrained that particular

16 person.  And he -- he did not complete the act properly after

17 being retrained, so I asked that he -- he depart, and he did

18 not return after that.

19     Q.  Okay.  Thank you.  So I want to talk somewhat

20 chronologically, although some of my questions may be a little

21 bit out of chronological order.  So I want to talk first,

22 after you became Camp VII commander, you talked about the fact

23 that you were briefed about the new mission that you were

1 over -- undertaking; is that right?

2     A. Yes, ma'am.

3     Q. And you were told at that time that 14 high-value

4 detainees, using the language of the DoD, were going to come

5 into your care?

6     A. Correct.

7     Q. And you were provided with a two-page document

8 describing each of those detainees?

9     A. Yes. We had background information on each one of

10 them, and we had medical information on each one of them;

11 that's correct. Those are two separate documents, if you

12 will.

13     Q. Okay. And this may be -- this is at first a yes-or-no

14 question. Do you know who gave you -- who prepared those

15 documents?

16     A. I do not.

17     Q. You did know that prior to arrival in Guantanamo, that

18 those men were -- had been detained in CIA custody; is that

19 right?

20     A. That is correct.

21     Q. Okay. And did you know where they came from?

22     A. No, ma'am.

23     Q. And in the information that was provided, you said

1 that there was some background information and medical

2 information. Did it include the fact that Mr. Mohammad had

3 been sleep deprived for more than seven days; that he had been

4 waterboarded more than 183 times; that his head had been

5 repeatedly slammed against the wall? Were all of those kinds

6 of facts included in that information?

7     A. Ma'am, I don't recall those specifically. I do recall

8 a description of their current state, any problems that they

9 may be experiencing upon arrival, their overall condition that

10 -- expected when we would first meet with them. One detainee

11 was an amputee, for example. One -- one had lost eyesight in

12 one eye.

13     So we -- we did have a good summary of the overall

14 condition of them from -- from that broader perspective, if

15 you will. That's what I'm referring to.

16     Q. Okay. And did that include body weights, for example,

17 that Mr. Bin'Attash was significantly underweight?

18     A. I don't remember body weights, to be -- I haven't seen

19 those documents in quite some time. I don't remember body

20 weights to be part of that.

21     Q. Okay. In that information, were you made aware that

22 the detainees had been held in communicado for three and a

23 half years and maybe, for some of them, more than that?

1    A.  That -- that statement was not made to me, no.

2    Q.  Did you know that?

3    A.  No, I did not know that.

4    Q.  Okay.  Did you know that they had not been previously

5  held in compliance with the Geneva Conventions?

6    A.  I did not know that.

7    Q.  Do you recall President Bush saying that he didn't

8  believe that the Geneva Conventions applied to these

9  prisoners?

10    A.  I remember this:  I remember Department of Defense

11  Directive 2310.01E which guides our activities for detention

12  operations which says, in fact, we -- we do adhere to the

13  principles of Geneva Convention Common Article 3.  Those are

14  one of the guiding references, governing authorities for which

15  I was responsible for enforcing, so I know that much.

16    Q.  Okay.  And did you have training on what was required

17  under the Common Article 3 of the Geneva Conventions?

18    A.  Yes.  I -- we -- I had training, correct.

19    Q.  Okay.  So you testified both on direct and on

20  Mr. Connell's cross that you -- that the guards -- the guard

21  force that you were supervising had received training.  Is

22  training considered part of operational control or does that

23  fall under a different category?

1    A.  Well, it's an example of the -- the operational

2  control, I believe.  So in assuming operational control of

3  those personnel, I was responsible for their training.  We

4  did, in fact, conduct training prior to the -- prior to the

5  arrival of the -- of the detainees.

6        So I was responsible for that.  That's -- that's one

7  of the things that would fall underneath the category of

8  operational control, yes.

9    Q.  And was that solely your -- I mean, did -- was -- were

10 any other government agencies involved in what should be

11 included in that training?

12   A.  No, not in this training I'm specifically referring

13 to.  The preparation for the mission, detention, safe, humane

14 care and custody, that was solely Department of Defense.  That

15 was my responsibility to ensure that those standards were met

16 and enforced.

17   Q.  Okay.  So on direct examination, you talked about

18 going on -- during the first week of September, going to the

19 other side of the island and meeting the C-17 flight that came

20 in?

21   A.  Yes, ma'am.

22   Q.  I'm going to talk a lot more about this in closed

23 session ----

1    A.  Okay.

2    Q.  ---- but I just have a couple questions.  Did you talk

3  with any of the folks who -- the personnel who were on that

4  flight while you were there?

5    A.  I stood at the ramp of the aircraft.  The answer is

6  yes, brief -- brief -- briefly.  Just I stood at the ramp of

7  the aircraft when we took custody of each one of those

8  detainees individually and so -- I mean, engines are running,

9  I believe, so there wasn't a conversation going on.  It was

10  quick exchanges, transactional, if you will.

11    Q.  Okay.  And what were they wearing?

12    A.  The detainees, ma'am?

13    Q.  No, the personnel you spoke with.

14    A.  I do not remember.

15    Q.  Were they wearing military uniforms?

16    A.  I'm not a hundred percent sure that all of them were

17  wearing military uniforms, to be quite honest.

18    Q.  Okay.  And when the detainees came off the flight, did

19  they have anything other than the clothes on their back?

20    TC [MR. SWANN]:  Your Honor, he can answer that in a

21  closed session.

22    MJ [Col COHEN]:  Okay.

23    ADC [MS. RADOSTITZ]:  Okay.

1    A.  So that process would work that -- it was -- it would

2  be the doctor that would first talk to him about that, the

3  harmful effects of going without nourishment and -- and the

4  concerns that -- that the doctor would have when -- and, you

5  know, we would watch for body mass index and -- and see

6  that -- if there were any potential harmful effects coming

7  forward.

8         But it would typically be the doctor that talked to

9  them, not me, if they were missing meals like that.  And --

10  and potentially, the psychiatrist as well; not just the

11  internal medicine physician, but the psychiatrist.

12    Q.  Okay.  So you talked earlier with Mr. Connell

13  about that there were two types of meetings every day.  There

14  was the, for lack of a better word, the lower-level meeting

15  and then the higher-level meeting?

16    A.  Yes, ma'am.

17    Q.  And were there written agendas for those meetings?

18    A.  No, ma'am.  Typically -- typically, I would -- I would

19  jot some notes down.  I knew -- I would structure the meeting.

20  I was responsible for both of them, if you will, and so I

21  would structure them with some notes of my own on what

22  needed -- what I was going to report, what changes came about.

23         I knew what the -- I knew what the commander was

1  interested in, so -- and I knew what -- what he would want to

2  hear about, and that's just about everything that was going on

3  there.

4      Q.  Okay.  And what happened to your notes?

5      A.  They would -- they'd be left at Camp VII.  There's

6  not -- I wouldn't have taken them with me afterward.

7      Q.  Okay.  And if somebody, for whatever reason, who was

8  a -- normally attended those meetings couldn't attend, how

9  would that person be notified of what was reported during a

10  daily briefing?

11      A.  Okay.  So, for example, if the -- if the internal

12  medicine doctor wasn't there, I would have the senior --

13  senior nurse or a senior corpsman who would sit in on the

14  discussion, and then he -- he or she would be responsible for

15  relaying that back to the doctor.

16      Q.  Okay.  And what about if you couldn't attend, how

17  would you be informed of what -- not so much what information

18  was being pushed out, but what information was coming back?

19      A.  I had a deputy who would sit in for me, and he would

20  bring that information back to me, or one of my other members

21  of my command element.

22      Q.  Okay.  So you testified about -- in those photographs

23  about the fact that there were two doors to each cell and that

1  it -- you made the recommendation that the outer door be

2  removed like it was in Camps V and VI; is that -- am I right

3  in remembering that?

4      A.  That's correct.

5      Q.  And would you consider that an operational decision,

6  that you were in operational control; and doors, is that an

7  operational concern?

8      A.  I believe it was, yes.

9      Q.  Now, you also talked about that one of -- I forgot to

10  ask this.  One of the people who attended the daily briefings

11  was the SJA?

12      A.  Correct.

13      Q.  And at that time, or during your period of time there,

14  was there an SJA that was specifically assigned to Camp VII,

15  or was this the SJA over all of Guantanamo?

16      A.  This was the SJA over all of Guantanamo.

17      Q.  And there wasn't -- now we have one that's specific to

18  Camp VII that ----

19      A.  Right.  No, he had both -- he wore both hats during

20  that time period.

21      Q.  Now, Mr. Swann talked to you a little bit about a

22  November 2007 return of an FBI agent to talk to Mr. Mohammad.

23      A.  Yes, ma'am.

**_UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT_**
~~**_TS//ORCON/NOFORN_**~~

1              DIRECT EXAMINATION CONTINUED

2    Questions by the Trial Counsel [MR. SWANN]:

3        Q.  And before we broke I was asking you certain questions

4    about the operation of the camp.  Let me read a statement and

5    you tell me whether it's a true statement or not.

6        A.  Okay.

7

8

9

10

11

12

13

14

15

16

17        LDC [MR. CONNELL]:  Your Honor?

18        MJ [Col COHEN]:  Counsel.

19        LDC [MR. CONNELL]:  I object.  This is just a strange way

20    to lead.

21        MJ [Col COHEN]:  Yeah, Counsel, is -- where are we going

22    with the line of questioning?  I guess ----

23        TC [MR. SWANN]:  That's the last question in this line of

**_UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT_**
~~**_TS//ORCON/NOFORN_**~~

1  questioning.

2      MJ [Col COHEN]:  All right.  I'm going to allow this one

3  so we can move on.  You may answer.

4

5

6

7

8

9

10

11

12

13

14          So I -- I do believe there's two separate missions

15  that went on there.  I can't account for why that statement

16  was made.  Again, OPCON is traditionally a military term used

17  by military -- in the military jargon to define a relationship

18  between forces and the -- and the -- and the commander of --

19  of those forces and how they interact and their

20  responsibilities.  There's OPCON, there's ADCON, TACON.  I'm

21  not going to go down those roads.

22          But OPCON, to me, as I've described, was OPCON over

23  forces, over forces that are accomplishing a mission, specific

*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*
*TS//ORCON/NOFORN*

1  mission.  The detention mission was responsible for -- was the

2  responsibility of Task Force Platinum.  The commander of Task

3  Force Platinum had OPCON over all those forces that conducted

4  the detention mission.



*UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT*
*TS//ORCON/NOFORN*

28789

**UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT**
~~TS//ORCON/NOFORN~~

1  [The R.M.C. 806 session was called to order at 1253,

2  4 November 2019.]

3      MJ [Col COHEN]:  The commission is called to order.

4  Parties are present.

5          Intelligence Community Standard 705-02 ----

6      LDC [MR. SOWARDS]:  Sorry, Your Honor.  May I have that

7  again?  I beg your pardon.

8      MJ [Col COHEN]:  Yes.  Intelligence Community Standard

9  705-02 signed by the Director of the National

10 Counterintelligence and Security Center dated 12/22/16,

11 paragraph 4.a. says, "In circumstances where a SCIF is under a

12 co-use agreement and/or personnel are not briefed into all the

13 respective programs, procedures shall be instituted by the

14 host and tenant CSAs to prevent unauthorized access to that

15 specific compartment, subcompartment or program information."

16         And then I don't have -- I haven't had a chance to

17 look this up yet, but it says, "Physical, visual, and acoustic

18 access to the comparted information by unauthorized personnel

19 shall be controlled by the security measures identified in

20 IC Tech Specs, Chapter 2 Section C."

21         And then I was -- I was looking to make sure.  In

22 addition, with respect to visitors, the National

23 Counterintelligence and Security Center put out technical

**UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT**
~~TS//ORCON/NOFORN~~

1    MJ [Col COHEN]:  You're back on the stand.  We're going to

2    conclude your testimony this afternoon, or at least the

3    classified session this afternoon.  Please have a seat.  I

4    remind you that you're still under oath.

5    WIT:  Understood, sir.

6    MJ [Col COHEN]:  Thank you.

7                    **CROSS-EXAMINATION CONTINUED**

8    **Questions by the Learned Defense Counsel [MR. CONNELL]:**

9    Q.  Sir, the military commission just thanked you for your

10   patience, but I just want to say that I'm pretty confident I'm

11   speaking for everybody when I say how sorry I am that you have

12   been kept waiting for seven hours today.  I know that your

13   time is important and valuable, and I just want to let you

14   know that the -- the question came up of what we were going to

15   do now and we uniformly said, "Let's get this over with.

16   Let's do this."

17   A.  Thank you, sir.  Appreciate that.

18   Q.  Sure.

19   LDC [MS. BORMANN]:  I'm sorry to interrupt, but Mr. ▇▇▇▇

20   has rejoined us.

21   MJ [Col COHEN]:  All right.  Thank you, ma'am.

22   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

23   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
TS//ORCON/NOFORN

1    say one week after I had been briefed in this we began --

2    myself and my operations officer began looking at how we would

3    adapt those -- those SOPs to conform to the new facility.

4

5

6

7

8    WIT:  Thank you, sir.

9    MJ [Col COHEN]:  I handed the witness a bottle of water.

10    LDC [MR. CONNELL]:  Sure.

11

12

13    A.  So I remember the site manager at the time, and this

14    is -- the first site manager wasn't there very long.  I

15    believe he was an interim until the longer-term one arrived.

16

17

18

19

20

21

22

23

UNOFFICIAL/UNAUTHENTICATED TRANSCRIPT
TS//ORCON/NOFORN

UNOFFICIAL / UNAUTHENTICATED  TRANSCRIPT
TS//ORCON/NOFORN

6      Q.  And was it your understanding that Admiral Harris

7  was -- or -- or Commander McCarthy was passing down

8  instructions from higher?  It wasn't their independent

9  judgment; is that right?

10     A.  Yeah.  To the best of my knowledge, it wasn't

11  independent decisions that were made at the JTF.  Those came

12  from the Pentagon.  Correct.

19                                                             It wasn't that first day

20  when we met at Camp VII and talked about the broader,

21  overarching responsibilities.  So it was a little closer to

22  that.

23         So our dialogue picked up the pace with OSD detainee

UNOFFICIAL / UNAUTHENTICATED  TRANSCRIPT
TS//ORCON/NOFORN

1  policy.  As we got closer -- "we" meaning myself,

2  Admiral Harris, Captain McCarthy, and the Deputy Commander,

3  Brigadier General Leacock, that we -- we were the ones that

4  were read into this and understood what was happening.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

UNOFFICIAL / UNAUTHENTICATED  TRANSCRIPT
~~TS//ORCON/NOFORN~~

7      If Admiral Harris or Commander McCarthy at the time

8   knew about those recommendations coming, we learned them from

9   OSD Detainee Policy.  If those decisions were made in

10  Washington, D.C., it was not obvious to me, at least, to -- so

11  that was not the role of the site manager that I interacted

12  with at the -- at Camp VII.

17      Q.  It means at a much higher interagency level?

18      A.  I believe so.  Because at my level, I didn't advise

19  him on how to protect national security information.  I don't

20  mean to sound facetious, but -- and he didn't tell me how to

21  do the detention operations.