# Attachment H

1    The commission is in recess.

2    **[The R.M.C. 803 session recessed at 1432, 03 November 2021.]**

3    **[The R.M.C. 803 session was called to order at 1456,**

4    **03 November 2021.]**

5    MJ [Col McCALL]:  The commission is called to order.

6    Parties are again present as before.  Mr. Mohammad is present.

7    The other accused are absent.

8    All right.  We'll go ahead and move into AE 779.  This

9    is Mr. al Baluchi's motion to compel discovery regarding

10   interagency processes to obtain statements from the

11   defendants.

12   LDC [MR. CONNELL]:  Thank you, sir.  I have one

13   housekeeping matter before that if ----

14   MJ [Col McCALL]:  Yes.

15   LDC [MR. CONNELL]:  You know, there are a lot of -- a lot

16   of pipes that run around here, and one of those pipes is super

17   important because it's the reason that this is a public trial,

18   and that's the pipe of audio and video from here in the

19   courtroom on the delay ordered by the military commission to

20   the gallery.

21   Over the break I was advised that at the last -- when

22   we started the last time, the audio was off for several

23   minutes, and that they could only begin to hear once

1  Mr. Gleason was arguing.  And that they figured out what was
2  going on, but it was -- it was a problem.  And that problem is
3  compounded by there's a rule, and the military commission
4  might know about it or not, that no one in the gallery is
5  allowed to communicate with anyone in the courtroom.  And
6  there -- I understand the original intent of that room --
7  rule, but it was probably not to let the judge that -- know
8  that the audio was not coming through.

9      So I don't have a proposed solution yet.  I will be
10 thinking about it.  But I did want to let you know about the
11 problem.  You know, yesterday I brought up the comms check
12 issue and everything checked out.  I probably should have done
13 that today because there was an issue, but I just wanted to
14 let you know and something to be cognizant of for the future.

15     MJ [Col McCALL]:  No, I appreciate you bringing that to my
16 attention.  And I'll also give it some thought on how we can
17 make sure that if that feed gets lost or, you know, again, we
18 see this, right, with the IT that we can be let known here in
19 the courtroom so we can pause.

20     LDC [MR. CONNELL]:  Sure.

21     MJ [Col McCALL]:  Because it is important.  It's an
22 unusual case.  It's a small gallery, but it's still important.

23     LDC [MR. CONNELL]:  Yes, sir.

1    MJ [Col McCALL]:  All right.  If you could hold on one

2  second, Mr. Connell.

3    LDC [MR. CONNELL]:  Of course.

4    MJ [Col McCALL]:  All right.  Proceed.

5    LDC [MR. CONNELL]:  Thank you, sir.

6       For the military commission is AE 779 regarding motion

7  to compel information about interagency processes that were

8  used to obtain statements from these five defendants.

9       You know, there's been some observations this morning

10  and it -- and especially when we cluster motions like this,

11  themes develop.  But this goes in a different direction,

12  right?  This is not a question of friction between the parties

13  where we couldn't work out something.  This is just a

14  disagreement among the parties on the scope of relevance, and

15  particularly on the scope of the military commission's order

16  in 538AA.

17       And so I -- I suggest that it's entirely appropriate

18  for -- for sort of bring to the military commission to resolve

19  this question because sometimes people disagree.  And in our

20  view, this issue begins and should probably end with the text

21  of AE 538AA, 561T.

22       538AA arose out of a long series of arguments about

23  the FBI/CIA/DoD, and I'm not going to rehearse the -- what

1   happened.  And as counsel for the government correctly noted

2   in the last argument, sort of it -- it sort of kicked off with

3   538C, but then everyone agreed ----

4       MJ [Col McCALL]:  And Mr. Connell, again, and perhaps

5   counsel that have been on this case longer than I have realize

6   that I'm probably interrupting more often as far as the

7   interpreters letting us know that -- for us to slow down.  So

8   the interpreters often use lip reading to assist in ----

9       LDC [MR. CONNELL]:  Ah.

10      MJ [Col McCALL]:  ---- interpreting.  And because we're

11  wearing the masks, they've let me know that it makes it

12  difficult.  So without going unnaturally slow, if we could

13  just all be cognizant and try to go a little bit slower.

14      LDC [MR. CONNELL]:  Thank you, sir.  I usually get into

15  trouble when I read, but when I argue, I don't usually get

16  into quite as much trouble.  But I -- I have nothing but

17  immense love and respect for the interpreters and I want to do

18  everything that I can to help them out.  So I had not thought

19  about the lip reading aspect.

20      So in this long series of arguments in 538 -- that

21  arose out of 538C, one thing that became clear is that there's

22  simply a difference among -- I don't want to speak for anyone

23  else -- I get in trouble when I speak for anyone else on the

1  left side of the room -- but between Mr. al Baluchi and the

2  government on the question of the appropriate scope of

3  discovery outside of Echo II.

4       You know, the government articulated this morning that

5  it believes that the question of voluntariness sort of begins

6  when you enter Echo II and leaves -- and ends when you leave

7  Echo II.  We see it as a much broader inquiry, and have

8  articulated that throughout the military commissions

9  proceeding since the filing of the motion to suppress.  And,

10 with due respect to my colleagues on the other side of the

11 room, we have won the issue.

12      538AA represents a policy determination by the

13 military commission that everything related -- that within

14 the -- within the scope which is established there, which has

15 to do with, you know, reasonably known to the prosecution, the

16 ordinary standards.  That text is, the government shall

17 produce all documents that are known or reasonably should be

18 known to any government officials who participated in the

19 investigation and prosecution of the case against these five

20 accused that reasonably tend to show cooperation between the

21 CIA, FBI, and Department of Defense in the effort to

22 abstain -- obtain statements from these five accused.

23      And so it's probably clear to you, but just in case,

1  you know, it -- that was -- we framed that up.  We asked for
2  that ruling because we were not getting anywhere with the --
3  the prosecution and we were not getting anywhere in the
4  question -- you know, we tried some -- some more granular
5  approaches, right?  We had -- we met and conferred.  We
6  established our, here's our six highest priorities.  You know,
7  if you give us those, maybe we'll back off on some -- we tried
8  negotiating it.

9        And the government negotiated in good faith.  I'm
10 not -- I'm not saying that they didn't.  But we tried
11 negotiating it.  And of those six priorities, only one of them
12 was ever turned over to us.  And so that wasn't really
13 working, so the meet and confer approach wasn't working.  And
14 so we asked the military commission, listen, can you settle
15 the principle?  And then maybe we can -- maybe we can use that
16 to work from there.

17        And the government -- the military commission did
18 settle the principle.  Not just here in 538A, but again and
19 again and again in the testimony of the witnesses.  Because
20 on, I believe, 60 occasions the government made relevance
21 objections and on almost all of those occasions, and this is
22 all laid out in the 824 series in granular detail, but on
23 almost all of those occasions the military commission ruled

1  the defense has a right to prove integration or cooperation

2  between DoD and CIA and FBI.  And so questions or documents

3  that are related to that are relevant in that evidentiary

4  context and here in the discovery context, which is very

5  closely aligned.

6         And -- but it was not -- it was not a complete victory

7  for us.  I mean, there's the paragraph c. in the ruling, 5.c.,

8  which denies something that we were asking for.  And we're

9  going to talk about that more when we get to 780 because 780

10  is about what -- what basket does certain information fit

11  into.  Does it fit into the b., must produce basket, or does

12  it produce -- fall into the c., don't have to produce basket?

13        After having that issue resolved, unfortunately 538AA

14  resulted in exactly -- in the production of exactly zero

15  additional discovery.  What we hoped would happen was that the

16  government would take this new expanded standard, which was

17  much, much broader than, you know, what they continued to

18  articulate even today, much, much broader than what they

19  thought the standard was, in good faith I'm sure, and that

20  they would go back and say, okay, look, we need to -- we need

21  to take another approach to this, go through this information

22  again, produce what falls -- you know, the delta between their

23  previous view of relevance and 538AA.

1    And they can speak to their processes.  I -- I don't

2   impugn their processes in any way.  But whatever their process

3   was, it was not effective at producing additional discovery

4   because no additional discovery was produced after 538AA.  The

5   only continuing discovery issue is the one that you addressed

6   in 538RR about the redactions in the intel requirements.

7    So, you know, I mentioned earlier that I think that

8   there are always a couple of questions that the -- that any

9   judge wants to know on a motion to compel, which is, number

10  one, what did you get already?  Number two, how do you know

11  that something else exists?  And number three, if you get that

12  something else, what are you going to do with it?

13    And so there are four categories.  I'm really going to

14  collapse them to three for this argument, but there are four

15  categories that we laid out in the motion of interagency

16  process documents that we know exist either through Freedom of

17  Information Act or some other way.

18    So I'd like to begin with category one, which is

19  interagency coordination on the denial of the rights to prompt

20  presentation, right to counsel, and the right to remain

21  silent.  Just a little while ago in AE 737, we talked about

22  general FBI policy, mostly laid out in a couple of key

23  documents.  We talked about the redacted policy in FBI-22700,

1  and I suggest what I think is occurring is that the redacted
2  policy in FBI-22700 represents their unilateral approach,
3  right?  FBI is fundamentally responsible for law enforcement
4  within the United States with -- and whether we include
5  Guantanamo in the United States or not, there is fundamental
6  FBI mission at Guantanamo that they'd been carrying out for
7  four or five years by this point, and -- you know, so that
8  their general counsel's office probably thought we need -- we
9  need some policy, and so that's why we're laying out
10  FBI-22700.

11       But given the persistent interests and involvement of
12  the CIA and other agencies, you know, it became clear that the
13  FBI could not decide on its own what the policy was going to
14  be.  For one thing, they weren't FBI prisoners.  You know, if
15  they were at MCC New York, they could go down there and pull
16  them out whenever they wanted and talk to them; but they're
17  not.  They're in a DoD facility at Camp VII under the
18  operational control of the CIA, and so there's multiple agency
19  partners that they have to collaborate with.

20       And the government's brief argues that -- like, one of
21  its main arguments is of course the interagency process comes
22  into play, which makes complete sense to me.  Of course the
23  interagency process comes into play.  And the whole of

1  government approach for extraction of -- of statements from

2  these defendants is, in our view, a reason why more discovery

3  should be produced, because there are more hands in the pot,

4  than a reason that it should not be produced.  Like, why would

5  we choose FBI as the unit of we're only going to produce

6  information from the FBI and their efforts to abstain --

7  obtain statements and -- and not produce them from DoD or CIA

8  who also had a hand in it?

9        You know, it seems somewhat arbitrary if we're going

10  to choose one -- in that situation, you can't even say, well,

11  only the FBI was in Echo II because DoD was also in Echo II,

12  right?  Mr. al Baluchi was interrogated by three people, two

13  FBI and one from CITF, the -- from out of Army CID originally.

14        And so, you know, it's been an interagency process to

15  obtain statements from the beginning and that's why I think

16  Judge Cohen put that "to obtain statements from these five

17  defendants" language in 538AA, which is that the effort to

18  obtain statements is the linchpin, not the individual agency

19  that is -- that is -- has come into play.

20        So what we do know is that there is an interagency

21  meeting and -- excuse me just one second.  We do know from

22  Freedom of Information Act documents that there's an

23  interagency meeting on 29 November of 2006.  And there are two

1  documents that have been released relating to that.  One of

2  them is found in the record at AE 538C Attachment E.  It is a

3  document which has FOIA markings under it and, thus, comes

4  under AE 118W (Amend).  And if I could have access to the

5  document camera and permission to publish to the gallery.

6      MJ [Col McCALL]:  You may.

7      LDC [MR. CONNELL]:  Perfect.  So the first thing that we

8  know that we as -- as Mr. al Baluchi's team can prove exists,

9  this document is given for context.  Like, I'm satisfied with

10 the FOIA production of this document.  I don't need anything

11 out of this Attachment E.  But it provides an agenda for an

12 interagency meeting.  And by the way, we interviewed the --

13 the person whose name is on this document and she didn't

14 remember anything about it, so -- so we -- we have done the

15 other ways that you could get information out of this.

16      And -- but what the agenda said was that there were

17 interagency decisions needed regarding the 14 high-value

18 detainees, which includes Mr. al Baluchi, of course, and under

19 the heading Questions That Must Be Answered Soon, the --

20 interagency body was going to consider -- and I'd like to draw

21 your attention to paragraph 4, is who should get permitted to

22 have access to the detainees now, how should such access be

23 regulated, and by whom?

1    There's a question of a joint FBI/CITF team, which has

2  obviously been in November under consideration, whether other

3  intelligence or law enforcement agencies would have access,

4  including foreign ones, and then whether there would be

5  counsel access, including defense counsel or habeas counsel.

6    So when I talked earlier about the -- the question of

7  due process as a factor that -- that the panel brings into --

8  you know, is really interested in, there was a very

9  intentional decision -- interagency decision-making process

10  about the question of whether we were going to give access to

11  counsel to prisoners who we intended to prosecute in a -- in a

12  court of law.  And that -- the second thing that we don't

13  know, we don't know if anyone sent in any policy paper.  The

14  government knows -- knows, I'm sure, that they looked into

15  this question from ODNI.

16    But at E -- Attachment F, we have the second document

17  which was released under Freedom of Information Act, which is

18  a memorandum for -- a partially redacted memorandum for

19  record -- sorry.  My glasses are fogging up with the mask.

20  MJ [Col McCALL]:  That's fine.

21  LDC [MR. CONNELL]:  And on the second page of the

22  memorandum for record, we have some important redactions,

23  especially regarding to access to the 14 HVDs.  Now, the first

1   sentence on that paragraph says that all representatives

2   agreed that a law enforcement team should be allowed to

3   conduct a, quote, historical narrative interview of each of

4   the HVDs.

5       Now, I'll tell you that we found this very

6   interesting, and one of the things that I -- I think is

7   important to demonstrate to the military commission is our due

8   diligence in seeking other sources of information, which is

9   why I told you that we interviewed the person whose name on

10  this document, but we also filed a Freedom of Information Act

11  request for historical narrative interview because that's an

12  unusual way to describe an investigation.  And -- and so with

13  both DoD -- with DoD, CIA, and FBI, all of which returned that

14  there were zero documents other than this one, which were --

15  referred to historical narrative interviews.

16      So we've never come to understand what a historical

17  narrative interview is, how that's different from the

18  understanding that Special Agent Fitzgerald testified to,

19  which was that the job -- their job was to put together

20  prosecutions if they could, like any law enforcement effort.

21      Then there's a redaction and then the -- then there's

22  an element -- the next sentence says:  DoD and DoJ lawyers

23  agreed to seek authorization for these interviews in the next

1  week.  That really goes to the question of -- of the

2  interaction of DoD and DoJ, which the parent of -- of FBI,

3  and -- and CIA.  Because I'm -- I'm not sure from whom they

4  are seeking those permissions.  We know there's CIA

5  operational control.  It would make sense there would have to

6  at least be CIA consent to an interview and -- and I -- then

7  we have a question of what about counsel?  Requests for access

8  by other groups such as -- blank --  military COCOM

9  investigators and NGOs will be determined by the prosecutors

10 on a case-by-case basis -- redaction.  So I think that

11 probably these redactions somewhere -- because we know from

12 the agenda they were considering the question of habeas and

13 defense counsel, I suspect that somewhere under these

14 redactions is a question of what are we going to do about

15 access to counsel by defense and habeas because otherwise, it

16 would not -- they would not have covered -- they cover

17 everything else that they described in the agenda.

18        Now, the last thing that I want to say is where this

19 document points us for additional information.  And in the --

20 the last sentence about military commissions proceedings,

21 there is a reference in the first sentence to an NSC, or

22 National Security Council, review effort.  This is -- this is

23 a deputies committee, right?  When you look at the people who

1  are on the distribution list, these are deputies.  But

2  something as important as this, it makes sense that it was

3  probably decided by the National Security Council and we --

4  you know, so that's the other place that -- just these

5  documents, we know that an NSC review effort exists because

6  it's -- it's documented here in this.  And that's not

7  something that we have received either a 505 substitution for

8  or any kind of -- of document.

9       Now, what will we do with it when we get it?  This is

10  what I began to describe to the military commission earlier,

11  that there's an arc or that there's a series of decisions that

12  are made that ultimately mean that the FBI agents on the

13  ground are not able to follow the ordinary policy that they

14  themselves have followed hundreds of times of advising of the

15  right to counsel, and advising of the right to remain silent,

16  including what happens if you don't exercise your right to

17  remain silent.

18       And I mentioned earlier the -- the clemency letter in

19  the Khan case and they actually specifically mention the

20  question of access to counsel.  In the first justification for

21  recommending clemency, the panel noted that:  Mr. Khan has

22  been held without the basic due process under the

23  U.S. Constitution.  Specifically, he was held without charge

1   or legal representation for nine years until 2012.

2         And the -- you know, one of the things that I think

3   that that suggests -- should suggest to the military

4   commission is that everyone knows how important access to

5   counsel is.  You know, Article 31 is baked into the

6   military -- the military gave <u>Miranda</u> warnings before <u>Miranda</u>.

7   Article 31 was put into the -- into the UCMJ in its creation

8   in 1950.  I mean, it -- it is a fundamental part of military

9   and panel thinking that, yeah, sure, if you're going to get

10   incriminating statements from someone, you observe their

11   rights and it's -- it's not just a, you know, sort of idea

12   that is interesting only to defense lawyers.  It's ones

13   that -- that is integral to a presentation to a -- the panel

14   about what actually happened here.

15         So the -- the other point that I want to make about

16   this high-level interagency process is that it had an actual

17   impact on what the individual agents did, not just the policy

18   that came out on January 10th.  But Special Agent Perkins

19   testified -- and this is at 20 September 2019 at 26647 to 48.

20   She testified that she spent a, quote, couple of months

21   reviewing CIA material as part of the High-Value Detainee

22   Prosecution Task Force while, quote, interagency high-level

23   government, end quote, discussions were ongoing about access

1  to the prisoners.

2        So it's at -- there's actually been, you know, a -- a

3  kind of a small reference, but there's already been a

4  reference to this in the testimony of one of the FBI agents

5  who interrogated Mr. al Baluchi about -- that -- that she knew

6  about this high-level interagency process that was going on

7  and was waiting for access to Mr. al Baluchi and

8  Mr. al Hawsawi and others.  And during that time, spent that

9  couple of months reviewing the CIA TD-314s and CIRs and other

10 documents that had been circulated by the CIA and placed in

11 something we're about to talk about called buckets.

12        All right.  And that actually brings us -- oh, excuse

13 me.  The -- the last observation that I want to make about

14 category one is that the government has -- those two documents

15 that I just showed you are the -- are the sum total of what we

16 know about this.  The -- and they both come from Freedom of

17 Information Act requests.  The government has produced zero

18 evidence on the interagency policy process.  They did produce

19 the 10 January 2007 memo, which is the end result, an FBI

20 general counsel document.  But the involvement of DoD and CIA,

21 this purported DoD policy not to give Miranda warnings, which

22 we saw referred to in 22700, and CIA involvement of whatever

23 type, the government has produced zero evidence about that.

1  Because that's been their consistent position is that it's not

2  discoverable, it's not relevant, and so they shouldn't have to

3  produce it.

4        So that brings us to the second category, which is

5  interagency coordination on creation of the defendants' -- the

6  defendant buckets of CIA information for use by the High-Value

7  Detainee Prosecution Task Force.  And there's been no

8  discovery on this topic either, but there has been substantial

9  testimony about it.  So I'd like to review what the sworn

10  testimony has been about that.  And I'll give you citations,

11  too.  You can look back at the exact quotes.

12        Special Agent Fitzgerald, who was one of the three

13  agents who interrogated Mr. al Baluchi here at Guantanamo,

14  testified about the creation of a High-Value Detainee Task

15  Force -- High-Value Detainee Prosecution Task Force in

16  September 2006, with the goal of preparing prosecutions of the

17  high-value detainees.  His testimony about that topic is from

18  18 September 2019 at 22887 to 912.

19        And he explained -- he testified at -- in that same

20  area that the High-Value Detainee Prosecution Task Force is a

21  joint effort of the FBI, the CIA, the Criminal Investigative

22  Task Force, which is put together by the DoD, the Office of

23  the Chief Prosecutor, and to a lesser extent NSA.  So there

1  were four -- sort of four full partners and one junior

2  partner.

3       The government has invoked national security privilege

4  over many -- inquiry into some aspects of the HVD PTF, like

5  its location, where it worked, how it worked, and specifically

6  the identity of the CIA officers who were assigned to it; but

7  it has allowed other questions which gives us some -- it cuts

8  out a lot of information that we don't have access to, but it

9  gives us some.

10      And according to Special Agent Fitzgerald, the FBI

11  element of the HVD PTF was supervised by Supervisory Special

12  Agent Joan-Marie Turchiano and Special Agent Grant Mendenhall.

13  And then there were about 15 special agents who were involved,

14  including himself, Special Agent Perkins, Special Agent

15  Pellegrino, Special Agent Gaudin, Special Agent Butsch,

16  Maguire, and Drucker, and two intel analysts, Brian Antol, and

17  Kimberly Waltz.

18      Special Agent Fitzgerald testified that the HVD PTF

19  used a closed computer system with a folder for each prisoner

20  that included FBI records, CIA cables, and other CIA records,

21  including TD-314s.  And that specific element is found in the

22  transcript at 18 September 2019 at 25909 to 10.

23      And he didn't give much detail but Special

1   Agent Perkins did.  She testified right after Special Agent

2   Fitzgerald and she called those buckets.  Buckets is her word.

3   And she testifies about the buckets.  And on 20

4   September 2019, between -- and 26640 to 26658, she testified

5   that the buckets contained, quote, CIA reporting that had been

6   disseminated out about a detainee or from a detainee, end

7   quote.  And that's at 26642.

8        The reason why I want to say that's particularly

9   important is that it includes both from the individual

10  detainee, Ammar al Baluchi, a senior al Qaeda detainee said

11  blah, blah, blah, blah, blah, but also about him.  And when we

12  get to 780 and 781, one of the things that we're going to be

13  talking about is the significance of reporting about a

14  detainee from other detainees and how the government used that

15  to obtain statements from these defendants.

16       So that was also a distinction that was powerful to

17  Special Agent Perkins, because she testified not just that

18  there was individual reporting from each detainee but also the

19  reporting about those detainees from the CIA.

20       The -- she also talked about stacks.  She said, in

21  addition there -- that there was a closed computer system that

22  had the buckets.  It was basically a folder.  It wasn't -- it

23  wasn't easily searchable.  It -- it wasn't a database that you

1  type in a name to.  It was document 1, document 2, document 3

2  and you could work your way down, which is why it took her and

3  Special Agent Fitzgerald a couple of months to work on it.

4          But she also talked about stacks, which she said there

5  was an eight- to ten-inch stack of printouts of CIA reports on

6  each detainee that she was provided -- each of the four that

7  she was working on that she was provided.  And she

8  differentiated those from the buckets.  She said, that's not

9  the same information that was in the buckets.  It came from a

10  different CIA source.  She thought perhaps it was printouts

11  from computers that had been seized, and so she said it was a

12  different set of information.  It was not just the buckets

13  printed, it was a -- a different stream.

14          And the government has produced exactly zero documents

15  about the existence of the High-Value Detainee Prosecution

16  Task Force and the buckets and the stacks of documents that

17  Special Agent Fitzgerald, Perkins, and others reviewed.

18          So these -- that brings us to the question -- or

19  that's how we know that this information exists.  And that

20  brings us to a question of what are we going to do with it,

21  which is, these buckets are critical to one issue, which by

22  itself -- even separate from all these other things we've

23  talked about, but by itself could lead the military commission

1  to grant Mr. al Baluchi's motion to suppress.  And that is,

2  the dispute over Special Agent Fitzgerald's pre-interrogation

3  access to CIA material about Mr. al Baluchi.  That's -- and so

4  I'm going to review sort of what that dispute is, what the

5  sworn testimony has been about it.

6        On 7 December of 2017, Special Agent Fitzgerald

7  testified that he did not get access to the closed CIA system

8  that we just talked about, which contained the buckets, until

9  2007.  And obviously, the interrogations took place at the

10 beginning of 2007, so that was pretty significant.  And that

11 led to the only information that the government has ever

12 revealed about the buckets.

13       On direct examination, the government asked Special

14 Agent Fitzgerald about is -- was that true?  Was it true that

15 you didn't get access to those buckets until -- to that closed

16 system -- they didn't even mention the word "buckets" -- but

17 to the closed system until 2007?  And that took place on 16

18 September 2019 at 25462.

19       And Special Agent Fitzgerald testified that he had

20 asked -- he had inquired and that he learned that he got

21 access to the closed system on 17 October 2006, which fits in

22 perfectly with Special Agent Perkins' testimony that they

23 spent a couple of months reviewing this material.

1    And so then the government asked Fitzgerald a question

2  on direct examination.  I want to quote it because it's

3  important.  He said:  Do you recall obtaining access to

4  statements made by Mr. Ali while he was in CIA custody?  And

5  that critical question is at 16 September 2019, 25547.

6    And the answer was, and I'm going to read it verbatim:

7  I don't recall, like, getting a specific access regarding

8  Mr. Ali of a CIA database circa 2003.  That's "sic."  I mean,

9  he says "2003."  Again my expectation and best recollection is

10  I would have had some of those, at least some of those

11  statements available to me, and likely read some of the

12  statements at the time, but I don't -- I don't know that -- if

13  I'm answering the question correctly, that I had formal access

14  to a CIA system of records at that time.

15    The reason why I want to quote that is you can take

16  that sentence -- I mean, you decide what that means.  Is that

17  a denial?  Is that an evasion?  I'm not certain.  But what we

18  did follow up on that, that -- the testimony of Special

19  Agent Perkins who testified that she and Special Agent

20  Fitzgerald and other HVD PTF members worked in an offsite

21  location in Virginia, reviewing the buckets in late 2006, and

22  that Special Agent Fitzgerald in -- specifically reviewed the

23  bucket for Mr. al Baluchi, the CIA -- the bundle of CIA

1 documents.  And her testimony to that came at 20

2 September 2019 at 26650.

3         The reason why I say that's so important is if the

4 government produces this information and we're able to get

5 Special Agent Fitzgerald back on the stand and have something

6 to impeach his claim with -- you know, it's difficult to

7 impeach one witness with the testimony of another witness.

8 You can't typically do that.  But if we have something, some

9 explanation of how these buckets worked, what his access was,

10 these documents that clearly exist or even what was in the

11 buckets other than general description of TD-314s and other

12 CIA -- CIA reporting from the black sites, then we can impeach

13 him, right?

14         And if he ultimately admits, not just I had some

15 access and I read some documents, but if he admits, yes, I

16 spent the two months prior to interrogating Mr. al Baluchi

17 reviewing CIA documents, then it's essentially game over on

18 these -- on these statements, right?  The claim -- the

19 government has retreated over time on the claims that it makes

20 from beginning with the clean team statements that

21 Judge Parrella, like, framed the 524 inquiry as to whether the

22 clean team statements are -- are admissible or not, using the

23 name "clean team," but the government has retreated over time.

1  And in this document, you know, interestingly, in 2019, the --
2  the government starts with its, okay, yes, it wasn't a clean
3  team.  It was a whole-of-government effort.  We all --
4  everybody mobilized to try to extract statements from these
5  defendants, which is -- you know, it's a -- it's a pivot,
6  which the people are allowed to pivot their -- their
7  approaches, but what they're really down to is Special Agent
8  Fitz -- yes, Special Agent Perkins knew everything that she
9  spent months and months reviewing, all this CIA documents
10 about Mr. al Baluchi but she wasn't the one asking most of the
11 questions.  She only asked some of the questions.  Special
12 Agent Fitzgerald asked most of the questions and -- and he
13 doesn't recall having looked at all the CIA material.

14      If -- if it turns out that what I -- what I have been
15 saying is true, then there's very little room for the
16 government left on this motion to suppress because -- because
17 if Special Agent Fitzgerald acknowledges, yeah, that's what I
18 did, I spent a couple of months from 17 October 2006 until the
19 middle of January reviewing CIA documents about Ammar
20 al Baluchi, then it's pretty much -- I don't see where there
21 is left for the government to go.  I mean, this -- this is
22 really critical material.

23      But to be honest, it's already been ordered, right?

1 The CIA buckets, the CIA stacks, the coordination of DoD, FBI,

2 CIA, has already been ordered in 538AA.  And, you know, when

3 I -- when we -- when we got the order in 538AA, I thought this

4 whole buckets and stacks problem was going to be solved and

5 that the government was going to produce something like a

6 substitution, a list that didn't give us the underlying

7 documents, an access log from Special Agent Fitzgerald,

8 something.  But nothing.  It's been crickets since then.

9           And the -- even though the military commission has

10 already ordered the production of this material, the

11 government hasn't produced it.

12      MJ [Col McCALL]:  Well, and -- Mr. Connell, let me stop

13 you there, because that was one of my questions coming into

14 this and -- normally, as you've seen my approach on these, a

15 lot of times I want to let y'all kind of lay this out for me

16 before I start to ask questions.  But, I mean, my read of your

17 motion is, I mean, the -- your view is the material that

18 you're requesting has already been ordered.

19      LDC [MR. CONNELL]:  Yes, sir.

20      MJ [Col McCALL]:  It's 538AA, that it falls within that.

21      LDC [MR. CONNELL]:  Yes, sir.

22      MJ [Col McCALL]:  All right.  And so the question of

23 whether or not it would -- what you've been going through now,

1  which is helpful for me to, like, maybe lay out what the

2  reasoning was under 538AA, but that's already been decided.

3      LDC [MR. CONNELL]:  Yes, sir.

4      MJ [Col McCALL]:  Okay.  And the only question is -- and I

5  appreciate that you're -- part of your argument has been

6  showing again what -- why you believe that there is more out

7  there.

8      LDC [MR. CONNELL]:  Yes, sir.

9      MJ [Col McCALL]:  All right.  I just wanted to make sure I

10  was understanding that.  Go ahead.

11      LDC [MR. CONNELL]:  Yes, sir.  And I'll just go ahead and

12  answer the unarticulated question that follows up after that

13  which is the military commission ordered, what do you want me

14  to do about it, Counsel?

15          And, you know, in hostilities where we have a very

16  similar structure, we've taken -- we filed a motion that --

17  that we think there should be an exclusion of the -- of the

18  government's hostilities arguments because -- evidence because

19  they have not produced the -- what the military commission has

20  ordered in that situation.

21          I leave it to the military commission whether we're to

22  sanction -- in sanction territory yet.  To me, what our actual

23  request for relief is, is that I think that there should be a

1  highly specific order for production of these four categories

2  of information that we asked for in the -- in the -- the

3  motion.  And the reason for that is because 5 -- the reason

4  why in my personal opinion, or team opinion, that we're not at

5  sanctions territory yet, because 538AA was a global approach,

6  right?  We asked the military commission to set broad

7  outlines.  The military commission did set broad outlines.

8         And I think the government has -- you know, could say

9  that if they were sanctioned at this point, we should have had

10 an opportunity to -- one more opportunity to comply, and I

11 think they should have one more opportunity to comply.  And

12 that's actually what I'm asking for, is a specific order, you

13 know, saying, look, 538AA says what it says and this

14 information that's sought in this motion falls under 538AA.

15 You know, produce it or we'll see what happens, right?  I

16 mean, that's really what it is.

17        And I think a highly targeted order would make it

18 easier ultimately for us.  If the government -- they may

19 invoke national security privilege, right?  That's one of

20 their options.  That has consequences, but that's one of their

21 options.  You know, the -- there's always the disclosure --

22 disclose or dismiss question for the government.  And 949p-6

23 includes sanctions other than disclose or dismiss, right?

1   There are other sanctions which are included there in the

2   statute which might come into play.  They came into play in

3   the -- in the 524 series.  That's what military -- the

4   military commission issued as a sanction there.

5          And so I think a highly specific order would be

6   appropriate because it would let -- it would frame up for the

7   government their decision that they have to make of are we

8   going to produce relevant discovery or are we going to pursue

9   some other remedy that they have available to them?

10         So the last observation that I just want to make on

11  category two is that the -- the military commission has really

12  ruled on the relevance of these specific things multiple

13  times.  You know, take the buckets, for example.  When I

14  started asking about the buckets, the military -- I mean, the

15  government objected and said it's outside the scope of the --

16  of the hearing.  It's not relevant.

17         And on all, except one point, the military commission

18  overruled them repeatedly saying this goes to integration of

19  FBI and CIA in a way that's relevant to -- I'm not saying that

20  defense theory going to carry the day, but it's at least

21  relevant to the defense theory, it's a viable theory, and I'm

22  going to let them explore it.

23         The one place that the military commission sustained a

1  relevance objection on this question was on the operating

2  system of the closed system.

3        The -- I asked a question which included is it like an

4  ordinary Windows-type system?  And the military commission

5  sustained an objection saying that's too much into the

6  technical details.  I moved on.  I got the information that I

7  actually wanted, which was that it was folders as opposed to a

8  searchable database, and everything was fine.  But that's the

9  only place where the military commission said, no, this

10  information is not relevant.

11       So really -- not only has the military commission

12  already adjudicated the scope of discovery in this area, it's

13  really already adjudicated whether this information about the

14  buckets, for example, and the interagency process falls within

15  the scope of relevant information because it came up a whole

16  bunch of times already.

17       And so I think that the kind of order that I'm asking

18  you for, the kind of specific order, is -- almost adds nothing

19  to the jurisprudence that the military commission has already

20  laid out on this topic, but it does add the question of

21  framing it up cleanly for the government so they can decide

22  how they want to respond.

23       So the third -- I'm going to collapse my third and

1  fourth categories, which are -- which are closely related.

2  And we now come to -- this is the first time this has come up,

3  but I have to explain a process that a military commission has

4  for public display of information.  We've talked about 118W

5  (Amend), but there's another process the military commission

6  has in place, which is that if we want to use, for example, a

7  slide that we've created or -- or -- or a transcript or a

8  document off of mc.mil, any document that we want to use that

9  doesn't fall within 118W, more than at least seven days in

10 advance of travel to Guantanamo, we have to take it to the

11 CISO.

12      And in this situation, I prepared a slide seven days

13 in advance of travel.  I took it the to CISO.  The CISO

14 immediately submitted it to the SC/DRT for review.  And now,

15 nine days after it was submitted for -- for SC/DRT review by

16 the CISO, they have not come back with an answer as to whether

17 it is -- it can be displayed or not.  I -- I made it in good

18 faith thinking that it was unclassified.  I don't -- no one

19 has suggested to me that it's -- that it is anything other

20 than unclassified.  But the rule is that I can't display to

21 the gallery or, you know, the public, such as they are, unless

22 we have an approval back in this process.

23      So what I'm going to do is I'm -- with -- with that

1 understanding and over my objection, the -- I'm going to ask

2 the military commission for the feed from Table 4 to display

3 my slide, and that I will ask that it be displayed to the

4 parties and the court only and not to the gallery.

5     MJ [Col McCALL]:  And I'll look into the background on why

6 that took so long, but, yeah, for -- at this time, you can

7 publish to the commission and the counsel.

8     LDC [MR. CONNELL]:  Thank you.  And for the record, Your

9 Honor, I'm showing AE 779E.  And this is the -- the third and

10 fourth category which I'm combining.  The third category of --

11 of interagency process that is relevant to the attempt to

12 extract -- obtain statements from these five defendants that

13 falls within the scope of AE 534AA.

14     And that's to explain the structure of governance, if

15 you will, of Camp VII.  And I'll start at the bottom.  We know

16 that there was a Camp VII commander who was on the DoD side

17 and that worked at Camp VII and had control -- had command

18 over the people who worked there.  We know in unclassified

19 testimony that the guards at Camp VII wore military uniforms

20 but were not members of the military.  And -- and we know that

21 the SSCI concluded that there was CIA operational control over

22 Camp VII.

23     Now, yesterday we spent a fair amount talking about

1  daily site reports and we know that there was someone who

2  prepared -- you know, from the CIA who prepared a daily site

3  report.  The government has neither produced -- has -- has

4  invoked national security privilege over the identities of

5  those persons.  And so the bottom part of this slide describes

6  that governance structure.  There are some -- there's person

7  or persons on the CIA side and we know there's Camp VII

8  commander on the DoD side.

9      Now, how did -- those people -- the Camp VII commander

10  testified was that he was under the command of the -- of the

11  JTF commander and that there was an interagency process that

12  essentially he daily interacted with.  And that interagency

13  process is known as the Special Detainee Follow-Up Group.  And

14  information -- so that was -- there were contributions to the

15  Special Detainee Follow-Up Group from the DoD and from the

16  CIA, possibly from others as well, we have very little

17  information.  We know some of the people who were on the

18  Special Detainee Follow-Up Group, in part because they listed

19  it on their LinkedIn, but the -- but we don't know all -- the

20  complete composition of it.  There's been zero discovery on

21  this topic.  This is all independent investigation that we've

22  done.  And we know how information flowed.

23      Mr. Swann yesterday talked about the 10- and 30-day

1   reports that the -- that the prosecution produced to us, and
2   that's a good source of information.  It's one of the ways
3   that we know that the interagency process in the camp we're
4   talking about, the -- you know, how they prepared for the law
5   enforcement interviews, how they decided conditions of
6   confinement.  But the 10- and 30-day reports only flow in one
7   direction.  They flow from the camp to the Special Detainee
8   Follow-Up Group.

9          Then there is a second set of information, and I don't
10  know whether documents exist in the second set or not.  We
11  know that there were very frequent, probably daily, secure
12  video teleconferences between the -- those who were involved
13  in the day-to-day administration of the camp and the Special
14  Detainee Follow-Up Group.

15         The -- I don't know whether -- like, those could have
16  just evaporated into the ether.  I'm not saying that they
17  recorded them or anything; I don't have any reason to believe
18  that that's true.  But we know that there was correspondence.
19  I don't know if there were notes.  I don't know if there were
20  minutes that were taken, if there were MFRs that were
21  prepared.  Those things might exist.  It would make sense,
22  like the way the government works that those things would
23  exist, but I cannot independently prove that they exist.  I

1 have -- no one has ever showed me one or talked to me about

2 one because none of the people who were on the Special

3 Detainee Follow-Up Group have ever responded positively to a

4 request for an interview.

5      But we do know and we are certain of a third category

6 of existing information, which are what are called summaries

7 of conclusions.  And when the Special Detainee Follow-Up

8 Group, that interagency process made a decision as to

9 conditions of confinement, for example, whether they were

10 going to be more like the black sites or more like Camp V;

11 what -- what access, who was going to get and how was that

12 going to be decided; decisions about how is the ICRC going to

13 work; all -- the defense counsel, you know, all these kinds of

14 sort of day-to-day decisions which get made by the Special

15 Detainee Follow-Up Group, they would issue a document called a

16 summary of conclusions and they would send that document back

17 down to Camp VII, you know, here's the policy you have to

18 follow.

19      We've never seen those summaries of conclusions.  In

20 my view, they clearly fall within 538AA and should have been

21 produced, but we do know of their existence, there's been

22 testimony to their existence.  And it's -- it has -- it's --

23 it's the way policy was promulgated from the Special Detainee

1  Follow-Up Group down to Camp VII.

2      And then there's a third level, which is that there

3  was a Senior Leadership Oversight Committee.  And the Senior

4  Leadership Oversight Committee decided questions that the

5  Special Detainee Follow-Up Group could not reach consensus on.

6  So, you know, the Special Detainee Follow-Up Group made most

7  policy decisions, but if there was a disagreement, say,

8  between the DoD side and the CIA side, then it would be bumped

9  up to the Senior Leadership Oversight Committee of more senior

10 government officials who would make those policy decisions.  I

11 don't know what the documents that the Senior Leadership

12 Oversight Committee issued are called, but it's clear that

13 there was some -- that there were at least occasional

14 decisions that were made by a senior body that would tell --

15 resolve differences among the Special Detainee Follow-Up Group

16 who would then convey them down to Camp VII.  And that's what

17 controlled the day-to-day life of Mr. al Baluchi and the other

18 defendants as to whether, you know, they would have -- how

19 their rec would work, whether they would be allowed rec,

20 whether they would be allowed to communicate with other

21 detainees, whether they'd be in complete solitary confinement,

22 how long that would last.  You know, those sorts of important

23 things which ultimately weigh on this period of what the

1  government calls attenuation between -- between September of

2  2006 and January of 2007 are really important.

3      They also ultimately affect the -- they're one of the

4  few ways that the conditions of confinement are documented,

5  right?  There are few sources of -- you know, the DIMS

6  records, for example, you've seen them.  They don't -- they

7  don't talk about the conditions of confinement.  They talk

8  about when food was delivered and things like that, but they

9  don't -- they don't talk about what it was like to be in

10  solitary confinement or who made that decision or what

11  solitary confinement actually meant.  Did it mean

12  24-hours-a-day isolation?  22 hours a day?  23?  Those --

13  those sort of policy decisions are made in this interagency

14  process and really provide important information about not --

15  about the conditions of confinement as well as the conditions

16  under which the law enforcement interviews, that is, the --

17  the so-called clean team interviews, would take place.

18      So that's kind of the third category of interagency

19  process information that we think is important to the effort

20  to obtain statements from these five defendants.  And that's

21  my presentation unless you have any other questions.

22      MJ [Col McCALL]:  No questions.

23      LDC [MR. CONNELL]:  Thank you, sir.