UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES G. CONNELL, III, | | |
| Plaintiff, | | |
| v. | | Civil Action No. 21-0627 (CRC) |
| CENTRAL INTELLIGENCE AGENCY, | | |
| Defendant. | | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

Table of Authorities ............................................................................................ 2

Introduction ....................................................................................................... 5

Argument ........................................................................................................... 7

    a.  CIA's *Glomar* assertion fails because the Director of National Intelligence has declassified the fact of CIA intelligence interest in and connection to Camp VII .......................................................... 8

    b.  CIA's *Glomar* response fails because CIA and its authorized representatives have already officially acknowledged the existence of documents regarding CIA's operational control of Camp VII ...................................................................................... 23

    c.  CIA unreasonably limited its search to previously-released records ...................................................................................... 29

Conclusion ...................................................................................................... 31

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2012) ................................................. 8, 19, 25

*Afshar v. Dep't of State*, 702 F.2d 1125 (D.C. Cir. 1983) ..................................... 23

*Citizens for Resp. & Ethics in Wash. v. Dep't of Justice*, 746 F.3d 1082

    (D.C. Cir. 2014) ........................................................................... 19

*De Sousa v. CIA*, 239 F. Supp. 3d 179 (D.D.C. 2017) ....................................... 8, 19

*Def. of Wildlife v. Border Patrol*, 623 F. Supp. 2d 83 (D.D.C. 2009) .................... 29

*Elec. Frontier Found. v. Dep't of Justice*, 384 F. Supp. 3d 1 (D.D.C. 2019)

    .................................................................................................... 19

*Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926 (D.C. Cir. 2012*)* ............................ 7, 22

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ................................................. 23

*Florez v. CIA*, 829 F.3d 178 (2d Cir. 2016) ..................................................... 11, 22

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) ..................................................... 11

*Gardels v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982) ..................................................... 7

*James Madison Project v. Dep't of Justice*, 302 F. Supp. 3d 12 (D.D.C.

    2018) .......................................................................................... 25

*Knight First Amend. Inst. at Columbia Univ. v. CIA*, 11 F.4d 810 (D.C.

    Cir. 2021) .................................................................................... 19

*Leopold v. CIA*, 987 F.3d 163 (D.C. Cir. 2021) ................................................ 23, 24

*Mil. Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) .................................. 11

*Moore v. CIA*, 666 F.3d 1330 (D.C. Cir. 2011) ..................................................... 24

*Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007) ...................................................... 29

*New Orleans Workers' Ctr. for Racial Justice v. ICE*, 373 F. Supp. 3d 16,

    37 (D.D.C. 2019) ................................................................................................ 29

*Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ..................... 29, 30

*PETA v. NIH*, 745 F.3d 535 (D.C. Cir. 2014) .................................................... 7, 19

*Prop. of the People v. Dep't of Justice*, 405 F. Supp. 3d 99 (D.D.C. 2019) ........ 7, 29

*Poulsen v. Dep't of Defense*, 373 F. Supp. 3d 1249 (N.D. Cal. 2019) .................... 22

*Truitt v. Dep't of State*, 897 F.2d 540 (D.C. Cir. 1990) ......................................... 29

*Weisberg v. Dep't of Justice*, 745 F.2d 1476 (D.C. Cir. 1984) .............................. 29

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ................................................ 8, 22, 24

## Statutes

50 U.S.C. § 3003 .................................................................................................... 11

50 U.S.C. § 3023 .................................................................................................... 11

50 U.S.C. § 3024 .................................................................................................... 11

## Other Authorities

Exec. Order No. 13,526 ...................................................................................... 8, 11

Fed. R. Civ. P. 56(a) ............................................................................................... 7

## INTRODUCTION

The head of the intelligence community, CIA itself, and authorized representatives of CIA have declassified both the intelligence connection between CIA and Guantanamo Bay's Camp VII and the existence of responsive documents about that connection. CIA nevertheless asserts a *Glomar* response to Plaintiff's FOIA request for documents about CIA's operational control of Camp VII, claiming that it must do so to avoid confirming an intelligence connection between itself and Camp VII. This *Glomar* assertion fails and the Court should deny CIA's motion for summary judgment.

In 2006, CIA transferred prisoners from black sites to Naval Station Guantanamo Bay, where they were imprisoned in a facility known as Camp VII. In 2014, at the direction of the President, the Director of National Intelligence ("DNI") declassified the fact that CIA maintained "operational control" over Camp VII after the prisoners' transfer.[1] The DNI and CIA declassified some documents providing specifics about what that "operational control" meant, including the allocation of interagency responsibilities.[2]

Plaintiff asked CIA for documents relating to CIA's operational control of Camp VII, and, upon CIA request, particularized his request.[3] CIA limited its search

---

[1] Doc. 16 (Declaration of Amy Zittritsch), Exhibit B (excerpts of redacted Executive Summary) at 160.

[2] Doc. 22 (Declaration of James G. Connell, III) ¶¶ 11-12 & Exhibits D-F.

[3] Doc. 14 (Declaration of Vanna Blaine), Exhibit D.

to previously-released CIA records and found three responsive documents, two of which it released in part.[4] Otherwise, CIA asserted that that to confirm or deny the existence of responsive records would reveal an intelligence connection between CIA and Camp VII.[5]

CIA attempts to stretch the *Glomar* doctrine past its breaking point. As extensive evidence shows, DNI already declassified the intelligence connection between CIA and Camp VII, robbing a *Glomar* response of any value. The DNI, CIA, and CIA's authorized representative have already acknowledged the existence of specific responsive documents, waiving the authority to assert *Glomar*. And CIA's decision to limit its search to already-released documents means that it refused to search where responsive documents are likely to be found.

This Court should deny CIA's motion for summary judgment and order a new search, disclosure if warranted, and an index of responsive documents.[6] Following a reasonable search and identification of its results, the parties can address what documents contain information reasonably segregable from intelligence sources and methods.

---

[4] *Id.* ¶ 20 & Exhibit H. After review of the supporting declaration, Plaintiff concedes that CIA may withhold C06833121 in its entirety.

[5] *Id.* ¶ 25.

[6] When negotiating the briefing schedule, Plaintiff expected to file a cross-motion for summary judgment. Upon review of CIA's search parameters and justifications, Plaintiff seeks a new search, production, and index rather than summary judgment.

## ARGUMENT

CIA's *Glomar* response fails in this unusual fact scenario. The DNI has already declassified what CIA's *Glomar* response seeks to protect: the intelligence connection between CIA and Camp VII. The CIA and attorneys authorized to act on its behalf have acknowledged the existence of responsive documents. And CIA wrongly limited its search to already-declassified documents rather than conducting a search reasonably likely to find responsive documents. A reasonable search, production as warranted, and index of withheld documents, rather than summary judgment, is the appropriate path forward in this case.

In the FOIA context as in others, "A court may grant summary judgment only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[7] To justify summary judgment upholding a *Glomar* response, "Affidavits must contain 'reasonable specificity of detail rather than merely conclusory statements' and cannot be 'called into question by contradictory evidence in the record.'"[8] The fundamental question is "whether on the whole record the Agency's judgment objectively survives the test of reasonableness, good faith, specificity, and plausibility."[9]

---

[7] *Property of the People v. Dep't of Justice*, 405 F. Supp. 3d 99, 110 (D.D.C. 2019) (quoting Fed. R. Civ. P. 56(a)).

[8] *PETA v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *EPIC v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012)).

[9] *Gardels v. CIA, 689 F.2d 1100, 1105 (D.C. Cir. 1982).*

**a. CIA's *Glomar* assertion fails because the Director of National Intelligence has declassified the fact of CIA intelligence interest in and connection to Camp VII.**

The DNI is the head of the intelligence community and, other than the President, the nation's highest declassification authority. After the DNI declassified CIA "operational control" over Camp VII in 2014, CIA and other authorities have—until now—consistently treated both the fact of CIA' connection to Camp VII and the existence of documents providing specifics as unclassified, even if the specifics themselves are classified. Further confirming or denying the existence of responsive records will not result in a harm cognizable under Exemption 1 or 3 because the DNI has already declassified the intelligence connection CIA claims to be protecting.[10]

Under Executive Order 13,526 § 3.6(a), "an agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." This element of E.O. 13,526 codifies the *Glomar* line of cases, "which permit an agency to 'refuse to confirm or deny the existence of records' in limited circumstances."[11]

In Ms. Blaine's declaration, CIA explains that it asserts a *Glomar* response under FOIA Exemptions 1 and 3 because "the mere confirmation or denial of the

---

[10] *See, e.g.*, *De Sousa v. CIA*, 239 F. Supp. 3d 179, 190 (D.D.C. 2017) ("A *Glomar* response may be challenged in two related ways. First, a plaintiff may challenge the agency's assertion of an exemption, that is, whether confirming or denying the existence of requested records would result in harm cognizable under a FOIA exemption." (internal quotation and alteration omitted)).

[11] *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2012) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)).

existence of responsive documents would, in and of itself, reveal a classified fact: namely, whether the CIA has an intelligence interest in, or clandestine connection to, a particular individual, group, subject matter, or activity."[12] This rationale fails because the DNI has already declassified the CIA "intelligence interest in, or clandestine connection to" Camp VII.

*Declassification of SSCI redacted Executive Summary*

In March 2009, the Senate Select Committee on Intelligence commenced a study of CIA's former Rendition, Detention, and Interrogation Program.[13] Under an inter-branch agreement, CIA established a secure electronic reading room at a CIA facility where SSCI staff could review CIA documents.[14] On December 13, 2012, the Senate Select Committee on Intelligence approved a 6,000 page report on its study of the.[15] The following day, SSCI Chair Dianne Feinstein submitted copies of the report

---

[12] Doc. 14 ¶ 25. Although FOIA Exemptions 1 and 3 can protect different interests, in this case the Exemption 1 and 3 *Glomar* analyses are identical. CIA's invocation of Exemption 1 cites sources and methods, Doc. 14 ¶ 30, and its Exemption 3 claim merely cites back to its Exemption 1 analysis. *Id.* ¶ 40.

[13] Doc. 21 at 3 (Declaration of Martha Lutz).  Plaintiff has deleted an irrelevant sub-exhibit from Ms. Lutz' declaration as originally filed.

[14] Doc. 20 at 5 (Declaration of Neal Higgins). Plaintiff has deleted irrelevant sub-Exhibits from Mr. Higgins' declaration as originally filed.

[15] Doc. 20 at 8; Doc. 19 (Declaration of Vanessa Brinkmann), Exhibit B (letter from Senator Feinstein to the President).  Plaintiff has deleted the other sub-Exhibits to Ms. Brinkmann's declaration as originally filed, which are not pertinent to this matter.

to relevant Executive agencies.[16] CIA conducted an extensive review of the report and provided a lengthy response.[17]

The SSCI revised the report after considering CIA comments.[18] On April 3, 2014, the SSCI voted to send the Executive Summary and Findings and Conclusions of the report to the President for declassification.[19] After the SSCI request for declassification, [20]

> The Director of National Intelligence ("DNI") and the CIA, in consultation with other Executive Branch agencies, conducted a declassification review of the April 2014 Executive Summary.  On August 1, 2014, at the direction of the President, the DNI declassified a redacted version of that document and the

---

[16] *Id.*

[17] Doc. 20 at 9.

[18] Doc. 20 at 9.

[19] Doc. 21 at 3 & Exhibit B (letter from Senator Feinstein to the President); Doc. 20 at 10 & Exhibit F (SSCI press release). Congress does not have authority to declassify its own documents.  Doc. 18 (Declaration of Steven Aftergood).

[20] Doc. 21 at 3-4; *see also* Doc. 20 at 11 ("[T]he Director of National Intelligence declassified a partially redacted version of the Executive Summary.").

President delivered it to SSCI that day.  Shortly thereafter, the Executive Branch engaged in extensive discussions with the SSCI about additional material within the Executive Summary which the SCCI sought to be declassified and released.  At the conclusion of those discussions, the SSCI delivered to the Executive Branch a new version of the Executive Summary for classification review.  A declassified version of the Executive Summary was transmitted to the SSCI for its unrestricted disposition on 8 December 2014.  The SSCI publicly released a final version of the Executive Summary the following day.

Although disclosures from other agencies generally do not bind CIA,[21] DNI declassification does. By law, the DNI "serve[s] as head of the intelligence community,"[22] which includes CIA.[23] The "sources and methods" statutory protection CIA claims under Exemption 3 flows to it from the DNI.[24] And of course the President has specifically given declassification authority to the DNI.[25]

---

[21] *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999); *Military Audit Project v. Casey*, 656 F.2d 724, 742-45 (D.C. Cir. 1981). *But see Florez v. CIA*, 829 F.3d 178, 185 n.6 (2d Cir. 2016) (explaining that third party disclosures can "permit an inference contradicting an asserting agency's *Glomar* response" under Exemptions 1 and 3).

[22] 50 U.S.C. § 3023 (b)(1).

[23] 50 U.S.C. § 3003(4)(b) (defining CIA as part of the intelligence community).

[24] *See* 50 U.S.C. § 3024(i)(1) ("The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."); Doc. 14 ¶ 38 (explaining role of DNI in protecting sources and methods).

[25] E.O. 13,526 § 3.1(c).

*Declassified CIA connections to Guantanamo detention facilities*

In the redacted Executive Summary, the DNI declassified four elements of information about CIA's connections to detention facilities at Naval Station Guantanamo Bay. First, the DNI declassified information about senior CIA officials' 2001 effort to establish a CIA detention facility at Guantanamo.[26]

Second, the DNI declassified information about three CIA detention facilities at Guantanamo.[27] With respect to DETENTION SITE RED, the DNI declassified references five numbered documents and a September 2006 Memorandum of Agreement Between the Department of Defense (DOD) and the Central Intelligence Agency (CIA) Concerning the Detention by DOD of Certain Terrorists at a Facility at Guantanamo Bay Naval Station.[28]

Third, the DNI declassified the fact at the core of this litigation: CIA operational control over Camp VII following the September 2006 transfer of CIA prisoners to Guantanamo Bay:[29]

(TS//███████████//NF) After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA.[977]

[977] CIA Background Memo for CIA Director visit to Guantanamo, December █, 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility.

---

[26] Doc. 16 (Declaration of Amy Zittritsch), Exhibit B (redacted Executive Summary excerpt) at 12.

[27] *Id.* at 140-41, 440.

[28] *Id.* at 140 n.848; *see also* Doc. 22, Exhibit D.

[29] Doc. 16, Exhibit B at 160.

The "separate building" is now known as Camp VII.[30]

Fourth, the DNI declassified references to two CIA documents regarding treatment of Ramzi bin al Shibh after his transfer to Guantanamo:[31]

> On September 5, 2006, bin al-Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba.[427]  After his arrival, bin al-Shibh was placed on anti-psychotic medications.[428]

[427] HEADQUARTERS ███ (031945Z SEP 06)
[428] ███ SITE DAILY REPORT - 24 MAY 07: ███ 8904 (182103Z APR 08)

*The declassified connection between CIA and Camp VII*

Factually, the premise of the CIA's *Glomar* response fails because the DNI has already declassified the connection between CIA and Camp VII. Ms. Blaine explained that, "In this case the CIA issued a Glomar response stating that it could neither confirm nor deny the existence of records that may reveal a *classified connection* between the Agency and the subject of Plaintiff's Amended FOIA Request because confirming or denying the existence or nonexistence of such records would reveal classified intelligence sources and methods information that is protected from disclosure."[32] But at least one key aspect of the connection between CIA and Camp VII is already declassified: its operational control over Camp VII following the September 2006 transfer of prisoners from black sites. This declassification has shown itself in subsequent actions and disclosures by CIA and its authorized representatives.

---

[30] Doc. 22, Exhibit G at 28584.

[31] Doc. 16, Exhibit B at 80; *see also* Doc. 17 ¶ 8.

[32] Doc. 14 ¶ 26.

After the DNI's declassification of CIA's operational control over Camp VII, it declassified two documents regarding interagency decision-making over Camp VII prisoners.[33] One of the documents, a Memorandum for Record, documented:[34]

(S//NF) On 29 November 2006, representatives from the NSC, DOD, State Department, DOJ, CIA and ODNI met to discuss several security issues concerning the 14 High Value Detainees (HVDs) being held at Guantanamo Bay. Consensus was reached on three of the four issues discussed with the fourth item, protection of information during military commission proceedings, being deferred pending additional discussions.

In this document, the DNI declassified not just the connection but some specifics of the connection between CIA and Camp VII, including security concerns documented further in the MFR.

CIA has also declassified documents regarding its connection to Camp VII. CIA released a September 2006 Memorandum of Agreement Between the Department of Defense (DOD) and the Central Intelligence Agency (CIA) Concerning the Detention by DOD of Certain Terrorists at a Facility at Guantanamo Bay Naval Station.[35] The redacted Executive Summary declassified by the DNI linked this document to

---

[33] Doc. 22, ¶ 12 & Exhibits E-F.

[34] *Id.* Fxhibit F.

[35] Doc. 22, Exhibit D.  CIA released this document prior to Plaintiff's request; indeed, Plaintiff cited the document in his response to CIA's request for particularization. Doc. 14, Exhibit D.

DETENTION SITE RED, and the first Camp VII Commander confirmed that it governed Camp VII in declassified testimony.[36]

The Memorandum of Agreement contains redactions of classified specific aspects of the relationship, but clearly documents a connection between CIA and Camp VII. In fact, CIA and other OCAs declassified a transcript of defense counsel arguing the CIA-Camp VII connection based on the Memorandum of Agreement:[37]

```
        Now, the CIA records, the CP7 records.  So the
government points out that we've been provided a statement
admitting relevant facts regarding Camp VII, and that's true.
We have -- the Camp VII commander talked about in his open
testimony that there was a memorandum of understanding
governing, between DoD and the CIA, governing who did what in

the camp.  So there's a relationship here.  So we have
discovery related to that.
```

The attorney representing CIA interests at Guantanamo has even called a witness on the question of CIA operational control—or not—of Camp VII. At Guantanamo, the Office of the Chief Prosecutor (OCP) represents CIA interests regarding classification guidance, *Touhy* regulations, witness production, and a variety of other matters.[38] From a *Glomar* point of view, it does not matter whether

---

[36] Doc. 22, Exhibit G at 28584.

[37] Doc. 17, Exhibit B at 34230-31.

[38] Doc. 16 ¶ 8; Doc. 22 ¶ 5.

the Camp VII Commander endorsed or denied CIA operational control; the key element is that the topic of a link between CIA and Camp VII was not itself classified.

OCP called the first commander of Camp VII, who first interacted with the prisoners in September 2006, as a witness on the question of CIA-DoD-FBI cooperation in the effort to obtain statements from the 9/11 Case defendants.[39] The First Camp VII Commander testified that the Camp VII guards wore military uniforms,[40] but that the guards were not in fact military.[41] He also testified that a separate facility at NSGB, now known as Camp Echo 2, had been used by the CIA to house detainees.[42]

The OCP attorney asked the First Camp VII Commander in open court to address the declassified SSCI statement that CIA had operational control of Camp VII:[43]

---

[39] Doc. 22, Attachment G at 28580-81.

[40] *Id.* at 28595.

[41] *Id.* at 28661.

[42] *Id.* at 28629.

[43] *Id.* at 28612.

Q.  In the Senate Select Committee on Intelligence, subcommittee study of the CIA's detention and interrogation program at page 160, there's a statement that reads that these men were under the operational control of the Central Intelligence Agency.  Do you believe that statement to be true?

A.  No, sir.  Operational control refers to the authorities a commander has over his or her assigned forces, and I believe I -- as a commander, I had -- I had full responsibility and authorities over those -- those forces. They responded to my orders consistently.  I -- I believe that to be the case.

TC [MR. SWANN]:  Okay.  I will ask you for your reasons in the closed session.

In declassified testimony during the closed session, the First Camp VII Commander explained that his answer regarding operational control related to the individuals carrying out the detention mission at Camp VII,[44]

In declassifying transcripts of the 9/11 Case proceedings, CIA has clearly considered assertions of CIA control of Camp VII to be unclassified. 9/11 Case transcripts are reviewed by Original Classification Authorities, including CIA, before their release to the public.[45] Much of the First Camp VII Commander's testimony, for example, providing specifics about CIA operational control has been redacted by

---

[44] *Id.* at 28788-89.

[45] Doc. 16 ¶ 18-19.

OCAs. But OCAs have routinely treated acknowledgment of the existence of specific aspects of operational control, including the First Camp VII Commander's testimony, as unclassified.[46]

> We -- we called the Camp VII commander. He spoke about CIA involvement at Camp VII, right?  Certainly
>
> a lot in classified session and a decent amount, as I pointed out, in open session, which raised issues.

This distinction between specifics of CIA operational control and their existence extends to the existence of responsive documents. CIA and other OCAs declassified most of the transcript of the argument over production of CIA documents regarding Camp VII. For example, defense counsel argued:[47]

> Given what we know about the level of CIA control over the LHM process, it just wouldn't be credible for the government to state that there are no CIA documents about the exertion of control over Camp VII administration that the Camp VII commander himself discussed.

Thus, the premise of CIA's *Glomar* response is factually incorrect: the intelligence connection between CIA and Camp VII is not classified.  CIA's *Glomar* response does nothing to protect the fact of its intelligence connection to Camp VII,

---

[46] Doc. 17, Exhibit C at 34268-69; *see also, e.g., id.* at 34239 ("It's an unclassified fact that the CIA was involved in the preparation for the LHM interrogations [in January 2007] months after their transfers to Camp VII.").

[47] *Id.* at 34239.

which it has acknowledged by repeatedly declassifying transcripts of attorneys describing the relationship.

*Partial* Glomar *response*

If considered as a partial *Glomar* response,[48] CIA's assertion fares no better. CIA makes no attempt to divide records into categories, or articulate a difference between records which fall within DNI's declassification or those that do not.[49] Indeed, because CIA did not search beyond the CADRE database of previously-released records,[50] it could not address whether records fell within or without the scope of DNI's declassification because it did not review them.

In contrast, the categories Plaintiff articulated at CIA request demonstrate the overbreadth of CIA's *Glomar* assertion.[51] Plaintiff's categories included, for example,

---

[48] There is an inherent internal tension in a partial *Glomar* response, because an agency simultaneously admits and refuses to confirm or deny the existence of certain documents. Generally, "An agency waives any right to make a *Glomar* response by disclosing whether responsive documents exist." *Knight First Amendment Institute at Columbia University v. CIA*, 11 F.4th 810, 814 (D.C. Cir. 2021) (citing *ACLU*, 710 F.3d at 426). Even if CIA may partially assert *Glomar* as a general matter, its attempt to do so here still fails because it does not adequately account for the declassified aspects of the interest it purports to protect. *Cf. Electronic Frontier Foundation v. Dep't of Justice*, 384 F. Supp. 3d 1, 13 (D.D.C. 2019) (rejecting blanket partial *Glomar* response).

[49] *See Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014) (discussing categorical approach to *Glomar*); *c.f. De Sousa*, 239 F. Supp. 3d at 191 (describing an order for CIA to particularize its *Glomar* response by category of request).

[50] Doc. 14 ¶ 20.

[51] *See PETA*, 745 F.3d at 545 (rejecting a *Glomar* assertion because "there exists a category of responsive documents for which a *Glomar* response would be unwarranted").

"What organization had decision-making authority over Camp 7."[52] CIA clearly has records of other agencies' participation in decision-making about Camp VII—it is listed in the distribution line of the December 6, 2006 Memorandum for Record declassified by DNI.[53] To acknowledge and produce such records, CIA would not have to acknowledge any intelligence connection to Camp VII beyond the avowed fact that it transferred black site detainees there.

CIA's declassifications of military commissions transcripts,[54] furthermore, make abundantly clear that assertions of CIA participation decision-making over Camp VII are unclassified. In litigation over discovery of interagency policy-making about Camp 7, Plaintiff argued, and CIA declassified the following:[55]

---

[52] Doc. 14 Exhibit D.

[53] Doc. 22 Exhibit F.

[54] In contrast to federal court, every military commissions transcript undergoes classification review by relevant Original Classification Authorities, including CIA, before release to the public.  Doc. 16 & Exhibit D.

[55] Doc. 22 Exhibit H at 34437.

But given the persistent interests and involvement of the CIA and other agencies, you know, it became clear that the FBI could not decide on its own what the policy was going to be. For one thing, they weren't FBI prisoners. You know, if they were at MCC New York, they could go down there and pull them out whenever they wanted and talk to them; but they're not. They're in a DoD facility at Camp VII under the operational control of the CIA, and so there's multiple agency partners that they have to collaborate with.

Plaintiff continued, and CIA also declassified:[56]

Special Agent Fitzgerald, who was one of the three agents who interrogated Mr. al Baluchi here at Guantanamo, testified about the creation of a High-Value Detainee Task Force -- High-Value Detainee Prosecution Task Force in September 2006, with the goal of preparing prosecutions of the high-value detainees. His testimony about that topic is from 18 September 2019 at 22887 to 912.

And he explained -- he testified at -- in that same area that the High-Value Detainee Prosecution Task Force is a joint effort of the FBI, the CIA, the Criminal Investigative Task Force, which is put together by the DoD, the Office of the Chief Prosecutor, and to a lesser extent NSA. So there

---

[56] *Id.* at 34446-47.

```
were four -- sort of four full partners and one junior
partner.
```

These examples illustrate that the participation of CIA in policy-making over Camp VII is not a classified fact, even if some of Plaintiff's other categories may implicate classified facts.

The declassification of CIA operational control over Camp VII creates a genuine issue of material fact regarding the application of Exemptions 1 and 3 to the existence of responsive records. CIA asserts that admitting the existence of records "may reveal a classified connection,"[57] but the connection is already declassified. CIA cannot carry its burden, in the *Glomar* context, to "demonstrate that disclosure of the existence or non-existence of records would be 'reasonably harmful to intelligence sources and methods.'"[58] CIA's assertion of a protected interest in protecting the existence of a link between itself and Camp VII is certainly "called into question by contradictory evidence in the record" which prevents CIA from obtaining summary judgment.[59]

---

[57] Doc. 14 ¶ 26.

[58] *Poulsen v. Dep't of Defense*, 373 F. Supp. 3d 1249, 1276 (N.D. Cal. 2019) (quoting *Wolf*, 473 F.3d at 377-78).

[59] *EPIC*, 678 F.3d 926, 931 (D.C. Cir. 2012); *see also Florez*, 829 F.3d at 186.

**b.  CIA's *Glomar* response fails because CIA and its authorized representatives have already officially acknowledged the existence of documents regarding CIA's operational control of Camp VII.**

In addition to declassification of CIA operational control as a fact, DNI, CIA, and CIA's authorized representative OCP have officially acknowledged the existence of documents responsive to Plaintiff's request. "Once an agency has officially acknowledged that records exist, there is no value in a *Glomar* response. The secret is out."[60] In this case, Plaintiff can meet even the exacting standards of the official acknowledgement test sufficient to create a genuine issue of material fact.

*Official acknowledgment in the* Glomar *context*

"[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."[61] Under the official acknowledgement doctrine, a plaintiff seeking disclosure must meet three criteria: "First, the information requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented disclosure."[62]

---

[60] *Leopold*, 987 F.3d 163, 167 n.5 (D.C. Cir. 2021).

[61] *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990) (citing *Afshar v. Department of State*, 702 F.2d 1125 (D.C. Cir. 1983)).

[62] *Id.* (citing *Afshar*, 702 F.2d at 1133).

Application of the official acknowledgement doctrine operates somewhat differently in the *Glomar* context, because a *Glomar* response "narrows the FOIA issue to the existence of records *vel non*."[63] "In the *Glomar* context, then, if the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information."[64] Accordingly, "A requester can overcome an agency's otherwise valid *Glomar* response by showing that the agency has officially and publicly acknowledged the records' existence."[65] If "the agency has officially acknowledged the existence of a record, the agency can no longer use a *Glomar* response and instead must either: (1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived."[66]

### *Official acknowledgement of responsive documents*

Initially, the DNI, acting at the instruction of the President, declassified the existence of documents regarding CIA's operational control of Camp VII. A "disclosure made by the President, or by [an] advisor acting as "instructed" by the President,' is attributable to executive branch agencies for purposes of the official acknowledgment

---

[63] *Wolf v. CIA*, 473 F.3d 370, 374 n.4 (D.C. Cir. 2007).

[64] *Id.* at 379.

[65] *Leopold*, 987 F.3d at 167 (D.C. Cir. 2021) (citing cases).

[66] *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (citing *Wolf*, 473 F.3d at 379-80).

doctrine."[67] The DNI declassified the existence of the document in footnote 977 of the redacted Executive Summary, which the CIA produced in response to Plaintiff's request. The DNI declassified two documents regarding CIA participation in interagency decisions regarding Camp VII prisoners.[68] And the DNI declassified the existence of two CIA documents regarding Ramzi bin al Shibh at Camp VII, including the existence of a Site Daily Report.[69]

CIA itself acknowledged the existence of three responsive documents. CIA produced to Plaintiff the DoD-CIA Memorandum of Agreement it had previously released in 2016, confirming its relevance to CIA operational control of Camp VII.[70] The redacted Executive Summary cited this document regarding DETENTION SITE RED.[71] This document memorialized the division of responsibilities between DoD and CIA at Camp VII beginning in September 2006.[72] The declassified portions of the Memorandum of Agreement lay out the responsibilities of DoD but not of CIA.

CIA also produced to Plaintiff the document in footnote 977, which SSCI cited as evidence for CIA operation control of Camp VII.[73] And CIA acknowledged but did

---

[67] *James Madison Project v. Dep't of Justice*, 302 F. Supp. 3d 12, 24 (D.D.C. 2018) (quoting *ACLU*, 710 F.3d at 429 n.7) (alterations in original).

[68] Doc. 22 ¶ 12 & Exhibits E-F.

[69] Doc. 16, Exhibit B at 140-41.

[70] Doc. 14, Exhibit H; Doc. 22 ¶ 11 & Exhibit B.

[71] Doc. 16, Exhibit B at 140 n.848.

[72] Doc. 22, Exhibit G at 28669-70.

[73] *Id.* ¶ 10 & Exhibits A & C; Doc. 14 Exhibit H.

not produce C06833121. No unredacted portions of any of these documents addresses CIA operational control of Camp VII.

CIA acknowledgement of these documents itself creates a genuine issue of material fact as to its *Glomar* assertion. Indeed, CIA makes no attempt to explain how it can simultaneous admit and refuse to confirm or deny the existence of responsive documents.

Finally, an OCP attorney representing the interests of the CIA has acknowledged the existence of CIA Site Daily Reports, like the one declassified at SSCI Executive Summary footnote 428. On January 31, 2020, attorneys for 9/11 Case defendant Ramzi bin al Shibh filed a motion seeking to compel production of CIA records relating to Camp 7.[74] Citing the disclosures in the redacted Executive Summary, Citing CIA operational control of Camp 7, and the documents acknowledged in footnote 428 in particular, the attorneys asserted a reasonable basis to believe that CIA records regarding Mr. bin al Shibh at Camp 7 are in existence.

In colloquy between the military judge and the prosecution, the OCP attorney representing CIA interests acknowledged the existence of responsive documents. Initially, the military judge addressed the issue of the Daily Site Report.[75] The military judge directly tied the Daily Site Reports to the CIA, the subject of the motion to compel.[76] The military judge then directly asked OCP to confirm or deny the

---

[74] Doc. 17, Exhibit B.

[75] *Id.*, Exhibit C at 34249-50.

[76] *Id.* at 34252.

existence of the CIA Daily Site Reports declassified at footnote 428. OCP confirmed

the existence of the documents.[77]

```
     MJ [Col McCALL]:  But -- so -- and this is where I'm
trying to cut through some of the -- the churn between the
parties.  If a document doesn't exist, that makes my job very
easy.  The document doesn't exist, the argument is over.

      If the question then is, well, the document exists but
we're not going to produce it because it doesn't fall under --
you know, it's not relevant or material, okay.  Then I -- then
I'm getting involved.

      So I guess that's my first question is:  When they
reference what was -- this report that was referenced in the
footnote 428, and then let's move into the second category of
the site daily reports, those do exist, correct?
     TC [MR. SWANN]:  Yes, sir.
```

Later in the argument, OCP again confirmed the existence of the Daily Site

Reports.[78]

---

[77] *Id.*

[78] *Id.* at 34259.

```
    MJ [Col McCALL]:  But again, the -- the defense position
appears to be that they're wanting -- it's not the underlying
information, it's the fact that it's then being put into CIA
reports, being communicated via CIA channels; any other
communications among the CIA and FBI, again, to show that --
that working together between the DoD and the CIA, and then
that might have been -- they could lend to defense arguments
for having an effect on the LHM.  That makes sense to me.
       So I guess going back, my question is:  It sounds like
those do exist, these daily site reports?
    TC [MR. SWANN]:  Yes, sir.
```

Based in part on the government's concession of the existence of CIA Daily Site Report like the one mentioned in footnote 428, the military commission then ordered OCP to produce the CIA records to the defense.[79]

CIA itself, its bureaucratic superior the DNI, and its authorized agent OCP have all officially acknowledged the existence of documents responsive to Plaintiff's request, including the Daily Site Reports. Separate from the declassification which vitiates CIA's purported interest in concealing an intelligence connection to Camp VII, these official acknowledgements operate as a waiver of the authority to assert a *Glomar* response.

---

[79] Doc. 17, Exhibit D.

### c. CIA unreasonably limited its search to previously-released records.

Perhaps relying too aggressively on its *Glomar* response, CIA truncated the search process by limiting to its search to a case management database containing only prior FOIA documents. In so doing, CIA failed to conduct a search "reasonably calculated to uncover all relevant documents."[80]

"To prevail at the summary judgment stage, 'the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested.'"[81] CIA bears the burden to demonstrate the adequacy of its search in addition to its justification for withholding records.[82] "The adequacy of the search, in turn, is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case."[83]

CIA cannot justify summary judgment because it clearly fails to aver that it searched all locations likely to contain responsive documents.[84] According to Ms. Blaine, CIA "conducted a search of previously-released CIA records in a case

---

[80] *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

[81] *Property of the People v. Dep't of Justice*, 405 F. Supp. 3d 99, 119 (D.D.C. 2019) (quoting *Oglesby v. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

[82] *See Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007); *Defenders of Wildlife v. Border Patrol*, 623 F. Supp. 2d 83, 88, 91 (D.D.C. 2009).

[83] *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984).

[84] *New Orleans Workers' Ctr. for Racial Justice v. ICE*, 373 F. Supp. 3d 16, 37 (D.D.C. 2019).

management database called CADRE, which is a repository of all Agency records that have been reviewed and/or compiled for potential release, or that have been previously disclosed to the public."[85] At the very least, CIA "was required to explain in its affidavit that no other record system was likely to produce responsive documents."[86]

CIA cannot aver that it has searched all locations likely to contain responsive documents—the so-called "magic words"—for the simple reason that it did not do so. Rather, CIA limited its search to previously released documents, leaving untouched the repositories likely to actually contain responsive records, such as the Site Daily Reports. The agency "cannot limit its search" to only one or more places if there are additional sources "that are likely to turn up the information requested,"[87] and its search was clearly inadequate.

---

[85]  Doc. 14 ¶ 20.

[86]  *Oglesby*, 920 F.2d at 68.

[87]*Id.*

## CONCLUSION

Most FOIA cases are decided on summary judgment, and most plaintiffs lose. This case is different. It comes against the background of substantial declassification and acknowledgment of CIA's operational control of Camp VII and the documents which illustrate it.

The denial of summary judgment, of course, does not mean that Plaintiff will receive all, or indeed any, additional documents regarding CIA's operational control of Camp VIII. But CIA should have to look in its repositories for responsive documents, and account to the Court and the Plaintiff for what it finds.

This Court should deny summary judgment, order a new search of all locations likely to contain responsive documents, direct CIA to produce documents as warranted, and provide an index of documents they withhold.

Dated: April 28, 2022

Respectfully submitted,

JAMES G. CONNELL, III
*Pro se*
P.O. Box 141
Cabin John, MD 20818-0141
(703) 623-8410
jconnell@connell-law.com
