UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES G. CONNELL, III,

            *Plaintiff*,

    v.

CENTRAL INTELLIGENCE AGENCY,

            *Defendant*.

Civil Action No. 21-0627 (CRC)

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

TABLE OF AUTHORITIES............................................................................................ ii

ARGUMENT.................................................................................................................2

I. The CIA's Declaration Satisfies the Applicable Deferential Standard for a *Glomar* Response under FOIA Exemptions 1 and 3. ..........................................................................................4
   A.  The CIA's *Glomar* Response is justified under Exemption 1.......................................4
   B.  The CIA's *Glomar* Response is independently justified under Exemption 3. .................7

II.  Plaintiff's Declassification and Official Acknowledgment Arguments Lack Merit...........9
   A.  Plaintiff's "Declassification" Waiver Argument Fails...................................................9
      i. None of the Referenced Documents or Statements Relied on by Plaintiff Support the Claim that the President, through the DNI, Declassified the Alleged CIA "Operational Control" over Camp VII. ............................................................................................10
      ii. None of the Referenced Documents or Statements Relied on by Plaintiff Support the Claim that the CIA Declassified its Alleged "Operational Control" over Camp VII. ......13
   B. Plaintiff Has Failed to Meet the "Official Acknowledgement" Three-Part Test to Overcome the Agency's *Glomar* Response. ................................................................15
      i. Plaintiff Has Failed to Meet the "Specificity-Matching" Requirements ...................15
      ii. Plaintiff has Failed to Show that the CIA has made any Official Public Disclosure to Waive its *Glomar* Response ......................................................................................18

CONCLUSION..........................................................................................................20

# TABLE OF AUTHORITIES

## Federal Cases

*ACLU v. CIA*, 710 F.3d 422  (D.C. Cir. 2013)........................................................................ 2, 18

*Barkto v. DOJ*, 898 F.3d 51 (D.C. Cir. 2018)................................................................................ 9

*CIA v. Sims*, 471 U.S. 159 (1985)................................................................................................ 7

*Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918 (D.C. Cir. 2003)........................ 7

*Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926 (D.C. Cir. 2012)................................................ 2, 8

*Fitzgibbon v. CIA*, 911 F.2d 755 (D.C. Cir. 1990) ................................................................ 11, 15

*Freedom Watch, Inc. v. NSA*, 783 F.3d 1340 (D.C. Cir. 2015) ..................................................... 6

*Frugone v. CIA*, 169 F.3d 772 (D.C. Cir. 1999) ............................................................... 7, 18, 19

*Government Accountability Project v. CIA*, 548 F.Supp.3d 140 (D.D.C. 2021)......................... 15

*James Madison Project v. CIA*, 344 F. Supp. 3d 380 (D.D.C. 2018) ......................................... 17

*Judicial Watch, Inc. v. CIA*, 298 F.Supp.3d 21 (D.C. Dist. 2018)............................................. 15

*Knight First Amendment Inst. at Columbia Univ. v. CIA*, 11 F.4th 810 (D.C. Cir 2021) ...... 14, 18

*Leopold v. CIA*, 98 F.3d 163 (D.C. Cir. 2021)....................................................................... 15, 17

*Mobley v. CIA*, 806 F.3d 568 (D.C. Cir. 2015).............................................................. 14, 18, 19

*Moore v. CIA*, 666 F.3d 1330 (D.C. Cir. 2011) ..................................................................... 15, 18

*NYT v. CIA*, 965 F.3d 109 (2nd Cir. 2020) ........................................................................ 10, 15, 17

*Osen LLC v. U.S. Cent. Command*, 969 F.3d 102 (2d Cir. 2020)............................................... 15

*Shapiro v. CIA*, 170 F.Supp.3d 147 (D.D.C. 2016) ................................................................ 2, 18

*Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009) .............................................................................. 15

*Wolf v. CIA*, 473 F.3d 370 (D.C. Cir. 2007) ...................................................................... passim

## Federal Statutes

5 U.S.C. § 552(b)(1) & (3)...................................................................................................... 4, 8

50 U.S.C. § 3024(i)(1) ................................................................................................................ 8

## Federal Rules

Fed. R. Civ. P. 56(a). ................................................................................................................. 1

## Other Authorities

Exec. Order 13526 § 3.1(b)...................................................................................................... 14

JAMES G. CONNELL, III,

        *Plaintiff*,

        v.

CENTRAL INTELLIGENCE AGENCY,

        *Defendant*.

Civil Action No. 21-0627 (CRC)

## DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

The Central Intelligence Agency ("CIA" or "Agency") moved for summary judgment on the two remaining issues in this Freedom of Information Act ("FOIA") case: (1) the CIA's *Glomar* response to Plaintiff's FOIA request; and (2) the withholding of document C06833121. *See* ECF No. 13-1 (CIA's Motion for Summary Judgment ("Mot.")) at 4. Plaintiff has "concede[d] that CIA may withhold C06833121 in its entirety,"[1] so the CIA is entitled to summary judgment as a matter of law on that issue. *See* Fed. R. Civ. P. 56(a).

The CIA is also entitled to summary judgment with respect to its *Glomar* response. As described below, the CIA's supporting declaration sufficiently explains why the CIA could neither confirm nor deny the existence or nonexistence of records that may reveal a classified connection between the Agency and the subject of Plaintiff's FOIA request. *See* ECF No. 14 (Vanna Blaine Declaration ("Blaine Decl.")) ¶¶ 4, 26-40. To be sure, Plaintiff's FOIA request is very specific and narrow—seeking information on seven "topics" related to the alleged CIA "operational control" over Camp VII during a specified four-month period. *Id.* at ¶¶ 11-12.

---

[1]       ECF No. 23 (Plaintiff's Opposition ("Opp.")) at 6 n. 4.

To defeat the CIA's *Glomar* response, Plaintiff attempts to conflate the narrow *Glomar* issue in this FOIA case with years-long complex discovery disputes currently being litigated in a military commission proceeding. Relying on statements and documents referenced in a congressional report, as well as statements made by military prosecutors, Plaintiff claims that information subject to the CIA's *Glomar* response has been declassified and officially acknowledged. These arguments fail because none of the statements and documents relied on by Plaintiff support these assertions. Because the CIA was properly justified in asserting a *Glomar* response with respect to records that would reveal a classified or otherwise unacknowledged connection between the CIA and the subject of Plaintiff's FOIA request, the CIA was likewise justified in limiting its search to publicly acknowledged records.[2]

## ARGUMENT

*Glomar* responses are justified in FOIA cases where, as here, an agency's reasons for invoking an exemption "appear[ ] logical or plausible." *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007). Courts "must accord *substantial weight*" to an agency's rationale for refusing to confirm or deny the existence of responsive records. *ACLU v. CIA*, 710 F.3d 422, 427 (D.C. Cir. 2013) (emphasis in original); *Shapiro v. CIA*, 170 F.Supp.3d 147, 158 (D.C. Dist. 2016) ("[W]hen a *Glomar* response touches upon issues of national security—as is the case here—courts must give

---

[2]      Contrary to Plaintiff's claim (Opp. at 7, 29-30 & ECF No. 26 at 1-2), no additional searches can be conducted in this case because the CIA has properly asserted that the fact of the existence or nonexistence of the records at issue falls within the scope of the *Glomar* response. *See Wolf*, 473 F.3d at 374 n.4 ("[W]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.") (quotations omitted); *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 934 (D.C. Cir. 2012) ("Because we find the Janosek Declaration sufficient to support NSA's *Glomar* response, requiring NSA to conduct a search and segregability analysis would be a meaningless—not to mention costly—exercise."). Thus, based on the specific facts of this case, the CIA's search was reasonable. *See* Mot. at 4-8; *see also* Blaine Decl. ¶33.

agency decisions substantial deference.") (quotations and citations omitted). Applying this deferential standard, the CIA here satisfies the "logical" or "plausible" test. Mot. at 2-3, 9-16.

Before proceeding to the *Glomar* analysis, however, it is important to understand the FOIA request at issue in this case. It is undisputed that, by letter dated March 8, 2018, Plaintiff "particularized" his initial request for documents from "1 September 2006 to 31 January 2007." Blaine Decl. ¶¶ 11-12; Mot. at 5-6; Opp. at 5.[3] In doing so, Plaintiff limited the scope of the request to a four-month "specific period of time." Blaine Decl. ¶¶ 11-12; *see also* n. 3 below. In his March 8 letter, Plaintiff further narrowed the scope of the request to a list of seven "possible topics"—all premised on Plaintiff's alleged claim that CIA maintained "operational control" over Guantanamo detainees at Camp VII during the specified period of time. *See id.* Significantly, Plaintiff admitted "that by listing these topics, [he] was not implying that responsive information actually exists, only that [he] would be interested in information *if* it did exist." Pl. Mar. 8, 2018 Letter (emphasis added). The only document that Plaintiff specifically requested, and hence knew existed, was "[t]he document cited at footnote 977 of the SSCI report, which . . . is [the] 'CIA Background Memo for CIA Director visit to Guantanamo, December 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility.'"[4] *Id.*

In response to Plaintiff's "particularized" or amended FOIA request (hereinafter referred to as "Plaintiff's Amended FOIA Request"), the CIA informed Plaintiff that, after searching for records that would reveal an unclassified or openly acknowledged association between the Agency

---

[3]    *See also* ECF No. 14-4 ("Pl. Mar. 8, 2018 Letter"); ECF No. 14-5 ("CIA May 4, 2018 Letter"); ECF Nos. 14-6 & 22-1 ("CIA Sept. 20, 2020 Letter"); ECF No. 25 ("CIA Statement of Undisputed Material Facts") ¶ 11; ECF No. 26 ("Pl. Opp. to CIA's Statement of Undisputed Material Facts") at 1.

[4]    Plaintiff also stated that he was aware of the 2006 "Memorandum of Understanding between the Department of Defense and the CIA regarding detention at Guantanamo Bay." *Id.*

and the subject of Plaintiff's Amended FOIA Request, the Agency had located three documents. *See* Blaine Decl. ¶ 16.[5]  Two of the documents were released to Plaintiff with redactions, and one was withheld in full.  *See id*.  With respect to any records that would reveal a classified or otherwise unacknowledged connection between the Agency and the subject Plaintiff's Amended FOIA Request, the CIA issued a *Glomar* response, stating that it could neither confirm nor deny the existence or nonexistence of such records.  *See id.*[6]

## I.   The CIA's Declaration Satisfies the Applicable Deferential Standard for a *Glomar* Response under FOIA Exemptions 1 and 3.

In support of its *Glomar* response, the CIA submitted a detailed declaration by the Information Review Officer of the CIA's Litigation Review Office, Vanna Blaine, a senior CIA official authorized to assess the current, proper classification of CIA information.  *See* Blaine Decl. ¶¶ 1-3.  Ms. Blaine's declaration sufficiently explains, "to the greatest extent possible on the public record," why the CIA's *Glomar* response to Plaintiff's Amended FOIA Request was properly justified under FOIA Exemptions 1 and 3.  Blaine Decl. ¶¶ 7, 22-40.

### A.   The CIA's *Glomar* Response is justified under Exemption 1.

Ms. Blaine's declaration explains in sufficient detail that the existence or nonexistence of records responsive to Plaintiff's Amended FOIA Request is a properly classified fact that pertains to "intelligence activities" and "intelligence sources and methods;" affirms that this determination was not made for an improper reason; confirms the need for consistency in invoking *Glomar* in response to FOIA requests; and explains the potential damage to national security.  *See* Blaine Decl. ¶¶ 25-36; *see also* Mot. at 10-12.

---

[5]      *See also* ECF No. 14-8 ("CIA July 15, 2021 Letter"); CIA Statement of Undisputed Material Facts at ¶ 11; Pl. Opp. to CIA's Statement of Undisputed Material Facts at 1.

[6]      *See also* CIA July 15, 2021 Letter; CIA Statement of Undisputed Material Facts at ¶ 20; Pl. Opp. to CIA's Statement of Undisputed Material Facts at 2.

Specifically, Ms. Blaine explained that other than the three acknowledged records, a formal acknowledgment confirming the existence of records reflecting a classified or otherwise unacknowledged connection between the CIA and the subject of Plaintiff's Amended FOIA Request could reveal, for example, "sensitive details about CIA's sources and methods and jeopardize the safety of CIA employees and the employees of other agencies." Blaine Decl. ¶ 34. "Conversely," Ms. Blaine observed, that disclosing that the Agency has no responsive records could "provide adversaries with insight into the CIA's priorities, resources, capabilities, and relationships with other agencies." *Id.* Either response, Ms. Blaine confirmed, "would reveal sensitive information about the CIA's interests, personnel, capabilities, authorities, and resources that is protected from disclosure by Executive Order 13526 and statute." *Id.*

Ms. Blaine explained that such sensitive information could be of great interest to hostile adversaries. *See id.* at ¶¶ 32, 34. These adversaries include "[t]errorist organizations, foreign intelligence services, and other hostile groups," who "continually search for information regarding the activities of the CIA and are able to gather information from a myriad of sources, analyze this information, and devise ways to defeat activities from seemingly disparate pieces of information." *Id.* at ¶ 32. To avoid such potential damage to the national security of the United States, Ms. Blaine explained that the CIA asserts a *Glomar* in all cases where the existence or nonexistence of records responsive to a FOIA request is a classified fact, including instances in which the CIA does not possess records responsive to a particular request. *See id.* at ¶ 35. Otherwise, if the CIA asserts *Glomar* only when it actually possesses responsive records, the response would be interpreted as an admission that a responsive record exists, thereby revealing the very information that the CIA is seeking to protect. *See id.*

Ms. Blaine's declaration here is at least as detailed as the declarations in *Wolf* and *Freedom Watch*, where the D.C. Circuit appropriately deferred to the agencies' judgments on national security concerns. In *Freedom Watch, Inc. v. NSA*, 783 F.3d 1340 (D.C. Cir. 2015), the Court upheld the Department of Defense's *Glomar* response to an organization seeking records on leaked information about cyber-attacks on Iranian nuclear facilities. The agency's declaration in that case explained that "[a]cknowledging the existence or non-existence of records could reveal whether the United States, and specifically [the Department of Defense], conducts or has conducted cyber-attacks against Iran," and that such a disclosure would threaten national security because it could "provid[e] insight into [the Department's] military and intelligence capabilities and interests." *Id.* at 1345 (quotations omitted). Affording that judgment "substantial weight," the D.C. Circuit ruled that the declaration "easily resolve[d]" the challenge to the agency's *Glomar* response, *id.* at 1344-45, because the agency's declaration had "explain[ed] the justifications for nondisclosure with reasonably specific detail." *Id.* (quotations omitted).

Similarly, in *Wolf*, the D.C. Circuit upheld the CIA's *Glomar* response to a writer seeking records about an assassinated foreign political candidate. *See Wolf*, 473 F.3d at 370. The CIA's declaration in that case explained that confirming the existence of responsive records could signal to adversaries the kinds of individuals "in which the CIA is interested and upon which it focuses its methods and resources," which could help adversaries resist its intelligence efforts. *Id.* at 376 (quotations omitted). The Court concluded that the declaration "both logically and plausibly suffice[d]" to justify the CIA's *Glomar* response. *Id.*

The same is true here. Ms. Blaine determined that acknowledging or denying the existence or nonexistence of responsive records related to the alleged CIA "operational control" over Camp VII risks harming national security. *See* Blaine Decl. ¶¶ 30, 36. "Mindful that courts have little

expertise in" intelligence matters, courts have reasoned that they are "in no position to dismiss" such "facially reasonable concerns." *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999). This deferential standard reflects the "magnitude of the national security interests and potential risks at stake" when agencies are asked to disclose sensitive national security information. *Ctr. For Nat'l Sec. Studies v. U.S. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003) (quotations omitted). Such risks are best addressed by national security professionals who are positioned to see "the whole picture" and "weigh the variety of complex and subtle factors" that militate against disclosure. *CIA v. Sims*, 471 U.S. 159, 179-80 (1985).

Applying this standard, the Court should find that the CIA's *Glomar* response under Exemption 1 is proper here because Ms. Blaine, a senior official with classification authority, has determined and sufficiently explained that the fact of whether the CIA has records responsive to Plaintiff's Amended FOIA Request is a properly classified fact. *See* Blaine Decl. ¶¶ 26-36.

**B.      The CIA's *Glomar* Response is independently justified under Exemption 3.**

Exemption 3 provides an independent basis for the CIA to protect its intelligence sources and methods from disclosure. *See* Mot. at 12-13; Blaine Decl. ¶¶ 26-36. Thus, Exemption 3 "standing alone, may justify the CIA's *Glomar* response." *Wolf*, 473 F.3d at 375. Courts afford "even greater deference" to the CIA under the National Security Act, a statute encompassed by Exemption 3. *Id.* at 377; *see also Sims*, 471 U.S. at 168-69 (explaining that "Congress entrusted the Agency with sweeping power to protect its intelligence sources and methods") (quotations omitted). The existence of such a statute, the D.C. Circuit explained, shows that "Congress has already, in enacting the statute, decided that disclosure of" the information that the statute protects "is potentially harmful." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d at 931 (quotations omitted). The Agency therefore need not make a specific showing of potential harm to national security to

justify withholding statutorily-protected information; "the only question is whether the withheld material satisfies the criteria of the exemption statute." *Id.* at 931-32.

The CIA's declaration here easily passes muster. As described above, Ms. Blaine's declaration contains sufficient justifications for invoking Exemptions 1 and 3 that are broader than the CIA's "intelligence interest" or "link to" or "connection with" Camp VII (Opp. at 8-9, 13-18, 22): they include protecting sources and methods, which are protected from unauthorized disclosure by the National Security Act. *See* Blaine Decl. ¶¶ 26, 32, 34, 39.

Under any standard of review, a request premised on discovering whether an intelligence agency has intelligence information on the alleged "operational control" over a facility implicates "intelligence sources and methods," 50 U.S.C. § 3024(i)(1). Plaintiff makes no attempt to challenge this, and instead focuses on disputing the CIA's "intelligence interest in, or clandestine connection to" Camp VII, which is information protected under Exemption 1. Opp. at 9. Exemption 3, however, protects intelligence sources and methods, and where it overlaps with Exemption 1, it provides an independent basis for justifying a *Glomar* response. *See Wolf*, 473 F.3d at 375. Plaintiff concedes that Exemptions 1 and 3 protect "different interests," but nevertheless claims that "in this case, the Exemptions 1 and 3 *Glomar* analyses are identical." Opp. at 9 n. 12. They are not. As explained above, "the only question" in an Exemption 3 analysis "is whether the withheld material satisfies the criteria of the exemption statute." *See Elec. Privacy Info. Ctr.*, 678 F.3d at 931-32. Other than unsuccessfully invoking the declassification and official acknowledgment waivers, *see infra* at 9-19, which primarily challenge the CIA's "intelligence interest in" or "connection to" Camp VII (Opp. at 9), Plaintiff made no effort to challenge Ms. Blaine's assertion that confirming or denying the existence of records responsive to Plaintiff's

Amended FOIA Request would reveal information that concerns the CIA's intelligence sources and methods. *See* Blaine Decl. ¶¶ 26, 30, 39.

Applying the "even greater deference" that courts ordinarily afford to agency declarations in Exemption 3 analyses, the Court should find that Ms. Blaine's declaration is sufficient to justify the CIA's *Glomar* response under Exemption 3. *See Wolf*, 473 F.3d at 375, 377.

## II. Plaintiff's Declassification and Official Acknowledgment Arguments Lack Merit.

Plaintiff does not challenge Ms. Blaine's original classification authority, nor does Plaintiff challenge the presumption of good faith afforded to agency affidavits. *See Barkto v. DOJ*, 898 F.3d 51, 74 (D.C. Cir. 2018) ("Agency affidavits are accorded a presumption of faith, which cannot be rebutted by purely speculative claims."). Plaintiff in fact concedes that a *Glomar* response is proper where the existence or nonexistence of an agency record falls within a FOIA exemption (Opp. at 8), but argues that the CIA is precluded from asserting *Glomar* because: (1) the DNI and CIA purportedly declassified the alleged CIA "operational control" over Camp VII; and (2) the CIA purportedly acknowledged the existence of records regarding alleged CIA "operational control" over Camp VII. *See id.* at 5-28. Both arguments fail.

### A. Plaintiff's "Declassification" Waiver Argument Fails.

Plaintiff argues that it is an undisputed fact that the "DNI declassified CIA's 'operational control' over Camp VII in 2014," and that the CIA has "repeatedly declassified the existence of documents regarding its operational control over Camp VII." Opp. at 5-18. Plaintiff's arguments have no basis in law or fact. To prevail on a claim of declassification, inferred or otherwise, a plaintiff must show that the information relied upon is sufficiently specific. *See NYT v. CIA*, 965 F.3d 109 (2nd Cir. 2020). Plaintiff has not done so here.

**None of the Referenced Documents or Statements Relied on by Plaintiff Support the Claim that the President, through the DNI, Declassified the Alleged CIA "Operational Control" over Camp VII.**

Plaintiff claims that "[i]n 2014, at the Direction of the President, the Director of National Intelligence ('DNI') declassified the fact that CIA maintained 'operational control' over Camp VII."[7] Opp. at 5; *see also id.* at 12 ("[T]he DNI declassified the fact at the core of this litigation: CIA operational control over Camp VII following the September 2006 transfer of CIA prisoners to Guantanamo Bay."). This claim has no merit. While Plaintiff writes at length about the redacted Executive Summary prepared and released by the Senate Select Committee on Intelligence in 2014 ("2014 Executive Summary") and its related declassification process, *see* Opp. at 8-14, Plaintiff only relies upon a handful of statements and documents—none of which actually support Plaintiff's specific claim that the DNI purportedly declassified the alleged CIA "operational control" over Camp VII. *See id.* at 5 n. 1 & 2, 8-18; *see also* ECF No. 22 ("Pl. Decl.") ¶¶ 11-12.

To start, Plaintiff relies upon a redacted copy of the September 2006 Memorandum of Agreement between the U.S. Department of Defense ("DoD") and the CIA concerning the detention by DoD of certain individuals at a facility at Guantanamo Bay Naval Station ("2006 MOA"). *See* Opp. at 5 n. 2; *see also id.* at 12 n. 29 & ECF No. 22-4 ("Ex. D"). Plaintiff claims that this document, which contains redactions of classified information, "clearly documents a connection between the CIA and Camp VII." Opp. at 15. But the "link" or "connection" between

---

[7]     Plaintiff also claims that Ms. Blaine's rationale for asserting *Glomar* under Exemptions 1 and 3 fails "because the DNI has already declassified the CIA 'intelligence interest in, or clandestine connection to' Camp VII." Opp. at 8-9. Plaintiff is attempting to conflate the interests at issue in this FOIA case. "[T]he core of this litigation," as Plaintiff concedes, is the alleged "CIA *operational control* over Camp VII" during the four month-period specified by Plaintiff. *Id.* at 12 (emphasis added); *see also* ECF No. 7 (Plaintiff representing to the Court in a Joint Status Report that he was challenging the CIA's *Glomar* response "on the basis that the question of CIA operational control (or lack thereof) over Camp VII has already been declassified.").

the CIA and Camp VII, as Plaintiff describes it, is not at issue in this FOIA case. *See id.* at 8-9, 13-18, 22. As Plaintiff himself admitted, "the core of *this* litigation" is the alleged "CIA *operational control* over Camp VII" during the relevant four month-period. *Id.* at 12 (emphasis added). And Plaintiff has not identified any information supporting his contention that the CIA maintained "operational control" over Camp VII or the individuals being detained there. To the contrary, the 2006 MOA explicitly states that the individuals or "unlawful enemy combatants" who were the subject of this agreement, were "DoD detainees under the *exclusive responsibility and control* of the Secretary of Defense." Ex. D at 1 (emphasis added); *see also id.* at 3 ("The Commander . . . is responsible for the detention of all [unlawful enemy combatants] at [Guantanamo], including *operation of all detention facilities* . . .") (emphasis added).

Plaintiff's reliance on excerpts from the redacted 2014 Executive Summary fares no better. *See* Opp. at 5 n. 2; *see also* ECF No. 16-2 ("Ex. B"). Plaintiff points to the following statement on Page 160: "After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S military detainees and remained under the operational control of the CIA." Opp. at 12. As support for this statement, the Senate Select Committee on Intelligence ("SSCI") cited the 2006 MOA. *See id.* Such an expansive reading of the 2006 MOA, however, is unsupported by the plain text in the document, as explained above. But even if this characterization by the SSCI was supported by 2006 MOA, Plaintiff's claim still fails because the D.C. Circuit has rejected attempts to establish an agency's official acknowledgement of classified information based on disclosures by Congress. *See Fitzgibbon v. CIA*, 911 F.2d 755, 765-766 (D.C. Cir. 1990) (holding that the CIA could refuse to disclose classified information even if already reported in a congressional report). Accordingly, an

unsupported characterization of the 2006 MOA in a congressional report cannot be attributed as a declassified "fact" to defeat an agency's *Glomar* response. *See id.*

Relying again on the redacted 2014 Executive Summary, Plaintiff also points to a statement on Page 80: "On September 5, 2006, bin al-Shibh was transferred to *U.S. military custody* at Guantanamo Bay, Cuba. After his arrival, bin al-Shibh was placed on anti-psychotic medications." Opp. at 13; *see also* Ex. B at 80 (emphasis added). As support, the SSCI referenced the following documents: [Redacted] SITE DAILY REPORT – 24 May 07; [Redacted] 8904 (182103Z APR 08). *See id.*; *see also* ECF No. 17 ("Pradham Decl.") ¶ 8. Once again, neither the quoted statement—nor the referenced "two CIA documents" (Opp. at 13)—support Plaintiff's contention that the CIA maintained "operational control" over Camp VII.

Plaintiff also relies on two DNI documents, Exhibits E and F, to support his declassification claim. *See* Opp. at 5 n. 2; *see also id.* at 14 n. 33, 20 n. 53; ECF No. 22-5 ("Ex. E"); ECF No. 22-6 ("Ex. F"). These exhibits appear to be facsimile communications from the Office of the DNI to Ashley Deeks at the "State [Department] - Legal." Exs. E & F. Exhibit E appears to include a "rough agenda" for a meeting regarding "Interagency Decisions Needed Regarding the 14 High Value Detainees." Ex. E at 1-3. Exhibit F appears to be a follow-up communication regarding the interagency meeting referenced in Exhibit E. Specifically, Exhibit F seems to be a memorandum from the DNI regarding certain "security issues" discussed during the meeting. Ex. F; Opp. at 14. These "security issues" concerned the safeguarding of classified information in military commission proceedings (*e.g.*, security clearances, media presence, access to the detainees, etc.). *See* Exs. E & F. While it appears that representatives from the CIA participated in this interagency meeting, neither Exhibit E or Exhibit F discuss the CIA's "link" or "connection" to Camp VII, much less that the CIA maintained "operational control" over Camp VII. *See id.* If anything, these

documents show that it was the DNI that organized and led the interagency meetings regarding the detainees—not the CIA. Suggesting that CIA's participation in this interagency meeting shows that CIA had "operational control" over Camp VII is a stretch and mere speculation, and does not support Plaintiff's claim that the President, through the DNI, purportedly declassified the alleged CIA "operational control" over Camp VII.

      **ii.   None of the Referenced Documents or Statements Relied on by Plaintiff Support the Claim that the CIA Declassified its Alleged "Operational Control" over Camp VII.**

Plaintiff claims that "CIA has also declassified documents regarding its connection to Camp VII." Opp. at 14. In support, Plaintiff relies, once again, on the 2006 MOA (Ex. D) and on statements made by non-CIA officials during military commission proceedings. *See id.* at 14-18; *see also* Pradham Decl. ¶¶ 12-14; ECF No. 22-7 ("Ex. G"). This claim also fails. As an initial matter, Plaintiff continues to conflate the interests at issue in this FOIA case. The core issue of this litigation, as Plaintiff concedes, is the alleged "CIA operational control over Camp VII" during the relevant four month-period (Opp. at 12)—not the "link" or "connection" between the CIA and Camp VII at some unspecified time (Opp. at 8-9, 13-18, 22). Additionally, Plaintiff's reliance on the 2006 MOA fails because, as explained above, Plaintiff points to no unclassified information in this document that supports his position that the CIA maintained "operational control" over Camp VII or the individuals being detained there.[8]

---

[8]    Plaintiff's reliance on Exhibit C (ECF No. 22-3) fails for the same reasons. Exhibit C, which the CIA produced to Plaintiff in response to his FOIA request along with the 2006 MOA, is a redacted copy of a "proposed itinerary" for the Director of the CIA during a visit to Guantanamo in December 2006 and an attachment with information regarding the 14 high-value detainees transferred to Guantanamo Bay. *See* ECF No. 22-3 ("Ex. C"). None of the unclassified information in the "proposed itinerary" or the attached document support Plaintiff's claim that CIA maintained "operational control" over Camp VII.

Plaintiff also relies on statements made in DoD military commission proceedings.  *See* Opp. at 15-22; *see also* Ex. G.  Plaintiff's reliance on these statements from "Unofficial/ Unauthenticated" military commission transcripts, which are not part of the official court record,[9] fails for at least two reasons.  First, none of the quoted statements support Plaintiff's specific assertion that the CIA maintained "operational control" over Camp VII.  Second, none of the quoted statements were made by CIA officials, much less authorized officials with original classification authority to declassify CIA sensitive information.  Instead, the quoted statements were all made by DoD employees or contractors, including: Plaintiff, who has contracted with DoD to serve as defense counsel for one of the Guantanamo detainees, Ammar al Baluchi, in *United States v. Ammar al Baluchi*, commonly known as the "9/11 Case"; the Office of Military Commissions, Office of the Chief Prosecutor ("OCP"), which is representing the U.S. Government in the 9/11 Case; and the First Camp VII Commander, a DoD military officer who served as the first commander at Camp VII.  *See id.*; *see also* Pl. Decl. ¶¶ 1-2, 5, 13-16.  While the OCP has represented certain CIA interests in the military commission proceeding, the CIA has not delegated declassification authority to the OCP attorneys.  *See* Exec. Order 13526 § 3.1(b).  Moreover, as explained further below, it is well-established that statements made by non-CIA officials (*i.e.*, DoD employees or contractors) do not waive the CIA's right to assert a FOIA exemption.  *See Knight First Amendment Inst. at Columbia Univ. v. CIA*, 11 F.4th 810, 816 (D.C. Cir 2021) ("Disclosure by one federal agency does not waive another agency's right to assert a FOIA exemption.") (quoting *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015)); *see also infra* at 18-19.

---

[9]     ECF No. 16 ("Zittritsch Decl.") ¶ 18 (stating that unofficial transcripts "are separate from the official court record").

### B. Plaintiff Has Failed to Meet the "Official Acknowledgement" Three-Part Test to Overcome the Agency's *Glomar* Response.

Plaintiff's "official acknowledgment" waiver claim fails for similar reasons. *See* Opp. at 23-28. To overcome a *Glomar* response on this basis, a FOIA plaintiff must show that the information requested: (1) is as "specific" as the information previously disclosed; (2) "matches" the information previously disclosed; and (3) the information has already been made public through an "official and documented" disclosure. *See, e.g.*, *Leopold v. CIA*, 98 F.3d 163, 170 (D.C. Cir. 2021) (quoting *Fitzgibbon*, 911 F.2d at 765); *Judicial Watch, Inc. v. CIA*, 298 F.Supp.3d 21, 22 (D.C. Dist. 2018). Plaintiff has not met any of the three requirements of this "strict" test. *See, e.g.*, *Moore, v. CIA*, 666 F.3d 1330 (citing *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009); *Government Accountability Project v. CIA*, 548 F.Supp.3d 140, 156 (D.D.C. 2021).

#### i. Plaintiff Has Failed to Meet the "Specificity-Matching" Requirements

To establish prior disclosure, FOIA plaintiffs "bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011); *Judicial Watch, Inc.*, 298 F.Supp.3d 2 at 22. "Prior disclosure of similar information does not suffice" to be an official acknowledgment. *Wolf*, 473 F.3d at 378; *Osen LLC v. U.S. Cent. Command*, 969 F.3d 102, 110 (2d Cir. 2020) ("[E]ven a substantial overlap between the requested information and previously disclosed information is not enough to establish waiver."). Courts must "insist[ ] on exactitude" to protect "the Government's vital interest in information relating to national security and foreign affairs." *Wolf*, 473 F.3d at 378 (quotations omitted).

Here, Plaintiff argues that the CIA's *Glomar* response fails because the "DNI, CIA, and the CIA's authorized representative OCP have officially acknowledged the existence of documents responsive to the Plaintiff's [Amended FOIA] Request." Opp. at 6, 23. In support, Plaintiff points

to essentially the same documents relied on for the declassification argument: the two documents with redactions produced to Plaintiff in response to his FOIA request (*i.e.*, the "proposed itinerary" for the CIA Director's visit to Guantanamo (Ex. C) and the 2006 MOA (Ex. D)); the two DNI documents regarding the interagency meeting (Exs. E & F); the "two CIA documents" referenced on Page 80 in the 2014 Executive Summary (Ex. B); and unofficial statements made by OCP attorneys in the 9/11 military commission proceeding (Ex. G). *See id.* at 25-27.

As explained above, none of these documents or statements support Plaintiff's claim about the alleged CIA "operational control" over Camp VII from September 1, 2006, to January 31, 2007, which is the subject of Plaintiff's Amended FOIA Request. *See supra* at 10-14. In fact, the plain text in 2006 MOA appears to contradict Plaintiff's claim, as it states that DoD—not the CIA—had exclusive responsibility and control over the detainees. *See* Ex. D at 1, 3. Likewise, the DNI documents show, if anything, that it was the DNI—not the CIA—organizing and leading the interagency efforts regarding security issues involving the detainees and military commission proceedings. *See* Exs. E & F. Nothing Plaintiff relied on points otherwise, and Plaintiff's speculation that participation in an interagency meeting supports his argument "is a far cry from 'official acknowledgement.'" *Government Accountability Project*, F.Supp.3d at 156.

Plaintiff's reliance on the "two CIA documents" referenced on Page 80 in the 2014 Executive Summary does not fare any better. Opp. at 25; Pradham Decl. ¶¶ 6-8. Plaintiff claims that the DNI already declassified the existence of these "two CIA documents," including the existence of a "Site Daily Report," and that "the OCP attorney representing the interests of the CIA has acknowledged the existence of CIA Site Daily Reports, like the one declassified." Opp. at 25-26. These "two CIA documents," however, discuss a detainee being transferred to *U.S. military custody* in Guantanamo and placed on medications. Pradham Decl. ¶¶ 6-8; Ex. B at 80 n.

428. Thus, these documents appear to contradict, rather than support, Plaintiff's assertion that the CIA maintained "operational control" over Camp VII or the detainees there. *See id.*

Additionally, none of the "topics" listed in Plaintiff's Amended FOIA Request are specific enough to match the "Site Daily Reports" that Plaintiff now attempts to rely on. Whether these purported reports are responsive to a motion to compel in a military criminal proceeding is not relevant to this FOIA case because, among other things, the issues, applicable legal standards, and the requested information are not the same.[10] To the extent Plaintiff claims the information sought is similar in both cases, this is insufficient to waive the CIA's *Glomar* response in this FOIA case. *See, e.g.*, *Wolf*, 473 F.3d at 378 ("prior disclosure of similar information does not suffice" to be an official acknowledgment); *James Madison Project v. CIA*, 344 F. Supp. 3d 380, 394 (D.D.C. 2018) (refusing to speculate that specific documents exist "based on general pronouncements in the public domain" and "demand[ing] 'exactitude,' particularly in cases like this one where national security and foreign affairs are involved").

Finally, even if the statements and documents that Plaintiff attempts to rely on were "specific" enough and "matched" the information sought in Plaintiff's Amended FOIA Request, Plaintiff still has failed to show that, other than the three located documents in this case,[11] the CIA

---

[10] Unlike this case, Plaintiff's motion to compel in the 9/11 Case sought "any [CIA] records related to Camp 7 that reference Mr. Bin al Shibh's detention, treatment, and conditions, or the Letterhead (LHM) interrogations from 2007." ECF No. 17-4 (Motion to Compel in 9/11 Case).

[11] Plaintiff argues that the "CIA's acknowledgement of these documents itself creates a genuine issue of material fact as to its *Glomar* assertion." Opp. at 26. This argument misunderstands the nature *Glomar*, which allows an agency to assert *Glomar* when the existence or nonexistence of *particular* records covered by *Glomar* has not been officially and publicly disclosed. *See NYT*, 965 F.3d at 116; *see also Leopold*, 987 F.3d at 170. This is even true when the agency makes a general acknowledgement of the existence of a program, but not the existence of records about the program. *See NYT*, 965 F.3d at 116 ("Even assuming *arguendo* that President Trump's statements revealed the general existence of the alleged covered program, a *Glomar*

itself has acknowledged the existence of responsive documents from September 1, 2006 through January 31, 2007, which is the relevant time period in this FOIA case. Indeed, Plaintiff acknowledges that the "two CIA documents" fall outside the four-month period relevant here. *See* Pradham Decl. ¶¶ 6-8.[12] Plaintiff therefore has failed to clear the "high hurdle" required to meet the specificity-match test. *Shapiro*, 170 F.Supp.3d at 159 (citation omitted).

### ii. Plaintiff has Failed to Show that the CIA has made any Official Public Disclosure to Waive its *Glomar* Response

Plaintiff has failed to provide any evidence supporting his claim that the DNI has officially acknowledged any documents responsive to his FOIA request, *see supra* at 10-13, but even if the DNI had made such public disclosure, the D.C. Circuit has made it clear that it will "not deem 'official' a disclosure made by someone other than the agency from which the information is being sought." *Frugone*, 169 F.3d at 774; *see, e.g.*, *Knight First Amendment Inst*, 11 F.4th at 816; *Mobley*, 806 F.3d at 583; *Moore*, 666 F.3d at 1333 n. 4. While the D.C. Circuit has recognized a "limited exception" to this general rule for public disclosures "made by an authorized representative of the agency's parent," this exception does not apply here. *Knight First Amendment Inst.*, 11 F. 4th at 816 (quoting *ACLU*, 710 F.3d at 429 n. 7). Contrary to Plaintiff's suggestion,[13] the DNI is not a "parent agency" to the CIA. *Id.* at 817 ("[N]either the ODNI nor

---

response is still appropriate if none of the relevant statements officially acknowledged the existence or nonexistence of specific records.").

[12]    Pradham Decl. ¶ 8 ("Based on my experience in reviewing CIA document released under the Freedom of Information Act, the context of the redacted Summary, and other unclassified sources, I can say to a reasonable degree of professional certainty that the footnote 428 . . . refers to two CIA documents: a 'Site Daily Report' dated *24 May 2007* and a cable numbered 8904 dated *18 April 2008*.") (emphasis added).

[13]    Plaintiff referring to the DNI as CIA's "bureaucratic superior" (Opp. at 28), and Plaintiff's statement that the "DNI 'serves as head of the intelligence community, which includes CIA.'" (Opp. at 11).

the CIA has a parent agency."). Plaintiff's argument that the DNI is authorized to act for the President does not fare any better because "the same can be said of all executive agencies." *Id.* The D.C. Circuit explained that "[i]f that were enough to allow one agency to make official acknowledgements binding on another, then the exception would entirely swallow up the rule." *Id.* Thus, a public disclosure by the DNI, to the extent it occurred, does not impact the CIA's *Glomar* response in this case. *See id.* at 816.

Plaintiff's argument regarding the unofficial statements by the OCP attorneys fails for similar reasons. As explained above, none of the unofficial statements made by these non-CIA officials in a military criminal proceeding support Plaintiff's claim that the CIA has acknowledged the existence of documents responsive to Plaintiff's Amended FOIA Request. But even if they did, the statements made by these DoD employees do not waive the CIA's right to assert a FOIA exemption. *See Mobley*, 806 F.3d at 583. While OCP has represented certain CIA interests in these DoD criminal proceedings, Plaintiff cites no legal authority to support his claim that OCP statements amount to an "official" acknowledgement that would waive the CIA's right to assert *Glomar* in this FOIA case. Binding case law supports the opposite. The D.C. Circuit has made it clear that "[o]nly the CIA can waive its right to assert an exemption to the FOIA." *Frugone*, 169 F.3d at 774. That has not occurred here.

In sum, the Plaintiff's declassification and official acknowledge waiver arguments fail. Because the CIA has properly invoked Exemptions 1 and 3 to support its *Glomar* response, the CIA is also entitled to summary judgment on this issue.

## CONCLUSION

For the foregoing reasons and those previously stated, the CIA's Motion for Summary Judgment should be granted in its entirety.

Dated: June 10, 2022          Respectfully submitted,

MATTHEW M. GRAVES
D.C. Bar No. 481052
United States Attorney

BRIAN P. HUDAK,
Chief, Civil Division

*/s/ T Anthony Quinn*
T. ANTHONY QUINN,
D.C. Bar No. 415213
Assistant United States Attorney
United States Attorney's Office
601 D Street, N.W. Civil Division
Washington, D.C. 20530
(202) 252-7558
Tony.Quinn2@usdoj.gov

*Attorneys for Defendant*