UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMES G. CONNELL, III**,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES CENTRAL INTELLIGENCE AGENCY**,<br><br>Defendant. | Case No. 21-cv-627 (CRC) |

## MEMORANDUM OPINION

In 2006, the Central Intelligence Agency transferred a number of "high-value" detainees to a detention facility at the U.S. military base in Guantanamo Bay, Cuba known as Camp 7. The intelligence community later declassified snippets of information that touch on the CIA's relationship to that facility. In 2014, for instance, the Director of National Intelligence blessed the public release of a redacted executive summary to a study by the Senate Select Committee on Intelligence ("SSCI") on the CIA's detention and interrogation program in the aftermath of the September 11, 2001 terrorist attacks. The executive summary states that in September 2006, after "14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA." Decl. of Amy Zittritsch ("Zittritsch Decl.") Ex. B at 160. Seizing on this statement, defense lawyer James Connell, who represents Guantanamo detainee Ammar al Baluchi before a U.S. military commission, filed a FOIA request with the CIA seeking "any and all information" relating to the CIA's "operational control . . . over Guantanamo Bay detainees." Decl. of Vanna Blaine, Information Review Officer ("Blaine Decl.") Ex. 1 at 1. After receiving clarification of the request, the agency responded by providing Connell three documents and

withholding one other.  As to other records, the agency issued a "*Glomar*"[1] response, neither confirming nor denying that any responsive information exists.  The agency based its *Glomar* response on FOIA Exemptions 1 and 3, which protect from release, respectively, classified records and records prohibited from disclosure by statute.

Connell challenges the CIA's *Glomar* response.  Specifically, he contends the agency waived its ability to assert the response because it has purportedly declassified and publicly acknowledged the existence of information reflecting its "operational control" over Camp 7, including in the two documents the CIA released to him.  Rejecting Connell's waiver argument, the Court will grant summary judgment for the CIA.

**I.   Background**

Mr. Connell lodged the request at issue with the CIA in May 2017.  Blaine Decl. Ex. 1 at 1.  The request begins:

> **Description of Request:**  In the Report: "Senate Select Committee on Intelligence: Committee Study of the Central Intelligence Agency's Detention and Interrogation Program" reads [sic] on page 160:
>
> > "After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA."  [Footnote 977 – CIA Background Memo for CIA Director Visit to Guantanamo, December [redacted], 2006, entitled Guantanamo Bay High-Value Detainee Detention Facility].  (brackets in original) (emphasis omitted).

It continues:

> I request for [sic] any and all information that relates to such "operational control" of the CIA over Guantanamo Bay detainees including but not limited to the document cited in the footnote 977.

Id.

---

[1] The *Glomar* response got its name from the Glomar Explorer vessel—the focus of Phillippi v. CIA, where a FOIA requester challenged the CIA's refusal to acknowledge the existence of records about the ship.  546 F.2d 1009 (D.C. Cir. 1976).

After acknowledging receipt, the CIA's FOIA office wrote to Connell seeking clarification regarding the scope of the request. Blaine Decl. Exs. 2, 3. It asked Connell to "provide the aspects of operational control that interest you, as well as a specific [] period of time you would like us to search." Id. Ex. 3 at 1. Connell responded that "[t]he specific period of time in which I am interested is 1 September 2006 to 31 January 2007." Id. Ex. 4 at 1. He further explained that "I am seeking to determine what 'operational control' means," and offered the following unexhaustive list of "possible topics:"

(1) Whether CIA "operational control" included only Camp 7 or extended to other facilities such as Echo 2;

(2) What organization had decision-making authority over Camp 7;

(3) Whether CIA "operational control" ended before or after 31 January 2007;

(4) Whether the "operational control" involved CIA personnel, whether employees or contractors;

(5) Any detainee records maintained by the CIA during the period of "operational control," such as Detainee Inmate Management System records or the equivalent;

(6) How other agencies would obtain access to detainees during the period of "operational control,["] such as a Memorandum of Understanding with the Federal Bureau of Investigation or Criminal Investigative Task Force; [and]

(7) How the facilities transitioned from CIA "operational control" to DOD "operational control."

Id.

The CIA replied in September 2020. Blaine Decl. Ex. 6. Treating Connell's clarifications as an amended request covering the period September 1, 2006 to January 31, 2007 and encompassing the seven listed topics, the agency indicated that a "thorough search" had revealed one three-page document, which it released. Id. at 1; Decl. of James G. Connell III ("Connell Decl.") Ex. A. As to other records, the agency issued a *Glomar* response, stating that it could "neither confirm nor deny the existence of records responsive to your request." Blaine

3

Decl. Ex. 6 at 1–2.  The agency explained that "[t]he fact of the existence or nonexistence of such records is itself currently and properly classified and is intelligence sources and methods information protected from disclosure by Section 6 of the CIA Act of 1949, as amended, and Section 102A(i)(l) of the National Security Act of 1947, as amended.  Therefore, your request is denied pursuant to FOIA exemptions (b)(1) and (b)(3)."  Id.

Connell filed an administrative appeal in December 2020 and followed with this lawsuit in March 2021.  Blaine Decl. Ex. 7; see also Compl.  The CIA responded to the appeal in July 2021, indicating that it had found three additional responsive documents, two of which it released in redacted form and the third of which it withheld in its entirety.  Blaine Decl. Ex. 8 at 1.  The two additional documents released by the agency were:  (1) a Department of Defense ("DoD")-CIA Memorandum of Agreement ("MOA") concerning DoD's detention of certain suspected terrorists at Guantanamo; and (2) a proposed itinerary and memo for the then-CIA Director's visit to Guantanamo in December 2006.  Connell Decl. ¶ 11; id. Exs. B, C.  The agency withheld Document C06833121, which it describes as "consist[ing] of classified draft remarks/discussion points addressing a specific aspect of a sensitive Agency intelligence program/operation."  Blaine Decl. ¶ 41.  The agency also repeated its *Glomar* response.  Id. Ex. 8 at 2.

The CIA moved for summary judgment; Connell did not cross move.  See Mot. Summ. J. ("Mot.").  Connell has since indicated that he does not challenge the withholding or redaction of the documents the CIA deemed responsive.  Opp'n Mot. Summ. J. ("Opp'n") at 6 n.4; Pl.'s Status Report (July 29, 2021).  The lone remaining dispute, then, is Connell's objection to the agency's *Glomar* response.

## II. Legal Standards

"FOIA cases typically and appropriately are decided on motions for summary judgment." Eddington v. U.S. Dep't of Just., 581 F. Supp. 3d 218, 225 (D.D.C. 2022). Under FOIA, federal agencies are generally required to "disclose their records upon request," subject to several exemptions. Knight First Amend. Inst. at Columbia Univ. v. CIA, 11 F.4th 810, 813 (D.C. Cir. 2021) (citing 5 U.S.C. § 552(a)(3)(A)). Agencies "may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." Wolf v. CIA, 473 F.3d 370, 374 (D.C. Cir. 2007) (cleaned up). This practice, known as a *Glomar* response, is proper if "the fact of the existence or nonexistence of agency records" itself falls within a FOIA exemption. Id. (cleaned up). In considering a *Glomar* response, courts apply the "general exemption review standards established in non-*Glomar* cases." Knight First Amend. Inst., 11 F.4th at 813 (cleaned up). The burden falls on the agency to justify the "applicability of FOIA exemptions." Mobley v. CIA, 806 F.3d 568, 580 (D.C. Cir. 2015).

An otherwise valid *Glomar* response can be waived if the agency has "officially and publicly acknowledged the records' existence." Leopold v. CIA, 987 F.3d 163, 167 (D.C. Cir. 2021) (citing Am. C.L. Union v. CIA, 710 F.3d 422, 426–27 (D.C. Cir. 2013)). An official acknowledgement must satisfy a three-part test—the information requested (1) "must be as specific as the information previously released;" (2) "must match the information previously disclosed;" and (3) "must already have been made public through an official and documented disclosure." Wolf, 473 F.3d at 378 (quoting Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990)). Plaintiffs relying on this strict test "bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." Schaerr v. U.S.

5

Dep't of Just., 435 F. Supp. 3d 99, 116 (D.D.C. 2020) (quoting Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983)). When applied to *Glomar* responses, the first two prongs of the inquiry merge—"if the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue—the existence of records—and the specific request for that information." Wolf, 473 F.3d at 379 (cleaned up). The prior disclosure must thus "confirm the existence or nonexistence of records responsive to the FOIA request." Knight First Amend. Inst., 11 F.4th at 813 (citing Am. C.L. Union, 710 F.3d at 427). Courts should "accord substantial deference to an agency's *Glomar* response and avoid searching judicial review when the information requested implicates national security, a uniquely executive purview." Eddington, 581 F. Supp. 3d at 225 (cleaned up).

### III. Analysis

The CIA supports its *Glomar* response with a declaration from Information Review Officer Vanna Blaine. See Blaine Decl. ¶ 1. Like the agency's initial response to Connell's FOIA request, Ms. Blaine grounds the *Glomar* response in FOIA Exemptions 1 and 3. Id. ¶¶ 16, 22, 26.

Beginning with Exemption 1, Blaine correctly notes that it protects from disclosure any information that has been properly classified pursuant to Executive Order ("E.O.") 13526, which established the current system for classifying national security information. Blaine Decl. ¶ 27. Blaine further explains that she holds "original classification authority" under E.O. 13526, meaning she has authority to assess the proper classification of CIA information up to the TOP SECRET level. Id. ¶ 3. Exercising that authority, Blaine declares that she "ha[s] determined that the existence or nonexistence of the requested records is a properly classified fact; the records

concern 'intelligence activities' and 'intelligence sources and methods' within the meaning of . . . the Executive Order; the records are owned by and under the control of the U.S. Government; and . . . the disclosure of the existence or nonexistence of [the] requested records reasonably could be expected to result in damage to national security." Id. ¶ 30.  Blaine continues, stating that formally acknowledging the existence or nonexistence of records "reflecting a classified or otherwise publicly unacknowledged connection between the CIA and the topics in Plaintiff's Amended FOIA request would reveal classified intelligence information and jeopardize the clandestine nature of the Agency's intelligence activities." Id. ¶ 34.  Either a confirmation or a denial, Blaine posits, "could be used by terrorist organizations, foreign intelligence services, and other hostile adversaries to undermine CIA intelligence activities and attack the United States and its interests." Id.

Blaine alternatively based the *Glomar* response on FOIA Exemption 3, which shields information that is specifically exempted from disclosure by statute.  Blaine Decl. ¶ 37.  One such statute is the National Security Act, which directs the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure." Id. ¶ 38; 50 U.S.C. § 3024(i)(1).  The CIA relies on the National Security Act to protect its own sources and methods.  Blaine Decl. ¶ 38.  Consistent with her discussion of Exemption 1, Blaine asserts that "acknowledging the existence or nonexistence of records reflecting a classified or otherwise unacknowledged connection to the CIA in this matter would reveal information that concerns intelligence sources and methods, which the National Security Act is designed to protect." Id. ¶ 39.  While the National Security Act does not require the CIA to identify the damage to national security that might result should it confirm or deny the existence of a responsive record, Blaine points to the same potential harms noted with respect to Exemption 1.  Id. ¶ 40.

7

Courts "must accord substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." Am. C.L. Union, 710 F.3d at 427 (cleaned up). An agency's rationale for invoking an exemption—even for *Glomar* responses—"is sufficient if it appears 'logical' or 'plausible.'" Id. (quoting Wolf, 473 F.3d at 374–75).

Connell does not dispute Blaine's authority to assess classification of CIA information. Nor does he contest that E.O. 13526 and the National Security Act are recognized grounds upon which to assert FOIA Exemptions 1 and 3, respectively. Rather, he argues that the CIA has waived its ability to invoke Exemptions 1 and 3 to support its *Glomar* response because the agency has declassified "the intelligence connection between [the] CIA and Guantanamo Bay's Camp VII and [officially acknowledged] the existence of responsive documents about that connection."[2] Opp'n at 5–7. Specifically, Connell claims that "the [DNI] declassified CIA 'operational control' over Camp VII in 2014" and, since then, "CIA and other authorities have—until now—consistently treated both the fact of [the] CIA'[s] connection to Camp VII and the existence of documents providing specifics as unclassified, even if the specifics themselves are classified." Id. at 8. As a result, he argues, further "confirming or denying the existence of

---

[2] While Connell presents declassification as a standalone basis for a *Glomar* response waiver—separate from the public acknowledgement test—he cites no authority supporting that approach and the Court has not independently found any. While an agency can publicly acknowledge the existence of records by declassifying documents discussing that information, waiver still requires satisfying the three criteria of the public acknowledgment test. To the extent that Connell relies on declassification to contend that the CIA's rationale for invoking exemptions 1 and 3 is not "logical" or "plausible," the Court rejects this argument. The Court finds the CIA's description of the "potential harm from further disclosures is both logical and plausible," Competitive Enter. Inst. v. Nat'l Sec. Agency, 78 F. Supp. 3d 45, 60 (D.D.C. 2015), and that the declassified documents referenced do not definitively disclose the CIA's "operational control" over Camp 7. "[T]he fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm to intelligence sources, methods and operations." Fitzgibbon, 911 F.2d at 766 (cleaned up).

8

responsive records will not result in a harm cognizable under Exemption 1 or 3 because the DNI has already declassified the intelligence connection [the] CIA claims to be protecting." Id.

Before tackling Connell's waiver argument and the declassified materials upon which it is based, the Court will first pinpoint the topic of Connell's FOIA request that he claims the agency has publicly acknowledged.  As discussed above, Connell initially sought "any and all information" related to the CIA's purported "operational control . . . over Guantanamo Bay detainees." Blaine Decl. Ex. 1 at 1.  He later clarified that he was interested in materials reflecting "what 'operational control' means," with reference to seven specific topics as examples.  Id. Ex. 4 at 1.  He further refined the request to cover the five-month period from September 1, 2006 through January 31, 2007.  Id.  And he reiterated that he was requesting the document cited at footnote 977 of the redacted SSCI Executive Summary, namely the "CIA Background Memo" for the CIA Director's visit to Guantanamo in December 2006.  Id.  With those refinements, the topic of Connell's FOIA request can fairly be described as records reflecting not only the fact of the CIA's purported "operational control" over Guantanamo detainees from September 2006 through January 2007, but also "what [that] operational control means"—that is, details about the CIA's purported operational control, including the seven questions Connell posed in response to the agency's call for clarification of his original request.  See id.  The topic of Connell's request also includes the specific unclassified documents noted in the request:  the SSCI Executive Summary and the CIA Background Memo cited at footnote 977.  Id.

Turning to Connell's *Glomar*-waiver argument, to support his contention that the CIA's "intelligence connection" to the topics of his FOIA request has been declassified or otherwise

officially acknowledged, Connell points to information contained in several publicly released documents.

He focuses primarily on the passage from the redacted SSCI Executive Summary quoted in his FOIA request, which states: "After the 14 CIA detainees arrived at the U.S. military base at Guantanamo Bay, they were housed in a separate building from other U.S. military detainees and remained under the operational control of the CIA." Opp'n at 12 (citing Zittritsch Decl. Ex. B at 160). The parties spar over whether the DNI's declassification of the quoted sentence in the executive summary is attributable to the CIA for purposes of the public acknowledgement doctrine. Opp'n at 11; Reply at 18–19. But the Court need not decide that question. Instead, assuming *arguendo* that DNI declassification suffices, the Court asks whether the passage matches the topics of Connell's FOIA request. In other words, does it acknowledge that the CIA in fact exercised "operational control" over Camp 7 and "what operational control means" in context? The Court thinks not.

As noted above, the information requested "must be as specific as the information previously released" and "must match the information previously disclosed." Wolf, 473 F.3d at 378 (cleaned up). The quoted sentence from the redacted SSCI Executive Summary does not meet this standard. For starters, it is not an acknowledgement *by the CIA* of its operational control over Camp 7; rather, it reflects the SSCI's characterization of the CIA's relationship to Camp 7, presumably based on its interpretation of the source document cited at footnote 977: the "CIA Background Memo" for the agency director's visit to Guantanamo Bay in September 2006. Accordingly, any CIA acknowledgment flowing from the declassification of the Executive Summary would only extend to the fact that the SSCI read the Background Memo cited at footnote 977 to imply CIA "operational control" over the fourteen detainees. That is not

enough to establish public acknowledgement.  Knight First Amend. Inst., 11 F.4th at 816 ("While information from outside an agency may be viewed as 'possibly erroneous,' confirmation by the agency itself 'would remove any lingering doubts.'" (quoting Frugone v. CIA, 169 F.3d 772, 774–75 (D.C. Cir. 1999))).

The declassified sections of the CIA Background Memo do not acknowledge the CIA's operational control over Camp 7, either.  See Connell Decl. Ex. C.  To the contrary.  The redacted memo states that the CIA "sent fourteen high-value detainees to the high-value detention center at GTMO." Id. at 4.  It then indicates that "[u]pon their arrival . . . all detainees are subject to the same general in-processing utilized by DoD for other detainees arriving at GTMO." Id.  That processing included "a medical exam by the on-site DoD physician, as well as any needed dental and psychiatric care." Id.  The memo continues that "[i]n order for a detainee to be considered for transfer from the CIA program to GTMO, . . . the detainee must no longer be of significant intelligence value" and be subject to trial by a military commission. Id.  Finally, under a section heading titled "End Game[,]" the memo explains that the "CIA desires to maintain custody of any given detainee only so long as that detainee continues to provide significant intelligence." Id.  Thus, if the unclassified portions of the memo suggest anything about "operational control," it is that CIA transferred the fourteen high-value detainees to Guantanamo, and relinquished "custody" over them, because they no longer had "significant intelligence value." Id.  And once the detainees were there, they were subject to customary DoD procedures.  As a result, neither the quoted language from page 160 of the redacted SSCI Executive Summary nor the CIA memo upon which it was based supports Connell's waiver argument.

Connell also points to the following snippet from page 80 of the redacted SSCI's unclassified Executive Summary: "On September 5, 2006, [detainee] bin al Shibh was transferred to U.S. military custody at Guantanamo Bay, Cuba. After his arrival, bin al Shibh was placed on anti-psychotic medications." Opp'n at 13 (citing Zittritsch Decl. Ex. B at 80). Connell contends that the DNI declassified references to two CIA documents supporting these statements. Opp'n at 13. But the passage says nothing about CIA "operational control." Indeed, the CIA Background Memo indicates that psychiatric screening was a standard part of *DoD* intake procedures for all detainees who arrived at Guantanamo.

Next, Connell points to a redacted version of a 2006 MOA between the DoD and the CIA concerning "DoD's detention of certain individuals" at Guantanamo Bay. Connell Decl. Ex. D at 1. As far as the Court can tell, however, none of the unredacted material discusses the CIA's role or activities under the MOA, let alone acknowledges the agency's operational control of Camp 7.

Connell also relies on two facsimiles from the Office of the Director of National Intelligence to a lawyer at the State Department regarding the agenda for an upcoming "[i]nter-agency meeting." Connell Decl. Exs. E, F. An attached agenda—for a discussion of "Interagency Decisions Needed Regarding the 14 High Value Detainees"—includes questions on "[w]hat level of security clearance is required to adequately protect the classified information" about "the CIA program and physical access to the detainees" and "[w]ho should be permitted to have access to the detainees." Id. Ex. E at 1–3. These questions may well encompass some of the specific topics of Connell's FOIA request. But a document that merely reflects the CIA's participation in an interagency meeting on those subjects falls far short of an acknowledgement

by the agency that it had "operational control" of Camp 7 or that documents concerning such "operational control" exist.

Finally, Connell cites excerpts from transcripts of military commission proceedings where defense lawyers, prosecutors, and the First Camp 7 Commander—all of whom are either employed or retained by DoD—referenced the CIA's purported operational control of Camp 7, including the sentence about "operational control" from page 160 of the SSCI Executive Summary.  See Opp'n at 15–18; Reply at 13; see also Connell Decl. Ex. G at 28584–86; Organization Office, Office of Military Commissions, https://www.mc.mil/ABOUTUS/OrganizationOverview.aspx.  Although not entirely clear to the Court, these proceedings appear to concern discovery disputes involving efforts by defense counsel to unearth specifics about the CIA's role at Camp 7.  See Decl. of Alka Pradhan ¶¶ 9–14. Connell claims that the CIA has declassified the transcripts.  Opp'n at 16–18.  But like the executive summary, the transcripts only reflect characterizations of the CIA's relationship to Camp 7 by people outside the agency.  They say nothing about the CIA's position on the matter.

In sum, none of the unclassified information Connell highlights constitutes public acknowledgement by the CIA of its "operational control" of Camp 7 or the ins and outs of "what [such] operational control means."  See Wolf, 473 F.3d at 378 ("An agency's official acknowledgment of information by prior disclosure . . . cannot be based on mere public speculation, no matter how widespread." (cleaned up)).  As a result, none of the materials referenced constitute a public acknowledgement by the CIA of the existence of documents concerning the agency's purported operational control of Camp 7.

The agency therefore has not waived its ability to assert a *Glomar* response to Connell's amended FOIA request. And because the Blaine Declaration "logically" and "plausibly" supports the response under FOIA Exemptions 1 and 3, the Court will uphold it.

A final point. Even if the Court were to assume *arguendo* that the CIA acknowledged its operational control of Camp 7 by declassifying one or more of the documents Connell cites, the agency's *Glomar* response would still be valid. In Wolf v. CIA, the CIA asserted a *Glomar* response with respect to a FOIA request for records related to former Colombian politician Jorge Eliecer Gaitan. 473 F.3d at 372. The requester countered with evidence that a former CIA Director had given Congressional testimony decades earlier that included direct quotations from CIA dispatches referencing Gaitan. Id. at 378–79. The D.C. Circuit found that the testimony amounted to public acknowledgment of the existence of records about Gaitan. Id. It thus held that the agency's *Glomar* response "[did] not suffice regarding the dispatch excerpts that reference Gaitan." Id. at 379. The Circuit went on to find, however, that the "official acknowledgment waiver relate[d] only to the existence or nonexistence of the records about Gaitan disclosed by [the former Director's] testimony." Id. As a result, the requestor "[wa]s entitled to disclosure of *that* information, namely the existence of CIA records about Gaitan that ha[d] been previously disclosed (*but not any others*)." Id. (emphasis added). Applying Wolf here, if the release of the redacted SSCI Executive Summary or any of the other documents that Connell highlights triggered a public acknowledgement waiver, then he would be entitled to an acknowledgement of the existence of those specific documents "but not any others." Id. All of those documents have been produced to Connell or are otherwise publicly available.

Accordingly, the CIA's *Glomar* response was valid and the agency is entitled to summary judgment. A separate order will follow.

CHRISTOPHER R. COOPER  
United States District Judge

Date: March 29, 2023